ORIGINAL

# In the United States Court of Federal Claims

FILED
APR 26 2004
U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** | ) |
| **Plaintiff,** | ) |
| v. | ) Case No. 04- 718C |
| **THE UNITED STATES of AMERICA,** | ) |
| **Defendant.** | ) |

## COMPLAINT

This case involves four long-term, travel management contracts that the United States Department of the Army competitively awarded to CW Government Travel, Inc. ("Carlson") in 2002. Pursuant to the contracts, Carlson has the "exclusive right" to provide "traditional" travel services to the specific Department of Defense ("DoD") bases, facilities and/or activities identified in the contracts. The Carlson Army Contracts also include the exclusive right to provide automated on-line travel booking services. The Carlson Army Contracts provide the Government with the option to have Carlson also provide travel services facilitated by the Defense Travel System ("DTS") Common User Interface ("CUI") or the option to transfer the official travel services requirements from any site when the DoD implements the DTS at each site to perform all official travel services requirements. The DTS is an ongoing attempt by the Government to develop and deploy a computer-based CUI that will provide electronic, end-to-end travel management services. If the DoD eventually implements the DTS, the military will, theoretically, no longer need traditional travel services. DTS CUI-facilitated travel services will replace "traditional" travel services.

The Government intends to remove the requirement to provide traditional travel services to 54 Military Entrance Processing Stations ("MEPS") from Carlson's Army Contracts as evidenced by the fact that it has issued a Solicitation to procure those traditional travel services from other contractors. Thus, the Government apparently interprets Carlson's Army Contracts as allowing the DoD to transfer requirements to provide traditional travel services out of Carlson's Contracts, even though the DTS CUI has not and will not be implemented for those requirements for at least another two years and perhaps much longer. The Government's interpretation is incorrect. Carlson has the exclusive right to provide traditional travel services under its four Army Contracts until the DTS CUI is actually implemented at each site included in those contracts. Thus, Carlson files this Complaint respectfully requesting a declaratory judgment finding that Carlson's Contracts prevent the Government from removing official travel services requirements from any site included in Carlson's Contracts unless, and until, the DTS CUI is actually implemented and capable of providing the majority of the official travel services required at each site, and also requests permanent injunction preventing the Government from acting on its interpretation.

Carlson alleges the following in support of its Complaint for damages, declaratory, and injunctive relief against the United States of America.

**THE PARTIES**

1. Plaintiff, Carlson, is a corporation organized under the laws of the State of Delaware.

2. Defendant is the United States of America.

The cognizant Contracting Officer for the contracts at issue is:

Ms. Jackie Robinson-Burnette
Contracting Officer
Department of the Army
Headquarters Surface Deployment
and Distribution Command
Attn: SDDC/AQ
200 Stovall Street, Room 12S67
Alexandria, Virginia 22332-5000
Telephone: (703) 428-2048
Facsimile: (703) 428-3325

## JURISDICTION

3. The United States Court of Federal Claims has jurisdiction over this action pursuant to The Tucker Act, codified at 28 U.S.C. § 1491 (2000) and the Contract Disputes Act codified at 41 U.S.C. §§ 601-613.

## STATEMENT OF FACTS

### I. CARLSON'S FOUR ARMY CONTRACTS

#### A. The Award Of The Contracts

4. On February 27, 2002, following full and open competition, the Surface Deployment and Distribution Command ("SDDC"), formerly the Military Traffic Management Command ("MTMC") (hereinafter referred to as "SDDC" or "MTMC"), awarded five contracts to Carlson for traditional travel services in five Defense Travel Regions (DTRs).

5. Army DTR-1 is comprised of Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, and Wyoming. The DoD installations, bases, and activities in this region include military MEPS sites.

6. Army DTR-2 is comprised of Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, Puerto Rico, and the Virgin Islands. The DoD installations, bases, and activities in this region include military MEPS sites.



::ODMA\PCDOCS\MC1DOCS1\160712\1

7. Army DTR-4 is comprised of Connecticut, Delaware, Kentucky, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, Virginia, and West Virginia. The DoD installations, bases, and activities in this region include military MEPS sites.

8. Army DTR-5 is comprised of Arkansas, Kansas, Louisiana, Missouri, Nebraska, New Mexico, Oklahoma, and Texas. The DoD installations, bases, and activities in this region include military MEPS sites.

9. The National Capital Region ("NCR") is comprised of the Washington, D.C. Metropolitan Area, including the Pentagon, Fort Belvoir, and Fort Myers. This NCR Contract is not involved in this action because it does not contain any MEPS sites.

10. All of Carlson's Army Contracts require that a minimum of 23% of the total contract be performed by small business subcontractors. Carlson meets or exceeds that small business subcontracting requirement on all the contracts.

11. Carlson's four Army DTR Contracts became effective on October 1, 2002, with a firm base period of 12 months and a series of eight, six-month option periods, for a total contract period of five years, expiring on September 30, 2007.

12. Each contract provided: "The Contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract."

13. Each contract provided that:

> The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract resulting from this solicitation.

14. Each of Carlson's four new Army DTR Contracts also provided: "At a future date a DoD travel services contract(s) will be awarded replacing this contract and all other Service/Agency existing travel service contracts. Once the DoD travel services contract is awarded all DoD sites will transition in accordance with the implementation dates to the DoD travel services contract."

15. At the time the contracts were awarded to Carlson, it was understood by all parties that "DoD implements the Defense Travel System (DTS)" meant the implementation of a fully functional DTS CUI to electronically perform all official travel management services.

16. Carlson's Army DTR and NCR Contracts also provide for the deployment of the DTS CUI to sites within these Contracts and for Carlson to provide travel services using the DTS CUI. To date, the DTS CUI has, or shortly will be, deployed to approximately 30 large military bases, installations, or activities under Carlson's DTR and NCR Contracts, and Carlson is providing a mixture of traditional and DTS CUI-facilitated travel services at those sites.

17. The Government has exercised the first two options of the contracts, extending all four of Carlson's Army DTR Contracts to September 30, 2004.

**B. MEPS Requirements In Carlson's Army DTR Contracts**

18. Carlson's four Army DTR Contracts include the provision of traditional travel services for MEPS.

19. MEPS locations primarily accommodate the travel of military recruits from MEPS stations where they first enter military service to the applicants' basic training camps.

20. MEPS travel is unique among DoD official travel requirements.

21. Providing commercial travel services to MEPS locations involves arranging group bookings, short notice substitutions, last minute cancellations, changes, and ticketing at any time during the year.

22. Commercial Travel Offices ("CTOs") providing travel services to MEPS sites must deal with last minute changes, last minute recruits, and last minute passenger substitutions (e.g., walk-ins, no shows and unqualified applicants).

23. At a MEPS site, the CTO does not have any of the names of the recruits/travelers until the day they show up at the MEPS for induction into military service.

24. Furthermore, the typical MEPS traveler – the recruit – is different because the traveler is usually young, the travel destinations (i.e., basic training sites) are typically the same year in and year out, and the MEPS group travelers are typically required to use special fares and flights that have been negotiated by the Government strictly for recruit travel, rather than using normal General Services Administration ("GSA") city pair airline fares.

25. At least 95% of MEPS travel is group travel.

26. The CTO must also arrange for group ground transportation between the MEPS site and departure airport and between the arrival airport and military base.

**C. Traditional Travel Services Under Carlson's Army Contracts**

27. In the traditional travel management system, the CTO is responsible for significant and time-intensive duties.

28. The requirements under Carlson's Army Contracts exemplify the labor-intensive qualities of providing traditional travel services.

29. CTOs providing traditional travel services must employ trained, skilled individuals. In this regard, Carlson's four Army Contracts require it to employ "capable and

qualified [personnel] in their specialty field in providing government sponsored travel for DoD personnel."

30. CTOs offering traditional travel services must also equip and staff travel office facilities at Government locations, and/or provide centralized reservation centers staffed with travel counselors thoroughly familiar with Government travel regulations and policies.

31. Under Carlson's Army Contracts, it is required to "make confirmed reservations as requested by the traveler or their designee to include issuance of tickets (or other appropriate record of reservation) for scheduled air, bus and rail travel."

32. Further, CTOs providing traditional travel services must be familiar with and use GSA city pair contract fares for all reservations for official travel, unless certain exceptions set forth in Government travel regulations apply.

33. Carlson's Contracts also require it to offer "complete car rental reservation services to include booking commercial car rental reservations to coincide with airline arrival/departure times utilizing the companies with which [SDDC] has negotiated DoD car rental rates." When recommending non-negotiated car rental services, the CTO must advise the traveler whether Collision Damage Waiver ("CDW") coverage is available.

34. In addition, Carlson's Army Contracts require it to "make confirmed reservations, issue tickets (accepting cash, check or credit card as the form of payment) for leisure travel when requested in conjunction with official travel."

35. Carlson's Army Contracts also require it to "make confirmed reservations for commercial and Government lodging. If Government lodging is not available, [Carlson] shall document the passenger name record for nonavailability. In lieu of Government lodging, GSA negotiated volume discount-lodging programs shall be utilized where available."

36. With regard to airline reservations, Carlson must provide advance seat assignments and advance boarding passes.

37. Carlson must also "advise the traveler, at the time of reservation, if any travel arrangements have cancellation or penalty charges, or nonrefundable deposits, including time frames and other conditions."

38. Carlson must also deliver tickets, or records of reservations, to the traveler in advance of travel, to any location the traveler requests.

39. Carlson is responsible for determining whether first class travel is authorized in accordance with DoD travel policy.

40. Carlson must provide a list of discounted fares for travel by groups and arrange group travel.

41. Throughout this process, Carlson must provide travelers with suggested itineraries, including routing, scheduling, and cost information.

42. Carlson must document and provide to the traveler the itinerary reflecting the least costly commercial transportation fares.

43. Carlson is also required to assist the Government in reconciling invoices received from charge card vendors. In this regard, the CTO must develop and provide the Government with a user's manual describing the central billing account reconciliation process.

44. The CTO must produce an electronic file detailing the results of the reconciliation.

45. The CTO must prepare and provide the Government with extensive, periodic management reports on the travel performed.

46. Generally, one of the most time-intensive tasks of a CTO, however, is communicating to the traveler the available travel arrangements consistent with Government travel regulations and Government rates, "should-cost" estimates, and assisting the traveler in making a decision regarding what arrangements to make.

47. In the case of the MEPS, however, the most time-consuming efforts are negotiating directly with air carriers to arrange for group travel of up to 50 or more recruits at special rates and restricted service. Such group travel cannot be booked via the automated Global Distribution Systems ("GDS") used for individuals or small groups (nine or less). CTOs must also arrange for land transportation for these groups of recruits between the airports and military bases. All the MEPS travel services require extensive personal efforts of Travel Counselors.

## II. CARLSON'S REQUESTS FOR A FINAL DECISION

48. On October 8, 2003, Carlson sent a letter to the Army Contracting Officer stating that it had learned that the DoD intended to issue a solicitation set-aside for small business concerns for DTS CUI-facilitated travel services to a number of military sites, including the 54 MEPS locations covered by Carlson's Army Contracts.

49. The letter stated that: "It is [Carlson's] position that so long as the [Army] Contracts are in effect, [Carlson] is the exclusive provider of travel services to the MEPS sites within those geographical regions, and any transfer of that travel service business to another contractor, small business or otherwise, would constitute a breach of [Carlson's Army] Contracts."

50. The letter also stated that, because the travel services required by MEPS could not be booked through the DTS CUI, the Army could not justify the removal of the MEPS locations from Carlson's Army Contracts on the basis that the DTS CUI had been implemented.

51. The letter concluded by reasserting Carlson's interpretation of its contracts, and requested a Contracting Officer's Final Decision pursuant to the Contract Disputes Act.

52. On October 9, 2003, the Army Contracting Agency, Information Technology, E-Commerce and Commercial Contracting Center ("ITEC4"), issued draft Request for Proposals ("RFP") No. W91QUZ-04-R-0003, set–aside for small businesses, which included the 54 MEPS sites discussed in Carlson's October 9, 2003 letter.

53. The Army, through the then-Military Traffic Management Command ("MTMC") (now "SDDC"), responded to Carlson's October 8, 2003 request for a Final Decision with an evasive letter from the Contracting Officer dated October 17, 2003.

54. The letter stated: "At this time, the Military Traffic Management Command has no plans to delete the MEPS travel services requirements from [Carlson's] contracts."

55. The letter continued, however, stating: "I cannot promise that the MEPS requirements never will be removed from these contracts. As you know, the contracts (in Performance Work Statement, paragraph 1.6.7) provide for the transition of travel services in accordance with implementation dates of future DOD travel services contracts."

56. MTMC's letter also stated that the Army disagreed with Carlson's interpretation of the contract because the Army could remove the MEPS requirements via the contract's termination for convenience clause, or by refusing to exercise future options.

57. Finally, the Contracting Officer refused to provide a Final Decision, stating:

> I also cannot provide a Final Decision on this matter pursuant to the Contract Disputes Act. I do not know whether these MEPS requirements ever will be deleted from these contracts or (if so) what the circumstances of such a removal of work may be. The Contract Disputes Act does not contemplate Contracting Officer decisions for hypothetical and speculative decisions.



::ODMA\PCDOCS\MC1DOCS1\160712\1

58. The Contract Disputes Act, 41 U.S.C. § 605(a) states: "All claims by the government against a contractor relating to a contract shall be the subject of a decision by the Contracting Officer."

59. The Federal Acquisition Regulations ("FAR") define a "claim," in part, as a "written demand or written assertion by one of the contracting parties seeking, as a matter of right . . . the interpretation of contract terms, or other relief arising from or relating to the contract . . . ." FAR § 33.201.

60. In a letter dated November 3, 2003, Carlson reasserted its interpretation of the Army DTR Contracts and again requested a Contracting Officer's Final Decision.

61. Carlson's November 3, 2003 letter referenced the draft Army ITEC4 Solicitation, which included the MEPS travel service requirements from Carlson's Army DTR Contracts.

62. The letter stated: "This is a very straightforward request. [Carlson] is entitled to a straightforward answer as to the Army's intention in regard to the MEPS sites currently included in the DTR Contracts. It is requested that you promptly issue a Final Decision pursuant to the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-613) and FAR Subpart 33.2."

63. Carlson's letter stated that if the Contracting Officer again refused to issue a Final Decision, or ITEC4 issued a final Solicitation for the MEPS requirements, Carlson would consider such action to be a Final Decision and would proceed accordingly.

64. In letters to Carlson dated November 17 and 18, 2003, the MTMC Contracting Officer stated that ITEC4 needed workload data from CTOs providing travel management services to DoD locations to support the DTS, which was the sponsor of the ITEC4 Solicitation.

65. The letter did not mention Carlson's November 3, 2003 letter demanding a Contracting Officer's Final Decision.

66. Following receipt of MTMC's letters, Carlson contacted the ITEC4 Contracting Officer, Peggy Butler, about the requested information. Ms. Butler directed Carlson to a DTS website. The DTS website stated that ITEC4 intended to provide the information requested to offerors for preparation of proposals in response to the draft RFP containing the MEPS requirements from Carlson's Army Contracts.

67. In a letter dated December 1, 2003 to the MTMC Contracting Officer, Carlson described how the Government's continued pursuit of contractors to replace Carlson at MEPS locations prior to implementation of the DTS CUI would violate Carlson's Contract.

68. Carlson's letter again explained its interpretation of the Army DTR Contracts and, again, requested a Contracting Officer's Final Decision.

69. In a letter dated December 29, 2003, MTMC's Contracting Officer responded to Carlson's letters dated November 3, 2003 and December 1, 2003.

70. The Contracting Officer's letter stated that: "there is no current intention to delete the MEPS requirements from your travel services contracts with the Army." The letter indicated, however, that the services could be removed from Carlson's Contract following the proposed acquisition set-aside for small businesses by ITEC4 for travel services at MEPS sites. The Contracting Officer further advised that she had no control over the ITEC4 Solicitation.

71. The letter stated: "If the contemplated contract is awarded for those services during the performance of your contracts, DTS PMO will need to coordinate the transition [transfer to other contractors] of the MEPS travel services with the Army."

72. The letter also indicated that the Army could engineer the removal of the MEPS sites from Carlson's Contract and transfer to other contractors through a non-exercise of options.

73. If the Army failed to exercise an option to extend any or all of Carlson's Army DTR Contracts, the Government would have to competitively procure follow-on contractor(s) for all the travel requirements, in addition to the MEPS sites. There is no indication that the Army intends to issue Solicitations to replace all the travel service requirements contained in Carlson's Army DTR Contracts.

74. Despite the Government's rejection of Carlson's interpretation, and acknowledgment of an intent to transfer the MEPS travel requirements from Carlson's Army DTR Contracts to other contractors, the Contracting Officer refused to issue a Final Decision.

75. MTMC's letter stated: "Your letter dated November 3, 2003, indicates that you may consider the lack of an absolute confirmation of your contract interpretation as an adverse Final Decision under the Contract Disputes Act (CDA). However, as stated previously, I do not know whether the Army ever will transfer MEPS services to a DTS contract…".

76. Despite the fact that the Government had issued a proposed RFP covering the services described in Carlson's letter, the Contracting Officer described Carlson's request as "hypothetical" and stated that: "I am unable to answer without speculation as to unknown future events." The Contracting Officer stated: "those decisions can only be made if and when DTS PMO awards a contract for MEPS travel services."

77. By letter dated January 6, 2004, Carlson again requested a Final Decision from the Contracting Officer on the interpretation of the terms of the Army DTR Contracts.

78. Carlson's letter stated: "[Carlson] is entitled, as a matter of right, to your independent determination in regard to all matters relating to these contracts, including an

interpretation of the contract terms. The interpretation of the terms of the above contracts should not depend upon the intent of the DTS PMO, or other Government solicitations."

79. Carlson's letter also stated:

> **It is requested that you confirm, without equivocation, that so long as the above-cited contracts are in effect, and [Carlson] is satisfactorily performing, none of the MEPS travel requirements currently included in these contracts may be transferred to another contractor.** The exclusivity provisions of these contracts are quite clear and unambiguous. If you will not confirm the exclusivity terms of these contracts, then the failure to agree with [Carlson's] interpretation will be taken as an adverse final decision. If, pending a response from you, ITEC4 issues Solicitation W91QUZ-04-R-007, and it covers the MEPS currently included in [Carlson's] contracts, that will be taken as an adverse decision under the Contract Disputes Act of 1978 and [Carlson] shall proceed accordingly.

(Emphasis as in original).

80. On February 13, 2004, the Army Contracting Agency – ITEC4 – issued Solicitation No. W91QUZ-04-R-0007 seeking travel management services for 67 MEPS sites, including 54 MEPS sites in Carlson's Army DTR Contracts.

81. On March 1, 2004, the SDDC Contracting Officer responded to Carlson's January 6, 2004 request for a Contracting Officer's Final Decision. The Contracting Officer again refused to provide a Final Decision. The Contracting Officer stated: "I do not know whether we will ever reach a point during the performance of your contracts that the DTS PMO will request a transfer of MEPS services."

82. The existence of Solicitation No. W91QUZ-04-R-0007, and the ongoing efforts by the Army Contracting Agency, ITEC4, to secure other contractors to perform the travel services currently being provided to the MEPS sites by Carlson, pursuant to the Army DTR

Contracts, is a clear repudiation of the exclusivity provisions in Carlson's Contracts. Such conduct by the Government must be deemed to be a constructive adverse Final Decision.

## III. The DoD's New Solicitation For MEPS Travel Services

83. The February 13, 2004 Solicitation No. W91QUZ-04-R-0007 (the "MEPS Solicitation") released by the Army Contracting Agency, ITEC4 is set-aside for small businesses. Carlson is not a small business concern and is thus precluded from competing under this MEPS Solicitation.

84. The MEPS Solicitation originally purported to seek proposals to provide both DTS CUI-facilitated travel services and traditional travel services for MEPS locations.

85. The 67 MEPS locations included in the ITEC4 Solicitation are divided into six groups for separate contract awards. The 54 MEPS sites currently included in Carlson's Army DTR Contracts are included in five of the six groups.

86. On April 16, 2004, ITEC4 released Amendment 4 to the MEPS Solicitation. The Amendment made significant changes to the Solicitation.

87. In conjunction with Amendment 4 to the MEPS Solicitation, ITEC4 issued a "Conform" document implementing the changes made to the original Solicitation by the first four Amendments into one document.

88. Pursuant to Amendment 4, proposals in response to the MEPS Solicitation are due on May 14, 2004.

89. Performance is scheduled to begin on April 1, 2005 at each MEPS site with the contractor to provide only traditional travel services.

90. There is no indication that the Army intends not to exercise the options to extend Carlson's Army DTR Contracts beyond April 1, 2005.

**A. DTS CUI-Facilitated Travel Services In The MEPS Solicitation**

91. The MEPS Solicitation originally required offers to provide only traditional travel services when the contracts commenced on April 1, 2005. The MEPS Solicitation indicated that sometime after October 1, 2005 (Fiscal Year 2006), the Government may start to deploy the automated DTS CUI system to some MEPS sites. Thereafter, the contractor would be required to provide a mixture of traditional and DTS CUI-facilitated travel services.

92. After deployment of the DTS CUI system to a MEPS site, the contractor would be required to provide a combination of traditional travel services and DTS CUI-facilitated travel services for the MEPS locations. Offerors were required to provide separate and distinct pricing for traditional travel services and DTS CUI-facilitated travel services.

93. The initial MEPS Solicitation indicated that DTS CUI-facilitated travel services would not represent a majority of MEPS travel services until FY 2007. The evaluation of offers and award decision assumed traditional travel would represent the majority of services for the first two contract years.

94. Currently, Carlson's provides a mixture of traditional travel services and DTS CUI-facilitated travel services to a number of military bases under its Army DTR Contracts. However, due to technical and mission requirements unique to MEPS travel requirements, there has been no deployment of the DTS CUI to any of the MEPS sites.

95. The DTS CUI is supposed to provide travelers with a seamless, paperless, integrated process that would allow travelers and commanders or supervisors to perform all necessary functions by computer.

96. Using a fully operational DTS CUI, a CTO would rarely come in contact with a traveler or supervisor. All the necessary information to arrange travel, secure authorizations,

make reservations, purchase tickets, perform reconciliation, and generate the required management reports is supposed to be provided by the DTS CUI via computer.

97. Most of the CTO's tasks would be imbedded in the DTS CUI.

98. According to the MEPS Solicitation:

> DTS takes advantage of state-of-the-art technologies and automates the entire travel process. The DTS is an end to end system, which includes items such as, application of simplified rules and entitlements, standardized DoD business processes, E-commerce of DoD's official travel process, automated management information system (MIS) archive, and a seamless, paperless travel process. This process begins by the traveler inputting data into DTS to initiate a travel request. This data is transferred to the Contractor via a web portal, and will arrive in the Contractor's Global Distribution System (GDS) as a pre-built passenger name record (PNR).

99. The MEPS Solicitation also stated that:

> DoD studies indicate that the use of the DTS will help reduce costs in the administration of official DoD travel. Additionally, it is envisioned that overall commercial travel office (CTO) costs for providing official travel management services will be reduced as a result of utilizing the DTS. The Government anticipates that efficiencies will arise from reduced telephone interaction with Government personnel, and less time required by CTOs to make arrangements.

100. Thus, rather than speak directly with a CTO representative to make travel arrangements, a traveler would use the CUI to view the different travel options (e.g., airline schedules and rates) and would select those options via computer.

101. Essentially, the CTO would only receive the traveler's final itinerary or completed PNR via computer and purchase tickets without need for direct communication with the traveler, or to process paper travel orders.

102. The CTO would also use the computer-generated PNR to perform quality control (e.g., ensure the trip and fares complied with Government travel regulations).

103. Use of the CUI is intended to significantly reduce the need for CTO staffing and eliminate the need for most of the costly on-site CTO at military bases and facilities.

104. Essentially, the DoD commercial travel management needs for all the bases and facilities within a multi-state region could be serviced from centralized CTO staffed with a few computer operators and travel counselors.

105. Thus, the CUI was intended to reduce the time, effort, and cost of the CTO's services, as well as substantially reduce the Government's internal administrative burden and costs.

**B. Traditional Travel Services In The MEPS Solicitation**

106. At present, due to technical issues, coupled with the unique travel requirements of the MEPS, the DTS CUI cannot be used to facilitate MEPS travel.

107. It is not now known when, or if, a significant percentage of MEPS travel could be facilitated by the DTS CUI due to the extent of technical difficulties and contrary commercial practices by the air carriers.

108. Therefore, the MEPS Solicitation requires contractors to provide only traditional travel services to the MEPS locations, until the DTS CUI is deployed.

109. In this regard, the MEPS Solicitation states:

> Automated DTS travel services will be implemented at designated Government locations over the course of the performance period of this contract on a phased basis by location and/or organizations at a location. The Contractor will provide traditional travel management services to support each location in its awarded Travel Area until such time as travel services facilitated by the DTS web portal shall be provided.

110. The DTS CUI will not be ready to facilitate MEPS travel, however, until after April 2006, at the earliest. Even then, it probably will not be able to facilitate travel of groups

exceeding nine recruits. It is also unlikely to be able to facilitate the routine ground transportation required by the groups of recruits.

111. The Solicitation does not require offerors to offer prices for performing DTS CUI facilitated travel during any portion of the five-year contract.

112. Rather, the Solicitation states that the Government intends to negotiate transaction fees for DTS CUI-facilitated travel services in the second year of performance, e.g., after April 1, 2006, for use subsequently if and when the DTS CUI is deployed to a MEPS site.

113. Further, the MEPS Solicitation also indicates that the Government will not deploy the DTS CUI to any of the MEPS locations prior to negotiating pricing sometime after April 1, 2006.

114. Finally, the Solicitation estimates for evaluation and contract award purposes that tickets will only be issued via traditional travel services through FY 09.

115. That the DTS CUI cannot facilitate MEPS travel is not surprising, due to the unique requirements of MEPS travel and technical characteristics or limitations of the DTS CUI.

116. Ninety-five percent (95%) of all MEPS travel is group travel of up to 50 or more recruits. Currently, the DTS CUI cannot perform the travel functions required for group travel.

117. The DTS CUI operates via commercial Global Distribution Systems (also known as Central Reservation Systems) to book travel and purchase tickets from air carriers.

118. The air carriers, however, will not permit the use of the Global Distribution Systems to electronically book groups larger than nine travelers.

119. Further, airlines will not allow CTOs to book travelers through a Global Distribution System, as required for booking through the DTS CUI, without the names of the travelers.

120. Because CTOs do not have the names of the travelers until the recruits show up, on the day of travel, they cannot book MEPS travel through the Global Distribution System.

121. Even when they have the names of the travelers, the air carriers will not accept reservations or ticket purchases via the Global Distribution System for groups larger than nine.

122. Therefore, the CTO must currently provide 100% of the MEPS travel requirements via traditional travel services and cannot use the DTS CUI.

123. There is no timetable for when, if ever, the DTS CUI will be capable of performing all the required functions necessary for MEPS group travel arrangements.

124. In the Summer of 2003, the General Accounting Office (the "GAO") heard testimony from DTS PMO staff regarding the DTS CUI, and the provision of travel services to MEPS locations, in connection with a similar solicitation previously issued by the Army Contracting Agency, ITEC4.

125. The testimony and evidence submitted during that protest was filed under a protective order.

126. Carlson has previously requested the release of that information to the Court of Federal Claims for use in another matter. The Army objected to the request. The GAO indicated that it would release the documents if ordered to by the Court.

127. The GAO's public decision, however, stated that: "With regard to the MEPS locations, the record does not reasonably reflect when, whether or to what extent the DTS will be used in view of the different nature of the travel at those locations." AirTrak Travel, et al., B-292101, June 30, 2003, 2003 CPD ¶ 117, at 23.

128. The GAO continued:

> [T]he solicitation did not disclose when the DTS will be fully deployed for use by the CTOs and the agency has advised offerors

> that 95 percent of travel at the MEPS would constitute group travel. See Tr., June 6, 2003, at 91-92. From the testimony of the agency officials, it was not clear whether the DTS can be utilized to book group travel at the MEPS because the DTS is currently configured to operate through the GDS, and the protesters have maintained that the GDS, which is controlled by the airlines, does not permit booking groups of 10 or more through the GDS, particularly where the names are unavailable; as a result, such arrangements typically are done through traditional means. See Tr., June 6, 2003, at 91-93. Agency officials gave varying testimony on whether the DTS would accomplish MEPS travel, only definitively representing that the DTS will automate some aspects of the DoD travel process at the MEPS, such as reconciliation of accounts. While the agency expresses optimism that the DTS will eventually be fully utilized for the MEPS locations, it has set no dates for the deployment and admits that there are obstacles to achieving this goal.

Id.

129. The Government has acknowledged the fact that the DTS CUI will not be deployed until deep into performance of the contracts awarded pursuant to the MEPS Solicitation.

130. Moreover, historical experience under the DTS CUI development contract, which commenced in 1998, makes it reasonably certain there will be unanticipated problems if or when the DTS CUI attempts to facilitate some MEPS travel requirements.

131. It is reasonably certain that contractors receiving awards under the MEPS Solicitation will be performing traditional travel services for the vast majority of the travel requirements during at least the first three years of the contracts.

132. It is reasonably certain that for the first two or three years of the contracts awarded under the MEPS Solicitation, the contractors will be duplicating the traditional travel services currently being provided by Carlson pursuant to the Army DTR Contracts.



::ODMA\PCDOCS\MC1DOCS1\160712\1

133. The fact that the MEPS Solicitation does not even require proposed DTS transaction prices, and only the traditional travel service pricing will be used in the evaluation and award decision, is conclusive evidence that the MEPS Solicitation is acquiring services that duplicate the services that Carlson won the exclusive right to provide under competitively awarded contracts.

134. It is reasonably certain that even if the DTS CUI is ultimately deployed to perform some portion of the MEPS travel requirements, that scenario will also duplicate the current contract performance under Carlson's Army DTR Contracts in which the DTS CUI is being used for a relatively small percentage of the total travel requirements.

## COUNT I

**(Request for Preliminary/Permanent Injunction and Declaratory Judgment Pursuant to 28 U.S.C. 1491(a)(2))**

135. Carlson incorporates each of the allegations in paragraphs 1 through 134 as if fully set forth herein.

136. The United States Code, 28 U.S.C. § 1491(a)(2), grants the Court of Federal Claims, in any case within its jurisdiction, "the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." In addition to the jurisdiction to render judgment upon any claim founded upon an express or implied contract under 28 U.S.C. § 1491(a)(1), the Court of Federal Claims shall also have jurisdiction to "render judgment upon any [Contract Disputes Act] claim . . . including . . . nonmonetary disputes on which a decision of the Contracting Officer has been issued . . . ." 28 U.S.C. 1491(a)(2).

137. Carlson is the exclusive provider of travel services for the locations covered by its Army DTR Contracts and the Government cannot transfer the requirements from the contracts to

another contractor so long as Carlson's Army DTR Contracts are in effect and Carlson is adequately performing.

138. Even if the Government has the contractual right to transfer requirements from Carlson's Army DTR Contracts to another contractor to perform DTS CUI-facilitated travel services, such transfers may not be implemented unless, and until, the DTS CUI is deployed and capable of performing a majority (or at least a significant percentage) of the travel requirements at the specific location being transferred.

139. The Government, however, has acted in direct contravention to the terms of the contract by issuing the MEPS Solicitation, including the traditional travel services Carlson is the exclusive provider of, even though the DTS CUI is not deployed or capable of performing such travel requirements prior to late 2006 at the earliest. Thus, the Government has indicated its contrary interpretation of the terms of Carlson's Army DTR Contracts.

140. The Army's obvious interpretation of Carlson's contractual rights to permit the transfer of requirements for essentially duplicate travel services to other contractors is incorrect and a breach of Carlson's Army DTR Contracts, as demonstrated by the plain language of the contracts.

141. Moreover, any partial or full termination for convenience of requirements from Carlson's Army DTR Contracts, or refusal to exercise an option to facilitate transfer of the requirements, in this situation, would be in bad faith. Applicable law and regulation prohibits the Government from transferring work awarded to Carlson under competitive procurements and on exclusive basis to another contract to provide essentially the same services.

142. Transferring the requirement to provide travel services to the MEPS sites contained in Carlson's Army DTR Contracts constitutes a material breach of Carlson's

Contracts, and would result in loss of significant personnel resources, key personnel, substantial disruption of remaining operations, and other substantial damages that may not be adequately compensated by monetary damages.

143. Carlson has submitted several claims to the Contracting Officer, in letters dated October 8, 2003, November 3, 2003, December 1, 2003, and January 6, 2004, pursuant to the Contract Disputes Act and the FAR requesting an interpretation of the terms of the contracts.

144. The Contracting Officer has purportedly refused to issue a Final Decision, while at the same time, disagreeing with Carlson's interpretation of contractual terms in each of its claims.

145. Carlson repeatedly requested a Contracting Officer's Final Decision pursuant to the Contract Disputes Act.

146. The Government has taken conclusive action evidencing an intent to transfer the MEPS travel requirements from Carlson's Army DTR Contracts to other contractors in direct contravention of Carlson's interpretation of contract terms, rights, and obligations.

147. Pursuant to the Contracts Disputes Act, the Government's refusal to provide a Final Decision and issuance of the MEPS Solicitation may be deemed a denial of Carlson's claims.

148. Carlson's allegations are well supported in law and fact; Carlson is likely to succeed on the merits of its appeal and request for declaratory judgment on contractual rights and obligations.

149. Carlson will be irreparably harmed by the transfer of the requirements to provide travel services to the 54 MEPS locations in Carlson's four Army DTR Contracts at any time during the performance period of Carlson's Army DTR Contracts, including option periods. The

public interest will be best served by the millions of dollars in savings to be realized by having Carlson continue to provide travel services to the MEPS locations, and other sites in these contracts, unless and until all such travel services may be efficiently performed by a fully functional, operational and deployed CUI.

150. Small business concerns are preparing to submit proposals on May 14, 2004, in response to the MEPS Solicitation, negotiate contract awards, and prepare to commence providing traditional travel services to 67 MEPS sites on April 1, 2005. Those small business concerns will be harmed if ITEC4 is allowed to proceed with the pending procurement and award contracts that cannot be performed without breaching Carlson's Army DTR Contracts.

151. A declaratory judgment by this Court interpreting Carlson's exclusive rights under the Army DTR Contracts will be in the best interest of Carlson, the Government, and small business concerns responding to the MEPS Solicitation.

## PRAYER FOR RELIEF

**WHEREFORE,** Carlson hereby requests this Court to find that the Government has improperly interpreted Carlson's Contracts to permit the transfer of requirements to provide travel services for MEPS locations, notwithstanding the fact that the travel services to be provided by the other contractors are essentially duplicative of the services provided under Carlson's Army DTR Contracts, and the DTS CUI will not have been deployed and capable of performing the MEPS travel requirements. As a result of the Army's unlawful conduct, Carlson is rightfully entitled to:

A) A declaratory judgment finding that Carlson is the exclusive provider of travel services for all the MEPS sites identified in Carlson's competitively-awarded Army DTR Contracts, so long as those Contracts are in effect;

B) Alternatively, a declaratory judgment finding that Carlson is the exclusive provider of travel services for all the MEPS sites identified in Carlson's competitively-awarded Army DTR Contracts, unless and until the DTS CUI is operationally deployed to and capable of performing the majority of travel requirements at each MEPS site;

C) A preliminary and permanent injunction ordering the Army not to transfer the requirement to provide travel services for MEPS locations under any of Carlson's Army DTR Contracts, so long as those Contracts are in effect, unless and until a DTS CUI is operationally deployed and able to provide the majority of required travel services to the Army at each of those sites;

D) All of its damages and costs;

E) All costs and attorneys' fees incurred in pursuing this action; and

F) Such other relief as the Court may deem just and proper.

Respectfully submitted,

Lars E. Anderson
Michael W. Robinson
Benjamin A. Winter
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)
*Counsel to CW Government Travel, Inc.*

Dated: April 23, 2004

B) Alternatively, a declaratory judgment finding that Carlson is the exclusive provider of travel services for all the MEPS sites identified in Carlson's competitively-awarded Army DTR Contracts, unless and until the DTS CUI is operationally deployed to and capable of performing the majority of travel requirements at each MEPS site;

C) A preliminary and permanent injunction ordering the Army not to transfer the requirement to provide travel services for MEPS locations under any of Carlson's Army DTR Contracts, so long as those Contracts are in effect, unless and until a DTS CUI is operationally deployed and able to provide the majority of required travel services to the Army at each of those sites;

D) All of its damages and costs;

E) All costs and attorneys' fees incurred in pursuing this action; and

F) Such other relief as the Court may deem just and proper.

Respectfully submitted,

Lars E. Anderson
Michael W. Robinson
Benjamin A. Winter
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)
*Counsel to CW Government Travel, Inc.*

Dated: April 26, 2004