IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CW GOVERNMENT TRAVEL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-718C |
| v. | ) | (Judge Hewitt) |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Pursuant to Rules 12(b)(1) and(6), and Rule 56(b) of the Rules of the United States Court of Federal Claims, defendant respectfully requests that the Court dismiss plaintiff's complaint for lack of jurisdiction and failure to state a claim upon which relief can be granted. In the alternative, defendant requests that the Court grant summary judgment in its favor and enter an order dismissing plaintiff's complaint because there are no genuine issues as to any material fact and the United States is entitled to judgment as a matter of law. In support of this motion, defendant relies upon the pleadings, the parties' proposed findings of uncontroverted fact, the attached appendix, declarations, and the following memorandum of law.

QUESTIONS PRESENTED

1. Whether this Court possesses jurisdiction to entertain plaintiff's complaint where plaintiff did not first file a claim, within the meaning of the Contract Disputes Act, with its contracting officer.

2. Whether this Court possesses jurisdiction to entertain plaintiff's complaint where the contracting officer did not issue a final decision.

3. Whether this Court possesses jurisdiction to entertain plaintiff's complaint where it requests relief that is not ripe for adjudication.

4. Whether, if this Court does possess jurisdiction to entertain plaintiff's complaint, the Government is nonetheless entitled to summary judgment because plaintiff is not legally entitled to the declarations it seeks from this Court.

DEFENDANT'S BRIEF

Nature Of The Case

Plaintiff, CW Government Travel, Inc. ("CW"), requests a declaratory judgment from this Court. Specifically, CW seeks a declaration that it is the "exclusive provider of travel services" for certain Military Entrance Processing Stations ("MEPS") at military installations across the country. CW alternatively seeks a declaration from this Court that it is the "exclusive provider of travel services" for the MEPS until a "Common User Interface" is activated for the Defense Travel System.[1] Pl. Compl. Prayer for Relief, pp. 25-26. In addition, CW asks this Court to enter an injunction barring the Government from transferring any requirements for MEPS travel service to any other contractor until the Defense Travel System is ready for use. Id. CW purports to have filed several claims with its contracting officer, pursuant to the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, seeking an interpretation of certain contract terms. Although the contracting officer responded to CW's letters, she refused to issue a "final decision" pursuant to the CDA because she did not believe that CW had presented her with a valid claim.

---

[1] In 1998, the Department of Defense, through the Defense Travel System Program Management Office ("DTS PMO"), entered into a contract to develop a common-user interface for DTS facilitated travel. Northrop Grumman has assumed obligations for contract performance.

CW considered the contracting officer's refusal to issue a final decision of its purported claims a deemed denial. This suit followed.

Statement of Facts

CW currently furnishes a broad range of travel services to the Army in five Defense Travel Regions ("DTRs") in accordance with contracts awarded in 2002 by the Military Surface Deployment and Distribution Command.[2] Four of the regions include requirements for travel services at a total of 54 MEPS locations. The basic terms of these contracts are identical; the location of requirements and prices are different. All of the travel service contracts are requirements contracts and contain the following clauses in Section 1.7 of the Performance Work Statement (PWS):

> **1.7.1** The contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract.
>
> **1.7.2** No person, private organization, or commercial travel service, including competing travel agencies, direct suppliers, or travel software vendors will be permitted direct access to areas under DoD control to advertise, sell, provide or promote official travel services to those sites, unless the Contractor has first declined to provide the particular service of the Contractor's levels of service are determined by the Contracting Officer to be unresponsive and/or unsatisfactory.

[2] The Military Surface Deployment and Distribution Command originally announced award of these contracts on February 27, 2002. Following protests by the two unsuccessful offerors, the Command took corrective action by permitting all three offerors to submit revised narratives describing the offerors' small and small disadvantaged business participation plans. After reviewing the plans, a new award determination was made on May 9, 2002. However, it apparently did not cancel the original award. The unsuccessful offerors filed additional protests, which were denied. Omega World Travel, Inc.; SatoTravel, Inc., B-288861.5 *et al.*, August 21, 2002, 2002 CPD ¶ 149; Omega World Travel, Inc. v. United States, 54 Fed. Cl. 570 (2002). CW and the Government signed the contracts on October 8, 2002.

App. 4-5.[3]

The contracts contained a base term of one year (October 1, 2002 through September 30, 2003), and eight option periods of six months each, for a maximum term of five years ending on September 30, 2007. To date, all options have been exercised, currently extending performance to September 30, 2004. The contracts include the standard "Option to Extend the Term of the Contract" clause, FAR § 52.217-9, that permits, but does not require, the Government to exercise options. The contracts also incorporate, by reference, the standard contract clause for commercial items (FAR 52.212-4). Paragraph (l) of that clause contains a provision allowing termination of the contract for the Government's convenience.

Several special clauses of the PWS were included to facilitate a smooth transition of requirements between Army and Defense Travel System ("DTS") requirements. These included the following:

> **1.11** Due to projected base closures and realignments, the Government cannot forecast how the revenue for official travel will be affected. As sites(s) are identified for addition or deletion, the Contracting Officer will issue a modification to the contract. A 60-day written notice will be provided to the contractor. In addition, Offerors are hereby notified that upon implementation of the Defense Travel Region 6 (DTR 6) contract the following locations (Ft Campbell, KY, Missouri; and Nebraska) will be deleted from the respective regions and incorporated into the DTR 6 contract.
>
> **1.1.1.2** The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel

[3] "App." refers to the appendix filed with this brief.

> services under the new system, some or all options may not be exercised under the contract resulting from this solicitation.
>
> **1.6.7** At a future date a DOD travel services contract(s) will be awarded replacing this contract and all other Service/Agency existing travel service contracts. Once the DOD travel services contract is awarded all DOD sites will transition in accordance with the implementation dates to the DOD travel services contract.
>
> **1.6.8** At any time after the base period of this contract, with a 90-day notice from the Contracting Officer to the Contractor, the Government may identify any/or all workload included in this contract to be deleted.

App. 1-4.

In an October 8, 2003 letter addressed to Jackie Robinson-Burnette, the administrative contracting officer of its Army travel services contracts, CW first raised the question of a possible transfer of MEPS travel requirements to the DTS.[4] The letter referenced the previous DTS solicitation for MEPS requirements that had been cancelled following a protest. CW maintained, "it is our understanding that the Defense Travel System Program Management Office ("DTS PMO") and ITEC4[5] have publicly announced their intention to reissue such a small business set-aside." The letter referenced its contracts' "exclusivity clauses," PWS ¶ ¶ 1.7.1 and 1.7.2, and asserted CW's belief that it was the exclusive provider of MEPS travel service during its contracts' terms. App. 6-7.

---

[4] Erma Spell, CW's President, signed the letters dated October 8, 2003, November 3, 2003 and January 6, 2004. R. Craig Thompson, Vice President of Government Markets for CW Wagonlit Travel, signed the letter dated December 1, 2003.

[5] ITEC4 is the acronym for the Army's Information Technology Electronic Commerce and Commercial Contracting Center.

CW argued that PWS ¶ 1.1.1.2, referenced above, did not grant the Government any right to remove requirements from its contracts. CW then requested that the contracting officer confirm that CW would provide all MEPS travel requirements throughout the entire contract period - including all options - and that no requirements would be transferred to another contractor. The letter sought a contracting officer's final decision if she did not agree with CW's interpretation. App. 6-7.

In a letter dated October 17, 2003, the contracting officer responded that the Military Traffic Management Command had no plans to remove the MEPS requirements from CW's contracts, but that she could offer no guarantee that these requirements would never be removed. Ms. Robinson-Burnette noted that there were several clauses in the contract which permitted the Government to remove requirements. Ms. Robinson-Burnette also stated that she would not provide a final decision because, "[t]he Contract Disputes Act does not contemplate contracting officer decisions for hypothetical and speculative situations." App. 8.

In a response dated November 3, 2003, CW characterized Ms. Robinson-Burnette's response as “clearly evasive.” CW said it did not ask for a guarantee that all options of the contracts would be extended. However, the letter opined that any action to partially terminate the contract for the Government's convenience would constitute a material breach of its contract. CW then again requested a final decision. App. 9-10.

The Army did not respond to the November 3, 2003 letter. However, in a letter dated November 18, 2003, the contracting officer requested workload data from CW regarding MEPS locations. In a December 1, 2003 letter to the contracting officer CW referred to these workload

requests. CW alleged that the workload request indicated the Government's intention to use other contractors to perform MEPS travel requirements. CW again asked for a final decision. App. 11-12. The contracting officer responded on December 29, 2003. This second response carefully expressed the Army's reason for not issuing a final decision. Ms. Robinson-Burnette reiterated that there was no intention to delete MEPS requirements from CW's contracts. She noted that, although the DTS PMO issued a small-business set aside draft solicitation for travel services at certain MEPS sites, no deletions of CW's requirements had been issued. She also again asserted that CW's contracts contemplated a transfer of some requirements. Ms. Robinson-Burnette concluded that she did not consider her letter to be a final decision. She wrote: "In my opinion, there is no current dispute over the contract terms that govern your ongoing performance under these travel services contracts." App. 13-14.

In its fourth letter, dated January 6, 2004, CW argued that it was entitled to a final decision upon this matter. For the first time, CW referenced its right under procurement regulations for an interpretation of contract terms. CW demanded:

> **It is requested that you confirm, without equivocation, that so long as the above-cited contracts are in effect, and CWGT is satisfactorily performing, none of the MEPS travel requirements currently included in these contracts may be transferred to another contractor.** The exclusivity provisions of these contracts are quite clear and unambiguous. If you will not confirm the exclusivity terms of these contracts, then the failure to agree with CWGT's interpretation will be taken as an adverse final decision.

(Emphasis in original; footnote omitted). App. 15-17.

The contracting officer responded to this fourth and final CW letter on March 1, 2004. In her letter, the contracting officer noted that CW's exclusivity clauses prohibited the Government

from obtaining "like services from another contractor while the services," were part of CW's contract. She continued: "However, the exclusivity clauses do not absolutely prohibit a transfer of services. The subject contracts allow for the non-exercise of options and a termination of services for the convenience of the government. " Ms. Robinson-Burnette refused to provide a final decision, and concluded that, in her opinion, there was no current dispute that affected CW's performance. App. 18-19. CW filed its complaint in this Court on April 26, 2004.

## ARGUMENT

### I. This Court Does Not Possess Jurisdiction To Entertain CW's Complaint

CW claims that this Court's jurisdiction is predicated upon the Contract Disputes Act, 41 U.S.C. § 601, et seq. ("CDA") because it purported to submit "claims" within the meaning of the CDA to its contracting officer and received denials of those claims. However, an examination of the alleged claims reveals that they were not claims within the meaning of the CDA. Accordingly, as we discuss below, CW's failure to file a proper claim leaves this Court without the jurisdiction to consider CW's complaint.

#### A. CW Did Not Submit A Valid Claim To Its Contracting Officer

CW asserts the Court possesses jurisdiction to entertain this action pursuant to the Tucker Act, 28 U.S.C. § 1491, and the CDA. Complaint ¶ 3. This Court's jurisdiction under the CDA is predicated upon the fulfillment of two fundamental requirements: the contractor's submission of a valid written claim to its contracting officer, 41 U.S.C. § 605(a), and the agency's issuance of a final decision upon that claim. 41 U.S.C. § 609(a)(3). See Vanalco, Inc. v. United States, 48 Fed. Cl. 68 (2000). The CDA does not delineate the requirements of a claim, but its implementing regulations, contained in the Federal Acquisition Regulations ( "FAR") do. The

regulations provide, in pertinent part: "Claim means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101 (2003).

CW contends that it filed a valid claim through its four letters to the contracting officer, by requesting an" interpretation of contract terms." The first three CW letters, however, do not clearly and unequivocally seek an interpretation of contract terms. The first CW letter asked that the contracting officer "confirm that the travel requirements for all MEPS sites indicated in the four DTR Contracts above will continue to be performed by CWGT throughout the total contract period, including all options that are exercised by the Government." App. 6-7. The second CW letter repeated the same request in identical language. App. 9-10. The third CW letter asked that the contracting officer "respond to CWGT's outstanding requests for a Contracting Officer's final decision on this subject without further delay." App. 11-12. The content of the letter indicated that CW was referring to its demand that "CW will be the exclusive provider of all official travel services to all sites covered by the Army contracts, including the MEPS." These letters clearly demanded an expression of the agency's <u>intent</u> rather than an interpretation of contract terms.

In the fourth letter, CW specifically stated that it was "entitled to a non-evasive final decision." CW reprinted paragraphs 1.7.1 and 1.7.2 of the PWS, and asserted its own interpretation of these clauses. App. 15-17. In this fourth letter, CW plainly submitted a demand couched in terms of requesting an interpretation of contract terms. Accordingly, this fourth letter represents CW's best case that it submitted a "claim" to the Government.

As requested, the contracting officer did provide an interpretation of the exclusivity clauses. However, to the extent that CW was asking for more than an interpretation of contract terms, i.e., to "confirm that the travel requirements for all MEPS sites indicated in the four DTR Contracts above will continue to be performed by CWGT throughout the total contract period, including all options that are exercised by the Government," Ms. Robinson-Burnette's interpretation was, necessarily, qualified.

Although, pursuant to the CDA and its implementing regulations, a contractor is entitled to an interpretation of contract clauses, it is obvious from its letters that CW was not asking for a strict contract interpretation of the exclusivity clauses. In its fourth letter, dated January 6, 2004, CW specifically asked: "**It is requested that you confirm, without equivocation, that so long as the above-cited contracts are in effect, and CWGT is satisfactorily performing, none of the MEPS travel requirements currently included in these contracts may be transferred to another contractor.**" App. 17. (Emphasis in original.)

In this passage, it is clear that CW was not asking for an "interpretation" of the contract terms, but rather, for a guarantee of how the Government would act if, *in the future*, the DTS PMO requested a transfer of MEPS sites to its proposed small business set-aside contracts. This is the crux of CW's complaint and it demonstrates the jurisdictional defects that exist here: CW seeks information concerning how the contracting officer would act in the event some unforeseen action occurred. Of course, a determination like that would depend entirely upon circumstances the contracting officer could not predict at the time she received this letter. For example, if a transfer occurred in conjunction with a transfer of all service requirements in a region, the Army simply could elect not to exercise an option. Additionally, the contract specifically allows the

Government to delete workload in the contract "at any time after the base period of this contract, with a 90-day notice from the Contracting Officer to the Contractor." Contract ¶ 1.6.8. Consequently, CW sought a guarantee to which it was not entitled, and which represented much more than an interpretation of contract terms.

The decision by the Court of Appeals for the Federal Circuit in Alliant Techsytems, Inc. v. United States, 178 F.3d 1260 (Fed. Cir. 1999), is the seminal case upon the subject of whether a request for an interpretation of a contract qualifies as a CDA "claim." In Alliant, the Army purported to exercise an option clause. That action required the contractor to commence work under the option clause less than two months from the date of the notice. The contractor sent a letter to the Army arguing that exercise of the option was ineffective; the Army rejected Alliant's interpretation in a letter issued six days later, within two weeks of the beginning of the option period. Id. at 1264. The contractor filed a complaint with this Court, which determined it possessed jurisdiction to issue a declaratory judgment, and found the contractor was required to perform, but at a lower delivery rate than specified by the Army. Both parties appealed. The Army challenged the trial court's jurisdiction, and argued that the contractor did not seek relief "as a matter of right" (as required in the definition of a claim) "because the disputes clause in the contract required Alliant 'to comply with the contracting officer's directive first and litigate about the directive's propriety later.'" Id. at 1265. The Federal Circuit rejected that argument and found jurisdiction pursuant to the contractor's right to assert a claim for contract interpretation.

In this case, however, unlike Alliant, the Government has not executed any contract change. The Government might never reach a point where it takes such an action. Thus, as we

discuss below, no live controversy is presented here. If some requirements are deleted from CW's contract in the future, there is no way to know now how, and pursuant to which contract clause, that would be accomplished. Therefore, in stark contrast to Alliant, where the Government already had taken contractual action, and the contractor's required performance in response to that action was imminent, no action has been taken in this case. CW does not want an interpretation of how it should proceed under a contract, but a reassurance that something is not going to occur.

This Court has followed Alliant in cases with similar factual situations. E.g., Clearwater Constructors, Inc. v. United States, 56 Fed. Cl. 303 (2003) (interpretation of whether government direction to contractor for "explosion proof" control panels was a constructive change to requirements); GPA-I, LP v. United States, 46 Fed. Cl. 1762 (2000) (interpretation of a lease payment clause which determined whether ongoing Government payments were tardy). However, we are unaware of any reported decision where a plaintiff has stretched the meaning of "interpretation" anywhere near as broadly as CW does in this case, and is seeking instead a guarantee of future Government action.

Accordingly, in its purported "claims," CW did not seek an interpretation of its contract, but an opinion or a guarantee from its contracting officer that some future action would either not occur, or be prohibited by its contract. Because this kind of declaration is not contemplated by the CDA or its regulations, CW never submitted a proper claim and this Court does not possess jurisdiction to entertain CW's complaint.

B. The Contracting Officer Did Not Issue A Final Decision

In addition to the requirement that a contractor must file a valid claim for this Court to possess jurisdiction, a contracting officer's final decision is also a jurisdictional prerequisite. See Made in the USA Foundation v. United States, 51 Fed. Cl. 252, 255 (2001) (plaintiff failed to provide evidence of a contracting officer's final decision which is the "linchpin for appealing claims under the CDA"); Buse Timber & Sales, Inc. v. United States, 45 Fed.Cl. 258, 265 (1999) (jurisdiction lacking when contracting officer lacks authority to issue final decision). In this case, the contracting officer has not issued a final decision.

In her letter dated March 1, 2004, the contracting officer provided an interpretation of the exclusivity contract clauses referenced by the contractor in its letter of January 6, 2004. While she noted that the exclusivity clauses prohibited the Government from obtaining travel services from another contractor while CW was providing the services, the clauses did not absolutely prohibit a transfer of those services. App. 18-19.

In addition to the above interpretation, however, the contractor also demanded that the contracting officer determine how the clauses would be applied if certain hypothetical events occurred. Assuming, for the sake of argument, that this demand represents a valid claim, the contracting officer did not decide the matter adversely to the contractor. Instead, Ms. Robinson-Burnette refused to issue a decision unless and until facts arose which made such a determination possible. Specifically, the contracting officer wrote:

> I do not know whether we will ever reach a point during the performance of your contracts that the DTS PMO will request a transfer of MEPS services. I also do not know what may be the circumstances of such a proposed transfer, if any eventually should be requested. Therefore, it is not simply a matter of interpreting

> the exclusivity clauses. It is a matter of knowing whether a proposed transfer involves an act of bad faith by the Government. I cannot determine that a transfer of MEPS services to a DTS PMO contract inevitably would be in bad faith.
>
> Accordingly, I am unable to provide a contracting officer's final decision in response to the hypothetical you have posed. Nonetheless, I will consider your interpretation of contract requirements if DTS PMO requests a transfer of MEPS services in the future.
>
> Once again, I do not consider this inability to provide the commitment that you have requested as a Final Decision under the Contract Disputes Act. In my opinion, there is no current dispute over the contract terms that affect your ongoing performance under these travel services contracts.

App. 18-19.

The Government admittedly cannot avoid jurisdiction by the neglect of a contracting officer to issue a final decision upon a valid claim.[6] However, here the contracting officer recognized that the contractor did not submit a valid CDA claim and she was unable to issue a final decision upon the matter demanded by the contractor. Nonetheless, she assured the contractor that she would consider the contractor's interpretation of the applicable clauses if, and when, events arise which would bring the possible deletion of MEPS locations into issue. At the time of her response, that is all she reasonably could do. This action complies with the statutory mandate to issue a final decision within a reasonable time.

---

[6] The CDA specifically requires the contracting officer to either issue a decision (for submitted claims of $100,000 or less), or "notify the contractor of the time within which a decision will be issued" (for submitted certified claims of more than $100,000), within 60 days. 41 U.S.C. § 605(c)(1) and (2). Here, there is no money claim. We have found no case that directly addresses when a contracting officer is required to issue a final decision on a non-monetary claim.

Consequently, because the contracting officer has not issued a final decision, this Court lacks jurisdiction to entertain CW's complaint.

II. CW Is Not Entitled To The Declaratory Judgments It Seeks In This Case

Even if this Court were to find that CW has filed a valid claim or claims in this case, this Court should dismiss CW's complaint because its request for declaratory relief is not ripe for adjudication. As such, CW has failed to state a claim upon which relief could be granted. In the Alliant case, the Federal Circuit determined that the Tucker Act and the CDA provided this Court with the jurisdiction to entertain non-monetary disputes. "We have held . . . that the Tucker Acts grants the Court of Federal Claims jurisdiction to grant nonmonetary relief in connection with contractor claims, including claims requesting an interpretation of contract terms." Alliant Techsystems, Inc. v. United States, 178 F.3d at 1268. However, the jurisdiction to entertain nonmonetary disputes is restricted, and the Court has exercised this form of relief only in very limited circumstances -- none of which exist here.

In Alliant, the Federal Circuit discussed the circumstances appropriate for declaratory relief. It emphasized the right to such relief was not automatic. After finding that this Court had acted within its jurisdiction to issue a declaratory judgment, the court set forth the limited basis for such relief. The appellate court held that this Court was not expected to issue a declaration of a contractor's rights anytime the contractor raised a question during contract performance. Rather, "[i]n responding to such a request, the court . . . is free to consider the appropriateness of declaratory relief, including whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests." Id. at 1271 (emphasis added). The

court then described the scenario presented by this case:

> While a contractor may want to know ahead of time how a contract issue will be resolved . . . such cases do not ordinarily put into question whether the contractor is obligated to perform at all. In such a case, the dispute typically concerns whether the government will be obligated to grant an equitable adjustment after the ordered performance is completed. It would normally be appropriate in such cases for the court or board to decline to issue a declaratory judgment and to await a later equitable adjustment claim by the contractor. In refusing a request for declaratory relief in the absence of a need for an early declaration of the parties' rights, the court or board would be applying a principle analogous to the traditional rule courts will not grant equitable relief when money damages are adequate. The discretion to grant declaratory relief only in limited circumstances allows the court or board to restrict the occasions for intervention during contract performance to those involving a fundamental question of contract interpretation or a special need for early resolution of a legal issue.

Id. This is precisely the case here - CW seeks a ruling upon an issue that may arise. The Court must decline to provide CW with such a ruling.

This Court has denied similar requests for declaratory judgment. In Hamilton Security Advisory Services v. United States, 60 Fed. Cl. 144 (2004), the Court held that declaratory relief was not appropriate when a declaration would not resolve the dispute, and legal remedies were available to protect the parties interests. In Sweet v. United States, 53 Fed. Cl. 208, 227-228 (2002), the Court denied requests for declaratory relief as not appropriate and held that claims for indemnification should be separately evaluated. The Court also turned down a request for declaratory relief in Made in USA Foundation v. United States, 51 Fed. Cl. at 256, and held that the Court did not possess the jurisdiction to enter declaratory relief when the request was unrelated to claim for monetary relief pending before court.

By the standard established in Alliant and followed by this Court, this is not a case where declaratory judgment is appropriate. As we discuss below, CW cannot establish that a live

dispute existed between the parties, that a declaration will resolve that dispute, or that available legal remedies available would be inadequate to protect the plaintiff's interests.

A. There Is No Live Dispute Between The Parties

There is no current or imminent decision by the Army to delete MEPS locations from the CW travel services contracts. Unlike in Alliant, the contractor is not being ordered to perform any action in contravention to its contract requirement. In fact, even CW admits that will not happen. At most, CW alleges that the Government contemplates the future deletion of requirements. In Aldridge v. United States, 59 Fed. Cl. 387, 388-89 (2004), the Court said: "A fundamental jurisdictional consideration for any federal court, including Article I courts, is whether the plaintiff has constitutional standing." citing Glass v. United States, 258 F.3d 1349, 1355-56 (Fed. Cir.2001); Sterling Savings v. United States, 57 Fed.Cl. 234, 236 (2003). If there is no standing, then the Court does not possess jurisdiction to hear the merits of a claim. See Arizonans For Official English, 520 U.S. 43, 67 (1997). A litigant must demonstrate, " "an invasion of a legally protected interest," that is "actual or imminent. " Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, (1992).

As the contracting officer informed CW, it is unclear whether the Government will reach a point where deletion of travel service requirements at MEPS sites is considered during the term of the CW Army contracts. There is no current dispute over contract terms that affects CW's contract performance. No deletions of work have occurred, the contracts are still in full force and effect, and CW has not been informed of any changes to its contract and its service to the Government.

CW seeks a declaration here that is akin to an advisory opinion. It wants the Court to declare how it would rule upon a possible future event. However, "it is well established that the court does not have jurisdiction to 'render advisory opinions.' . . . The constitutional offense to advisory opinions is founded in the requirement of Article III that a case or controversy must exist before the court exercises jurisdiction." Naplesyacht.com v. United States, 60 Fed. Cl. 459, 481 (2004), quoting Fina Oil & Chemical Co. v. Ewen, 123 F.3d 1466, 1470 (Fed. Cir. 1997). There is no case or controversy yet in this case and may never be one. Accordingly, CW's complaint should be dismissed.

B. The Declarations Sought By CW In This Case Will Not Likely Resolve Any Dispute

In the first of the two requested declaratory judgments, CW requests that the Court declare that CW remain as "the exclusive-provider of travel services for all the MEPS sites identified in CW's competitively-awarded Army DTR Contracts, so long as those Contracts are in effect." Arguably, this would resolve the dispute because it would mandate that CW remains as the sole provider of travel services for all MEPS sites. This proposed judgment would preclude the transfer of any MEPS locations, except apparently in conjunction with the non-exercise of an option that would terminate the contract(s) and transfer all travel service requirements in a region.

However, even CW appears to realize that first proposed declaration goes beyond its own strained contract interpretation (which at least would allow the transfer of requirements upon deployment of a DTS CUI). Therefore, CW also has proposed an alternative declaratory judgment that requires CW to be the exclusive provider of travel services for MEPS sites "unless and until the DTS CUI is operationally deployed to and capable of performing the majority of

travel requirements at each MEPS site." Complaint, Prayer for Relief, Request B. The determination of that event, though, is not readily ascertainable and probably would be disputed. Therefore, if adopted, the alternative form of declaratory judgment likely would lead to further controversy and litigation as to whether the DTS CUI is "operationally deployed to and capable of performing" these travel requirements. Accordingly, there is no indication that if these declarations were adopted by the Court it would end the dispute.

C. CW Has Adequate Legal Remedies to Protect Its Interests Without Resorting To A Premature Judicial Determination Of Its Contract Rights

If, assuming for the sake of argument, the Government eventually decides to transfer MEPS locations to another contractor, CW can certainly pursue legal action. In either case, the law provides for a full recovery of any costs or damages it may sustain in the future due to a possible deletion of work from the CW contracts. In other words, its legal rights are fully protected and will be available if, and when, any allegedly wrongful events occur.

This situation differs significantly from that in Alliant, where the contractor alleged it would be required to perform additional work outside the scope of the contract (or risk a default termination) unless the court issued a declaratory judgment to determine its rights. As noted by the Federal Circuit, Alliant involved an unusual case that "put into question whether the contractor is obligated to perform at all." Alliant Techsytems, 178 F.3d at 1271. In the more typical case, involving a possible future claim for costs or damages, "[i]t would normally be appropriate in such cases for the court or board to decline to issue a declaratory judgment and to await a later equitable adjustment claim by the contractor." Id.

Accordingly, CW's suit in this Court is premature and should be dismissed by this Court. If the scenario imagined by CW occurs at some point in the future, it has a variety of legal options at its disposal. Until then, however, CW has no legal recourse in this Court.

## III. Summary Judgment Is An Appropriate Method For The Disposition Of The Case

Even if this Court were to find that CW filed a valid claim, the contracting officer issued a final decision, and the request for declaratory judgment is properly before this Court, the Court must nonetheless dismiss CW's complaint because there are no genuine issues of material fact, and the Government is entitled to judgment as a matter of law. Paxson Electric Company, Inc. v. United States, 14 Cl. Ct. 634, 642 (1988) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). Accord Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). A genuine dispute is one in which the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987).

No genuine factual dispute between the parties exists in this case because there are no material factual issues in dispute. Accordingly, summary judgment is therefore particularly appropriate "to secure the just, speedy and inexpensive determination of [this] action." Rule 1(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), Sweats Fashions, 833 F.2d at 1562. Celotex, 477 U.S. at 327. As we establish below, the United States is entitled to summary judgment.

IV. CW Is Not Entitled To The Declarations It Seeks In This Case

CW has asked for a declaratory judgment "finding that CW is the exclusive provider of travel services for all the MEPS sites identified in CW's competitively-awarded Army DTR Contracts, so long as those Contracts are in effect." Pl. Compl. Prayer for Relief A. Even if the Court has subject matter jurisdiction -- which, as demonstrated above, it does not -- and a declaratory judgment is an appropriate form of relief in this case, the contracts themselves establish that CW is not entitled to a declaratory judgment.

CW argues in its complaint that the Army may transfer requirements from the travel service contracts to the DTS PMO only upon "implementation of a fully functional DTS CUI to electronically perform all official travel management services." Pl. Compl., Introduction and ¶¶ 13-16. That interpretation, however, misconstrues and/or ignores several provisions of the contracts. Moreover, this first request for declaratory judgment goes beyond even CW's incorrect interpretation of contract provisions. It would preclude a transfer of MEPS locations so long as any aspect of the Army travel service contracts are in effect, even if a DTS CUI is implemented. Consequently, it plainly limits the Government beyond what even CW maintains is the correct contract interpretation.

The interpretation of a contract "begins with the language of the written agreement." Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003), citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993). "Where . . . the provisions of the Agreement are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning, and [the court] may not resort to extrinsic evidence to interpret them." Id.

(citing McAbee Constr. Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996). Conversely, where an agreement presents ambiguities, a court may consider extrinsic evidence to interpret the agreement and discern the parties' intent or to determine whether an ambiguity actually exists. See Sterling Savs. v. United States, 57 Fed. Cl. 445, 452 (2003); Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin., 169 F.3d 747, 752-53 (Fed. Cir. 1999).

As CW notes, the contracts contain exclusivity clauses that assure CW "has the exclusive right to provide all official commercial travel services at all sites covered in this contract," and prevent competing travel organizations from locating upon military facilities where CW furnishes such services. App. 5. The clauses prevent the Army (or other DOD organizations) from obtaining travel services from a competitor to the plaintiff while CW has the contractual obligation to perform such services. However, these clauses do not prevent the Army from deleting these requirements, and transferring them to another contractor. Even CW acknowledges that the requirements can be transferred in at least one instance, i.e., development of a DTS CUI. In fact, the contracts allow the services to be transferred under more than one circumstance.

In anticipation that travel service requirements eventually would transition to a DTS PMO contract(s), the contracts contain several special terms, PWS sections 1.1 and 1.6, relating to this transition. These terms are not ambiguous or inconsistent. One provision, PWS ¶ 1.6.8, limits the right of the Government to delete requirements during the base period of the contracts. However, that base period already has expired. Otherwise, contrary to CW's assertions, the provisions do not limit the usual rights of the Government to delete requirements; they either expand such rights, or put the contractor upon notice of the possibility of a transfer of travel

service requirements to DTS PMO contracts.

In its complaint, CW has chosen to focus on two clauses -- PWS ¶¶ 1.1.1.2 and 1.6.7 -- to the exclusion of other terms. The first of these clauses states:

> **1.1.1.2** The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract resulting from this solicitation.

In ¶ 15 of the complaint, CW asserts the following with respect to the above clause: "At the time the contracts were awarded to CW, it was understood by all parties that 'DOD implements the Defense Travel System (DTS)' meant the implementation of a fully functional DTS CUI to electronically perform all official travel management services." However, the contracts do not contain any language supporting that interpretation. While CW contends that interpretation "was understood by all parties," it provides no evidence to support the assertion.

Moreover, even if CW has correctly interpreted the meaning of "implementation of the Defense Travel System," the clause itself does not restrict the Government's right to exercise options. On its face, the clause simply recognizes that the Army may choose not to exercise options in order to transition services. It then alerts CW to the possibility that some options will not be executed to allow a transfer of requirements. It does not only limit the right of the Army to exercise options where a DTS, with an operational CUI, has been implemented.

The second clause referenced by CW, PWS ¶ 1.6.7, declares: "At a future date a DOD travel services contract(s) will be awarded replacing this contract and all other Service/Agency existing travel service contracts. Once the DOD travel services contract is awarded all DOD

sites will transition in accordance with the implementation dates to the DOD travel services contract." The clause does not restrict the Army's right to delete or transfer travel service requirements. On the contrary, the clause declares the intention of the Government to transfer requirements when DOD travel services are awarded.

However, CW seeks to graft its interpretation of the phrase "implementation of a Defense Travel System" from PWS ¶ 1.1.1.2 onto the meaning of "DOD travel service contract(s)" in PWS ¶ 1.6.7. As discussed, the use of that definition with respect to PWS ¶ 1.1.1.2 at best is highly dubious; the transfer of that definition to modify the term "DOD travel services contract(s)" located in a separate paragraph (PWS ¶ 1.6.7) three pages later in the contract is not supportable.

CW then argues that, together, PWS ¶¶ 1.1.1.2 and 1.6.7 indicate that the Army may transfer travel service requirements from the CW contracts to DTS contracts only when those contracts have a fully functional CUI that electronically performs all travel service functions. Even if the term "DOD travel service contract(s)" reasonably could be read to mean only a system with "a fully operational DTS CUI to electronically perform all official travel management services," these clauses clearly do not restrict the Army's right to transfer travel service requirements. These two contract clauses, either separately or in combination, advise the contractor of a possible future transfer of requirements without imposition of a precondition that limits such a transfer upon development of a fully operational DTS CUI.

In other words, CW tries to impose its own restrictive reading by manufacturing a dubious meaning to one term ("implementation of the DTS"), transferring that meaning to another term ("DOD travel services contract(s)") in an entirely separate paragraph, and then

arguing that the second clause furnishes the sole basis for transferring travel service requirements from its Army contracts. CW's strained interpretation of these two contractual provisions is absent contract support and devoid of merit.

In contrast, another special term directly refutes CW's interpretation. PWS ¶ 1.6.8 reads: "At any time after the base period of this contract, with a 90-day notice from the Contracting Officer to the Contractor, the Government may identify any/or all workload included in this contract to be deleted. "

This clause plainly allows the Army to transition travel service requirements to DTS PMO. It expressly says the Army may delete such requirements "at any time after the base period of this contract." CW's interpretation of the other two clauses (PWS 1.1.1.2 and 1.6.7) can prevail only if PWS 1.6.8 is entirely disregarded, contrary to the standard rule of contract interpretation that courts reject any interpretation that would leave portions of the contract language meaningless, useless, ineffective or superfluous. Veit & Company, Inc. v. United States, 56 Fed. Cl. 30, 39-40 (2003) (rejecting plaintiff's interpretation which would have rendered meaningless many specific references in the contract).

PWS 1.6.8 explicitly allows the Government to delete any requirements from the CW travel service contracts (including MEPS locations) for transition to DTS PMO after expiration of the base period, without recourse to any other contractual provision. Despite CW's contentions, PWS 1.1.1.2 and 1.6.7 do not contradict that authority.

As discussed, the travel services contracts have only a one-year base and eight six-month options. As per the standard option clause, the Government may exercise the options, but is not required to do so. Therefore, the Army may terminate services to the MEPS locations in any

region simply by not exercising an option period for a region. Consequently, this Court could not issue the declarations requested by CW because CW's interpretation of the contract clauses are not supportable by the language of the contracts. The Court should dismiss CW's complaint because there are no genuine issues of material fact in dispute and the Government is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons set forth above, defendant respectfully requests that the Court dismiss plaintiff's complaint for lack of jurisdiction, or, in the alternative, grant summary judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/James M. Kinsella
JAMES M. KINSELLA
Deputy Director

s/Lisa B. Donis
LISA B. DONIS
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
ATTN: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

Attorneys for Defendant

JULY 22 , 2004

CERTIFICATE OF FILING

I hereby certify that on July 22 , 2004, a copy of foregoing "Defendant's Motion to Dismiss Or, In The Alternative, Motion for Summary Judgment," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Lisa B. Donis
LISA B. DONIS