SCOPE OF WORK – DEFENSE TRAVEL REGIONS, NATIONAL CAPITAL REGION AND OTHER DESIGNATED DOD OR US GOVERNMENT ACTIVITIES.

The Contractor shall provide all personnel, equipment, materials, supervision and other items or services necessary to perform the management and operation of a Contracted Travel Office (CTO), as defined in this Performance Work Statement (PWS). Performance shall be in support of all designated facilities in the Defense Travel Regions (DTRs), including other designated Department of Defense (DOD)/Government activities specified in the Workload Data. DTR 1 includes the states of AZ, CA, CO, HI, ID, MT, NV, OR, UT, WA and WY. DTR 2 includes AL, FL, GA, MS, NC, SC, TN, PR and VI. DTR 4 includes CT, DE, KY, MA, MD, ME, NH, NJ, NY, OH, PA, RI, VT, VA, and WV. DTR 5 includes AR, KS, LA, MO, NE, NM, OK and TX. National Capital Region (NCR) consists of locations at the Pentagon, Fort Myer, Army Material Command Building, Hoffman Building One, Hoffman Building Two, Fort Belvoir, Humphreys Engineer Center Support Activity, All Sources Analysis System Project Office, Defense Logistic Agency, Defense Nuclear Agency, Defense National Stockpile Center, Defense Contract Audit Agency, Washington Headquarters Services, Defense Threat Reduction Agency and Defense Contract Management Agency in the state of Virginia; National Defense University, and Walter Reed Army Medical Center in the District of Columbia; US Army Research Laboratory, US Army Concepts Analysis and Uniformed Services University of the Health Sciences in the state of Maryland, the National Imagery Mapping Agency in Virginia, Maryland and the District of Columbia and the Defense Environmental Security Corporate Information Management Program Office, and Defense Advanced Research Projects Agency in Arlington, VA.

1.1. General.

1.1.1. Due to projected base closures and realignments, the Government cannot forecast how the revenue for official travel will be affected. As site(s) are identified for addition or deletion, the Contracting Officer will issue a modification to the contract. A 60-day written notice will be provided to the contractor. In addition, Offerors are hereby notified that upon the implementation of the Defense Travel Region 6 (DTR 6) contract the following locations (Ft Campbell, KY, Missouri; and Nebraska) will be deleted from the respective regions and incorporated into the DTR 6 contract.

1.1.1.2. The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract resulting from this solicitation.

1.2. Quality Control Plan. (QCP) The Contractor shall complete and implement an effective Quality Control Plan (QCP) that includes all aspects of customer service and other provisions required by the Contract. The plan will be submitted to the Contracting Officer within 90 days of the contract award date. The QCP should include details concerning processes proposed to ensure contract quality assurance.

1.2.1. Copies of the QCP and all results will be provided to the Government Quality Assurance Evaluators (QAE) in their respective Defense Travel Region and National Capital Region. All updates to the QCP shall be forwarded to the Contracting Officer for distribution to the QAE.

1.2.2. Surveillance of Contractor performance may be conducted through random sampling, report results (Management Information System (MIS) and Quality Control Plan (QCP)) and customer feedback.

1.3. Personnel.

1.3.1. All contractor personnel shall be capable and qualified in their specialty field in providing government-sponsored travel for DOD personnel. The contractor shall employ personnel who read, write and speak English fluently. The Contractor shall not employ any person who is a current employee, a former employee, or officer of the United States Government, or member of the military service if the employment of that person would create a potential conflict of interest, unless such person seeks and receives approval for such employment in accordance with Standards of Ethical Conduct for Employees of the Executive Branch, 5 CFR 2635, and its DoD or other Departmental Supplement. Before the Contractor employs Government personnel (civilian and military), the Contracting Officer Representative (COR) shall receive a commander/supervisor written approval for such employees.

1.4. Emergency Services.

1.4.1. The Contractor shall respond to national emergencies, accident investigations, aircraft recovery teams, evacuations, rescue operations, civil disturbances, natural disasters, military peacetime and wartime contingency operations, exercises, and personal passenger emergencies. At all times during national emergencies, the Contractor shall ensure that quality customer service is maintained.

1.5. Travel Office Facilities, Safety, and Physical and Personnel Security (Official).

1.5.1. A list of locations that are currently staffed is provided at **Attachment 1**. This attachment includes workload data. The Contractor shall:

1.5.1.1. The Contractor shall ensure hours of on-site operations match the normal business hours of the government entity at that location. Operating hours may be modified as agreed to by the COR for that site.

1.5.1.2. The Contractor shall provide travel office interior and exterior signs which shall conform to Service and agency regulations and local custom as provided by the COR.

1.5.1.3. The Contractor shall ensure that Contractor personnel comply with all published safety and security guidelines applicable to the installation or site or such additional procedures as the installation or site commander judges necessary in light of emerging circumstances. All accidents that result in damage to Government property occupied and used by the contractor, and/or injuries to Contractor personnel, shall be reported to the COR within 1 workday from occurrence.

1.5.1.4. The Contractor shall ensure that these facilities are maintained in a clean and orderly manner consistent with installation and agency standards to be provided by the COR.

1.5.1.5. The Contractor shall clearly identify their personnel.

1.5.1.6. The Contractor shall provide personnel capable of obtaining a security clearance granted by the Defense Industrial Security Clearance Office (DISCO) when required by the Government. This may vary by location; but at a minimum personnel must pass a credit check, have no felony or serious misdemeanor and have no history of continuous moral turpitude. The Contractor must comply with the provisions of the DD Form 254, Contract Security Clearance Classification Specification, **Attachment 3** to the contract. The Government will provide security clearances at no expense to the Contractor. The following locations require security clearances: **DTR 1**- Detachment 16, Pearl Harbor HI; **DTR 2**- Ft Bragg NC; **DTR 4**- US Army Foreign Counter Intelligence Activity, Ft Meade MD; and **National Capitol Region**- DARPA; DTRA; USASCAF; DLA; RDE- Ft Belvoir; AMC; Hoffman; and US Army Research Laboratory.

1.5.2. Government Furnished Facilities and Services. The Government will provide adequate office space for required commercial travel services at no additional cost to the contractor. The Government will make available utilities, custodial services, refuse collection, pest control services, the Government centralized mail distribution of interoffice mail, and Military Police and fire protection at the level provided to local Government offices. The Government will provide an air conditioning system to meet operability needs of the Contractor's Computer Reservation System (CRS) in accordance with local policy.

1.5.2.1. If the Government requests the Contractor to relocate during the period of the Contract, at least 90 days advance notification will be provided. Any Government request for relocation shall be at Government expense. Contractor initiated moves shall be paid by the contractor.

1.5.3. Telephone Lines. The Government will provide, at no cost to the contractor, existing telephone lines, except DSN telephone lines. The cost of activating or maintaining service to existing lines shall be borne by the Contractor. The Contractor at its expense may install additional lines and connections. All telephone lines used by the Contractor in any CTO, including those installed at the expense of the Contractor, are subject to the control of the installation telephone office. Telephone numbers shall be listed in installation telephone directories as "Contracted Travel Office". The name of the Contractor may be listed in accordance with local policy; the Contractor may include the name of a subcontractor.

1.6. Transition Plan (Phase-in/Phase-Out)

1.6.1. The Contractor shall take all actions necessary to ensure there is no break in service during the transition between the Contractor hereunder and any previous or successor Contractor during phase in and phase out of travel operations. The transition will be handled with minimal disruption to the customer. The Contractor must include their marketing approach.

1.6.1.1. We recognize that the contractor will provide various forms of service for our customers. The contractor must provide customer service in accordance with its transition plan for the types of service proposed. Examples are:
a. Staff to nonstaff
b. Nonstaff to staff
c. Nonstaff to online booking
d. Staff to online booking
e. Staff to call center

f. Nonstaff to call center

1.6.2. The Contractor shall electronically transfer to the successor contractor all travel records, to include historical data, and associated files contained in the contractor's data repository.

1.6.2.1. The Contractor shall continue to reconcile all forms of payment under this Contract for 90 calendar days after the contract performance period ends. No later than the 20th calendar day after Contract expiration, the Contractor will provide to the COR, or other authorized Government representative, a hard copy report for each payment mechanism containing the following information for each unbilled transaction (debits and credits) remaining in the Contractor's data base:

a. Complete ticket number
b. Traveler's name
c. Accounting data
d. Travel order number
e. Complete itinerary
f. Dollar amount

1.6.3. The Contractor shall allow the successor Contractor access to government owned or controlled office space not less than 90 days prior to contract expiration for site surveys.

1.6.4. The Contractor shall issue and deliver tickets for travel commencing within three days after contract expiration by close of business of the last workday of the contract.

1.6.5. The Contractor shall cease operations and vacate all Government facilities by 12:00 midnight on the last working day of contract performance, unless otherwise approved by the Contracting Officer. The successor Contractor shall have access to assigned facilities
the weekend prior to the implementation date.

1.6.6 Telephone numbers used by the Contractor at on-post offices shall not be transferred to off-post locations upon expiration of the contract performance period. Any telephone numbers used for off-post service centers, such as a regional reservation center, and which are promoted to the military community under the contract, shall be terminated upon expiration of the contract. Telephone number(s) shall not be reactivated without specific approval of the Contracting Officer.

1.6.7 At a future date a DOD travel services contract(s) will be awarded replacing this contract and all other Service/Agency existing travel service contracts. Once the DOD travel services contract is awarded all DOD sites will transition in accordance with the implementation dates to the DOD travel services contract.

1.6.8 At any time after the base period of this contract, with a 90-day notice from the Contracting Officer to the Contractor, the Government may identify any/or all workload included in this contract to be deleted.

1.7. <u>Exclusivity.</u>

1.7.1. The Contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract.

1.7.2. No person, private organization, or commercial travel service, including competing travel agencies, direct suppliers, or travel software vendors, will be permitted direct access to areas under DoD control to advertise, sell, provide or promote official travel services to those sites, unless the Contractor has first declined to provide the particular service or the Contractor's levels of service are determined by the Contracting Officer to be unresponsive and/or unsatisfactory.

1.7.3. RESERVED.

2. <u>REQUIREMENTS FOR ALL OFFICIAL TRAVEL (Traditional Travel Services)</u>

2.1. The Contractor shall provide the following travel management services in accordance with DoD/Army travel policies and procedures and best industry practices:

2.1.1. The Contractor shall make confirmed reservations as requested by the traveler or their designee to include issuance of tickets (or other appropriate record of reservation) for scheduled air, bus, and rail travel. The reservation procedures used shall be capable of accessing all DoD approved carriers. For official travel, use of General Services Administration (GSA) city pair contact fares is mandatory unless one of the exceptions provided in the Department of Defense regulation 4500.9-R. applies.

2.1.1.1. Travel orders authorize official travel at Government expense. Travel orders should be issued before travel begins unless an urgent and unusual situation prevents prior issuance. If official travel begins or is performed before travel orders are issued, the travel must be pursuant to oral, letter, or message authority. A confirmatory travel order must be issued within 72 hours of travel begin. The order must include an authorization and justification statement for unusual delay in issuance. The COR/traveler will be responsible for providing the confirmatory travel order. There will be no impact or liability against the CTO if the confirmatory travel order is not obtained. The CTO is advised to notify the COR at the time of CBA reconciliation that the confirmatory travel order was not provided. The CTO will zero fill the lines of accounting and the responsibility will rest with the COR when reconciling and obtaining copies of the confirmatory orders.

2.1.2. The Contractor shall not make reservations for international travel via commercial means on the basis of a direct request from a traveler, unless authorized by the COR. The preponderance of international travel is accomplished on commercial aircraft chartered outside the scope of the contract and travelers shall be directed to contact their ITO for reservations and ticketing. If industry capability becomes available to book Patriot Express service through the CRS, the Contractor shall do so upon request from the COR. When the Contractor is requested by the COR to book Patriot Express service, the international air travel shall be limited to air travel on scheduled, commercial flights. The Contractor will not be reimbursed by the Government for tickets issued on a foreign flag carrier for official international travel unless written authorization is obtained from the COR.

2.1.2.1. The Contractor shall offer complete car rental reservation services to include booking commercial car rental reservations to coincide with airline arrival/departure times utilizing the companies with which Military Traffic

CW Government Travel Inc

October 8, 2003

Ms. Jackie Robinson-Burnette
Contracting Officer
Department of the Army
Headquarters, Military Traffic Management Command
200 Stovall Street
Alexandria, Virginia 22332-5000

**Re: Improper Removal of Work Associated with MEPS in DAMT01-02-C-0025; DAMT01-02-C-0026; DAMT01-02-C-0027 and DAMT01-02-C-0028; Request for A Contracting Officer's Final Decision**

Dear Ms. Robinson-Burnette:

Reference is made to a previous Solicitation (DABL01-03-R-1001) issued as a small business set-aside by the Department of the Army, Information, Technology, E-Commence and Commercial Contracting Center ("ITEC4"), which included approximately 49 Military Entrance Processing Stations ("MEPS"). The travel service requirements for those same MEPS are covered by the above-referenced contracts ("DTR Contracts") awarded to CW Government Travel, Inc. ("CWGT") in February 2002, and commenced on October 1, 2002. Those DTR Contracts are currently in their first six-month option period and have options remaining to extend the total contract period through September 30, 2007.

We understand that as a result of protests to, and a decision by, the General Accounting Office (the "GAO") (AirTrak Travel, et al.; B-292101; B-292101.2; B-292101.3; B-292101.4; B-292101.5; June 30, 2003) Solicitation DABL01-03-R-1001 was cancelled. However, it is our understanding that the Defense Travel System Program Management Office ("DTS PMO") and ITEC4 have publicly announced their intention to reissue such a small business set-aside Solicitation that includes the travel requirements for the MEPS sites covered by CWGT's DTR Contracts.

Section 1.7 of each of CWGT's DTR Contracts, entitled "Exclusivity" provides:

> **1.7.1 The Contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract.**
>
> **1.7.2 No person, private organization, or commercial travel service, including competing travel agencies, direct suppliers, or travel software vendors, will be permitted direct access to areas under DoD control to advertise, sell, provide or promote**

*Integrating Solutions with Service*

1777 Northeast Loop 410 • Suite 702B • San Antonio, Texas 78217 • USA

> **official travel services to those sites, unless the Contractor has first declined to provide the particular service or the Contractor's level of service are determined by the Contracting Officer to be unresponsive and/or unsatisfactory.**

It is CWGT's position that so long as the DTR Contracts are in effect, CWGT is the exclusive provider of travel services to the MEPS sites within those geographical regions, and any transfer of that travel service business to another contractor, small business or otherwise, would constitute a breach of CWGT's DTR Contracts.

It is noted that Section 1.1.1.2 of CWGT's DTR Contracts provides that if the Department of Defense ("DoD") implements the Defense Travel System ("DTS") and is able to provide the Army/other DoD agencies with travel services under the new system (e.g., end-to-end *eTravel* or CUI), then some of the DTR Contract options may not be exercised. However, this does not give the Government the right to remove significant travel service requirements piecemeal from the CWGT DTR Contracts. Moreover, it is well known that the travel services required by the MEPS cannot be provided by the DTS CUI, even if the DTS CUI can be made to adequately perform general DoD travel service requirements. The MEPS utilize group travel arrangements which cannot be booked automatically via the GDS or DTS CUI, but must be booked by travel counselors. Since the actual MEPS travel service requirements cannot be performed by the DTS CUI, the award of other travel service contracts by or on behalf of the DTS PMO cannot justify removal or transfer of the MEPS travel requirements from the CWGT DTR Contracts.

It is requested that you confirm that the travel requirements for all the MEPS sites included in the four DTR Contracts cited above will continue to be performed by CWGT throughout the total contract period of each contract, including all options that are exercised by the Government. In other words, so long as a DTR Contract remains in effect, none of the travel requirements of the MEPS sites currently in that DTR Contract may be transferred to any other contractor.

If it is the Government's position that the travel requirements of the MEPS sites covered by the DTS Contracts may be transferred to another contractor, including pursuant to a small business set-aside procurement, then it is requested that you promptly issue a Final Decision pursuant to the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-613) and FAR Subpart 33.2. Your cooperation and immediate attention to this important matter is appreciated.

Sincerely,

Erma Spell

Erma Spell
President

(file)
Hard copy
faxed & mailed
17Oct03

DEPARTMENT OF THE ARMY
HEADQUARTERS
MILITARY TRAFFIC MANAGEMENT COMMAND
200 STOVALL STREET
ALEXANDRIA, VA 22332-5000

REPLY TO
ATTENTION
OF

October 17, 2003

MTMC Contracting Center

SUBJECT: **Removal of Work Associated with MEPS in DAMT01-02-C-0025 thru 0028**

Ms. Erma Spell
Carlson Wagonlit Travel
1777 NE Loop 410
Suite 702B
San Antonio, TX 78217

Dear Ms. Spell:

This letter responds to your referenced letter regarding your concern over a possible future removal of travel services requirements for Military Entrance Processing Stations (MEPS) from the subject contracts. At this time, the Military Traffic Management Command has no plans to delete the MEPS travel service requirements from these contracts.

I cannot promise that the MEPS requirements never will be removed from these contracts. As you know, the contracts (in Performance Work Statement, paragraph 1.6.7) provide for the transition of travel services in accordance with implementation dates of future DOD travel services contracts. The contracts also contain the standard termination for convenience clauses. Moreover, there is no guarantee that future options will be exercised.

I also cannot provide a Final Decision on this matter pursuant to the Contract Disputes Act. I do not know whether these MEPS requirements ever will be deleted from these contracts or (if so) what the circumstances of such a removal of work may be. The Contract Disputes Act does not contemplate contracting officer decisions for hypothetical and speculative situations.

Further, I will keep you abreast of any changes in regards to this, as soon as I hear of them. If there are any questions, please contact me at (703) 428-2048.

Sincerely,

Jackie Robinson-Burnette
Contracting Officer

CF: MTPP (Cullen Hutchinson)

CW Government Travel Inc

November 3, 2003

Ms. Jackie Robinson-Burnette
Contracting Officer
Department of the Army
Military Surface Deployment & Distribution Command
200 Stovall Street
Alexandria, Virginia 22332-5000

**Re: Improper Removal of Work Associated with MEPS in DAMT01-02-C-0025; DAMT01-02-C-0026; DAMT01-02-C-0027 and DAMT01-02-C-0028; Request for A Contracting Officer's Final Decision**

Dear Ms. Robinson-Burnette:

Reference is made to my request for a Contracting Officer's final decision of October 7, 2003. Your response, dated October 17, 2003, is clearly evasive, and simply not acceptable to CWGT. We have never received such a communication from you in the past. Such a response raises questions as to whether it represents the independent action of the Contracting Officer.

My request was not in regard to any hypothetical or speculative situations. The Department of the Army, Information, Technology, E-Commerce and Commercial Contracting Center ("ITEC4") has issued a draft Solicitation No. W91QUZ-04-R-0003 that includes all the Military Entrance Processing Stations ("MEPS") currently in the above-referenced contracts ("DTR Contracts") awarded to CW Government Travel, Inc., ("CWGT") under a highly competitive procurement. Those DTR Contracts are currently in their first six-month option period, and have options remaining to extend the total contract period through September 30, 2007.

As pointed out in my letter of October 7, 2003, the DTR Contracts unequivocally provide that CWGT will be the "exclusive" provider of official travel services for all sites covered in those contracts, so long as the contracts are in effect. I simply requested that you confirm this fundamental contractual right, particularly in light of contrary action by ITEC4 and the DTS PMO.

I did not ask you to guarantee that all the options under the DTR Contracts would be exercised to extend them through September 30, 2007. I did not ask you to guarantee that each and every MEPS site would remain open and continue to require official travel services through September 30, 2007. I did not ask you to guarantee that the Government would never exercise its rights to terminate some contract requirements for the convenience of the Government. However, it is noted that if such a partial termination for convenience was done in order to transfer the requirements to another contractor, that would not be a good faith exercise of such a termination for convenience. In that situation, we would contend it is a material breach of CWGT's contractual rights. Even if it were permissible to remove the MEPS sites from the DTR Contracts via the rouse of a termination for convenience, the equitable adjustment that CWGT would be entitled to would be very substantial. My request was also not limited to the current plans of SDDC, but obviously includes other Army and Department of Defense activities.

*Integrating Solutions with Service*

1777 Northeast Loop 410 • Suite 702B • San Antonio, Texas 78217 • USA

Ms. Jackie Robinson-Burnette
November 3, 2003
Page 2

It is requested that you confirm that the official travel requirements for all the MEPS sites included in the four DTR Contracts cited above will continue to be performed by CWGT throughout the total contract period of each contract, including all options that are exercised by the Government. In other words, so long as a DTR Contract remains in effect, none of the then-current official travel requirements of the MEPS sites currently in that DTR Contract may be transferred to any other contractor, including any contractor receiving an award pursuant to a Small Business Set-Aside Solicitation issued by ITEC4.

This is a very straightforward and honest request. CWGT is entitled to a straightforward and honest answer as to the Army's intention in regard to the MEPS sites currently included in the DTR Contracts. It is requested that you promptly issue a Final Decision pursuant to the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-613) and FAR Subpart 33.2.

Please be advised that if we receive another response similar to your letter of October 17, 2003, or ITEC4 issues a Solicitation for contractors to provide official travel services to MEPS sites included in the DTR Contracts that could result in a transfer of such requirements to another contractor while a DTR Contract remains in effect, we shall consider such action to be an adverse Final Decision and proceed accordingly.

Your cooperation and immediate attention to this crucial matter is appreciated.

Sincerely,

Erma Spell
President

CW Government Travel

1777 Northeast Loop 410
Suite 702B
San Antonio, TX 78217

December 1, 2003

Headquarters Military Traffic Management Command
MTMC/AQ (Attn: Ms. Jackie Robinson-Burnette)
200 Stovall Street
Alexandria, VA 22332-5000

Re: Change Order Request for MEPS Workload Data

Dear Ms. Robinson-Burnette:

Reference is made to your letter dated November 18, 2003 advising that the Government intends to modify CW Government Travel's ("CWGT") Army contracts to require extensive workload data from MEPS activities. It is our understanding that such information has been requested by the ITEC4 Contracting Officer and she provided us with a corrected link on November 21, 2003 to a Defense Travel System ("DTS") web-site. That DTS site set forth the detailed workload information requested for each MEPS activity currently served by CWGT. It is noted that the introduction to the DTS workload data format states:

> "The information collected is for the sole use of the Government in providing prospective offerors the most accurate and current workload data available. The workload data is being provided to prospective offerors for their preparation of proposals in regards to the Government's Small Business Final Request for Proposals for Travel Management Services."

As you are aware, CWGT believes that its contracts are quite explicit and unequivocally provide that CWGT will be the exclusive provider of official travel services to all sites covered by the Army contracts, including the MEPS. We have twice requested a Contracting Officer's final decision under the Disputes Clause in regard to CWGT's exclusive rights to provide travel services to the MEPS sites. In your written response of October 17, 2003, and again during our meeting of November 7, 2003, you represented that the Government has no plans to delete the MEPS requirements from CWGT's contracts and that you were unaware of any intent on the part of ITEC4 Contracting to procure other contractors to provide travel services to the MEPS currently under CWGT's contracts. The request that CWGT produce extensive workload data for the MEPS under its Army Contracts, and the referenced DTS web-site, indicate that the Government does, in fact, intend to procure other contractors to perform the MEPS travel requirements in clear violation of CWGT's exclusive contract rights.

It is requested that you respond to CWGT's outstanding requests for a Contracting Officer's final decision on this subject without further delay. It is noted that although we will promptly and fully respond to your demand for MEPS workload data, such a request is considered to be an anticipatory breach of CWGT's Army contracts.

In regard to the request for specific MEPS workload data, please be advised that it will take at least two weeks to gather the information and the process will be expensive. The DTS workload survey that CWGT was directed to respond contains 57 questions. Each of those 57 questions must be researched and answered for each of the 54 CWGT MEPS, making a total of 3078 questions that must be researched and answered. Much of that research must be performed manually, since it is not normally reported or segregated in the DTS requested format. Apparently the DTS questionnaire was drafted for ease of use for one contractor performing on one contract at one location – e.g. Air Force Base.

It is also noted that the DTS questionnaire fails to request workload data that is unique to MEPS activities. For example, the vast majority of MEPS requirements involves group travel and that is not reflected in the DTS questionnaire. The MEPS requirements are also very unique in regard to the extreme fluctuations in seasonal travel requirements and also within each business day. However, those factors that significantly impact the resources necessary and cost of performing MEPS requirements are not addressed in the DTS questionnaire. In other words, the workload data being requested by DTS for the MEPS will be very misleading for any potential contractors.

We believe that Contract Modifications will be required for each of the four CWGT Army Contracts to reflect the varying additional costs that will be incurred to provide this information for the MEPS located in each Contract. We hope to have reasonably accurate cost estimates for this added work for each contract by early next week. If you need additional information or wish to discuss the above please do not hesitate to call me.

Sincerely,

R. Craig Thompson
Vice President, Government Markets

CC: Lottie Myers, Contractor Administrator

DEPARTMENT OF THE ARMY
HEADQUARTERS
MILITARY TRAFFIC MANAGEMENT COMMAND
200 STOVALL STREET
ALEXANDRIA, VA 22332-5000

REPLY TO
ATTENTION
OF

December 29, 2003

MTMC Contracting Center

SUBJECT: **Removal of Work Associated with MEPS in DAMT01-02-C-0025 thru 0028**

Ms. Erma Spell
Carlson Wagonlit Travel
1777 NE Loop 410
Suite 702B
San Antonio, TX 78217

Dear Mr. Spell:

I am responding to your referenced letters (dated November 3, 2003 and December 1, 2003), asking for a Final Decision of the Contracting Officer, confirming that the requirements for travel services at Military Entrance Processing Stations (MEPS) will continue to be performed by your firm "throughout the total contract period of each contract, including all options that are exercised by the Government."

First, let me apologize for this late response, unforeseen circumstances have caused the delay. As stated in my previous letter (dated October 17, 2003), there is no current intention to delete the MEPS requirements from your travel services contracts with the Army. However, I also cannot assure you that at some future date these services will not be deleted and/or transferred to a Department of Defense travel service contract. That depends primarily on the outcome of the proposed acquisition set-aside for small business by the Defense Travel System (DTS) Program Management Office (PMO) for travel services at MEPS sites, including those currently within your Army contract.

As referenced in your letters, the DTS PMO has issued a draft solicitation for those travel services. I have no control over that solicitation. If the contemplated contract is awarded for those services during the performance of your contracts, DTS PMO will need to coordinate the transition of the MEPS travel services with the Army. However, as of this date, DTS PMP has not asked me to delete any MEPS travel sites from your contract for transition to a DTS contract. I cannot predict the date of such an award (if it ever occurs), or the status of your contracts at such a date. If MEPS travel services need to be transferred, the Government may elect to do so in conjunction with a non-exercise of options for your contracts, as you acknowledge would be within the Government's contractual rights. However, that determination has not been made as of this date.

Your letter asserts that a partial termination for convenience that results in a transfer of these MEPS services from the Army contracts to a DTS contract would breach your contract. Your interpretation will be considered in any decision to transfer MEPS requirements from the Army contracts to a DTS contract. However, under the existing contracts, such an action may be allowable under some circumstances. It is premature for me to speculate as to how (if ever) MEPS travel services will be transferred.

I cannot speak for the DTS PMO or fully anticipate what it may request from the Army in the future. However, I assure you that any decision on my part will be made in good faith and with full consideration of your contractual rights.

Your letter dated November 3, 2003 indicates that you may consider the lack of an absolute confirmation of your contract interpretation as an adverse Final Decision under the Contract Disputes Act (DCA). However, as stated previously, I do not know whether the Army ever will transfer MEPS services to a DTS contract, or whether such a transfer (if it occurs) will be in conjunction with the non-exercise of options. Those decisions can only be made if and when DTS PMO awards a contract for MEPS travel services. If a deletion of travel services from your contract is considered in the future, I also cannot anticipate at this time all the circumstances that may influence such a decision. All these matters are uncertain. Consequently, I believe your request involves a hypothetical that I am unable to answer without speculation as to unknown future events.

I do not consider this inability to provide the absolute commitment that you have requested to be a Final Decision under CDA. I simply lack the knowledge of future events that would enable that type of commitment. In my opinion, there is no current dispute over the contract terms that govern your ongoing performance under these travel services contracts.

Finally, I understand that the Government has offered the commitment that you request from me as part of a partial settlement of your claim in the Court of Federal Claims. This commitment would bind the United States Government, *i.e.*, the DTS PMO as well as the Army. If you desire that type of commitment, I suggest that you pursue those settlement negotiations with the Department of Justice.

I hope this response fully clarifies my position in this matter. I look forward to continue working with you on your current contracts. I will keep you informed, as I become informed.

Sincerely,

Jackie Robinson-Burnette
Contracting Officer

CF:
Craig Thompson, CWGT
Cullen Hutchinson, MTPP

08 JAN 2004

CW Government Travel™

1777 Northeast Loop 410
Suite 702B
San Antonio, TX 78217

January 6, 2004

Ms. Jackie Robinson-Burnette
Contracting Officer
Department of the Army
Military Surface Deployment & Distribution Command
200 Stovall Street
Alexandria, Virginia 22332-5000

**Re: Improper Removal of Work Associated with MEPS in DAMT01-02-C-0025; DAMT01-02-C-0026; DAMT01-02-C-0027 and DAMT01-02-C-0028; Request for A Contracting Officer's Final Decision**

Dear Ms. Robinson-Burnette:

Reference is made to your letter dated December 29, 2003, in response to our repeated requests for a Contracting Officer's final decision regarding the interpretation of the exclusivity provisions in the above-cited contracts, particularly as related to the MEPS sites.

The issue in controversy is simple, straightforward and the Contractor is entitled to a non-evasive final decision regarding the interpretation of contract terms pursuant to the Contract Disputes Act of 1978 and the Disputes Clause (FAR 52.233-1) in the above contracts. Section 1.7 of each of CWGT's DTR Contracts, entitled "Exclusivity" provides:

> **1.7.1 The Contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract.**
>
> **1.7.2 No person, private organization, or commercial travel service, including competing travel agencies, direct suppliers, or travel software vendors, will be permitted direct access to areas under DoD control to advertise, sell, provide or promote official travel services to those sites, unless the Contractor has first declined to provide the particular service or the Contractor's level of service are determined by the Contracting Officer to be unresponsive and/or unsatisfactory.**

It is CW Government Travel's ("CWGT") position that, so long as the above DTR Contracts are in effect, CWGT is the exclusive provider of travel services to all the sites listed in the contracts, including the MEPS sites, and any transfer of such travel service business to another contractor, small business or otherwise, would constitute a breach of CWGT's DTR Contracts.[1] The removal of the MEPS travel requirements from CWGT's contracts would have a significant adverse impact on CWGT's performance of those contracts.

Your letter of December 29, 2003, indicates that you cannot provide a final decision in regard to the interpretation of CWGT's contract terms because you do not know what the DTS PMO intends to do in regard to the MEPS sites included in CWGT's contracts.[2] Your letter further indicates that, if the DTS PMO awards contracts for travel services to these MEPS sites, then the MEPS travel requirements in CWGT's contracts would be transferred, and the only question is timing of such a transfer. Again, you state that such a determination would essentially be made by the DTS PMO.

CWGT is entitled, as a matter of right, to your independent determination in regard to all matters relating to these contracts, including an interpretation of the contract terms. The interpretation of the terms of the above contracts should not depend upon the intent of the DTS PMO, or other Government solicitations. It is also noted that these contracts do bind the entire U.S. Government, including the DTS PMO. Moreover, as the Contracting Officer responsible for these contracts, your final determination in regard to the interpretation of contract terms also binds the entire U.S. Government.[3] We understand and appreciate the fact that you cannot control the actions of the DTS PMO and ITEC4. However, you, not they, are responsible for the

---

1 Clearly, a partial termination for convenience that removes the MEPS requirements from CWGT's contracts for the purpose of transferring the business to contracts awarded on behalf of the DTS PMO would be a subterfuge for breaching the exclusivity provisions of CWGT's contracts and could not be considered an act in good faith.

2 It is noted that on December 17, 2003, ACA, ITEC4, Directorate of Contracting, posted a notice on FEDBIZ OPS that Solicitation W91QUZ-04-R-0007 covering six travel areas nationwide for MEPS would be issued by January 31, 2004, with initial proposals due March 31, 2004. Moreover, the earlier draft of that solicitation listed all the CWGT MEPS sites, and CWGT was directed to provide MEPS workload information for use in that solicitation. Obviously, CWGT's concern regarding a breach of its contractual rights by the Government is not hypothetical.

3 You have apparently been misinformed in regard to the nature of the partial settlement offered by the Department of Justice in a pending Court of Federal Claims action. That partial settlement offer did not provide a commitment that none of the MEPS sites would be transferred to another contractor, so long as the CWGT contracts were in effect. What was offered to CWGT was not acceptable for that and other reasons.

interpretation of the above contracts, and resolution of any disputes or controversy arising thereunder.

**It is requested that you confirm, without equivocation, that so long as the above-cited contracts are in effect, and CWGT is satisfactorily performing, none of the MEPS travel requirements currently included in these contracts may be transferred to another contractor.** The exclusivity provisions of these contracts are quite clear and unambiguous. If you will not confirm the exclusivity terms of these contracts, then the failure to agree with CWGT's interpretation will be taken as an adverse final decision. If, pending a response from you, ITEC4 issues Solicitation W91QUZ-04-R-007, and it covers the MEPS currently included in CWGT's contracts, that will be taken as an adverse decision[4] under the Contract Disputes Act of 1978 and CWGT shall proceed accordingly.

Your efforts, to date, to ensure the proper and fair administration of the above contracts are appreciated. However, we trust that you understand that CWGT cannot, and will not, sit idly by and watch DTS PMO and ITEC4 proceed to violate the terms of CWGT's contracts.

Sincerely,

Erma Spell
President

[4] MTMC, as the contracting activity responsible for CWGT's contracts, has an obligation to ensure that other Government activities do not violate the terms of CWGT's contracts. The pending action by the DTS PMO and ITEC4 is well known to MTMC, and the exclusivity terms of CWGT's contracts have, presumably, been called to the attention of the DTS PMO and ITEC4 by MTMC. Therefore, the issuance of a solicitation to secure other contractors to perform the official travel services required by the MEPS sites in CWGT's contracts must be considered as a deliberate, knowing attempt by the responsible Government officials to violate CWGT's contractual rights.

DEPARTMENT OF THE ARMY
MILITARY SURFACE DEPLOYMENT AND DISTRIBUTION COMMAND
200 STOVALL STREET
ALEXANDRIA, VA 22332-5000

March 1, 2004

Contracting Center (PP&PS Div)

Erma Spell
Carlson Wagonlit Travel
1777 NE Loop 410
Suite 702B
San Antonio, TX 78217

Dear Ms. Spell:

Reference is made to your request for Contracting Officer's Decision regarding potential transfer of MEPS services from DAMT01-02-C-0025 thru 0028 (your letter, dated January 6, 2004). I am responding to the subject letter requesting an interpretation of the exclusivity clauses in the subject contracts.

I note that your most recent request differs slightly from the prior requests for a contracting officer decision in other letters referenced in the subject letter. In previous letters (dated October 8, 2003 and November 3, 2003), you requested that as contracting officer I "confirm that the official travel requirements for all MEPS sites included in the four DTR contracts cited above will continue to be performed by CWGT throughout the total contract period of each contract, including all options that are exercised by the Government." As I explained in previous responses (dated October 17, 2003 and December 29, 2003), I am unable to provide the absolute commitment requested because I "lack the knowledge of future events that would enable that type of commitment."

In the most recent letter, you request an interpretation of the exclusivity clauses of the subject contracts (paragraphs 1.7.1 and 1.7.2 of the performance work statement). You also assert that "so long as the above DTR Contracts are in effect, CWGT is the exclusive provider of travel services to all the sites listed in the contracts, including the MEPS sites, and any transfer of such travel service business to another contractor, small business or otherwise, would constitute a breach of CWGT's DTR Contracts." In other words, you are asking me to agree that the exclusivity clauses absolutely prohibit a transfer of travel service businesses (including Military Entrance Processing Stations or "MEPS" services) to another contractor.

The exclusivity clauses clearly prohibit the Government from obtaining like services from another contractor while the services are part of your contract requirements. However, the exclusivity clauses do not absolutely prohibit a transfer of services. The subject contracts allow for the non-exercise of options and a termination of services for the convenience of the government.

Printed on Recycled Paper

Of course, consistent with its contractual obligations, the Government may not terminate for convenience the services in a requirements contract *in bad faith* in order to transfer such services to another contractor. In a footnote, you maintain that any partial termination for convenience of MEPS services to transfer them to contracts awarded by the Defense Travel System (DTS) Program Management Office (PMO) necessarily would not be in good faith. I cannot make that determination at this time. I do not know whether we ever will reach a point during the performance of your contracts that the DTS PMO will request a transfer of MEPS services. I also do not know what may be the circumstances of such a proposed transfer, if any eventually should be requested. Therefore, it is not simply a matter of interpreting the exclusivity clauses. It is a matter of knowing whether a proposed transfer involves act of bad faith by the Government. I cannot determine that a transfer of MEPS services to a DTS PMO contract inevitably would be in bad faith.

Accordingly, I am unable to provide a contracting officer's final decision in response to the hypothetical you have posed. Nonetheless, I will consider your interpretation of contract requirements if DTS PMO requests such a transfer of MEPS services in the future.[1]

Once again, I do not consider this inability to provide the commitment that you have requested as a Final Decision under the Contract Disputes Act. In my opinion, there is no current dispute over the contract terms that affect your ongoing performance under these travel services contracts.

I look forward to continuing working with on your current contracts.

Sincerely,

Jackie Robinson-Burnette
Contracting Officer

[1] Your recent letter contends that my prior response (December 29, 2003) indicates that the DTS PMO essentially would determine whether and when MEPS services would be transferred. I do not read my letter to suggest that. I did not intend to convey that meaning in the letter.