# In the United States Court of Federal Claims

| | | |
|---|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 04-718C** |
| | ) | **(Judge Emily C. Hewitt)** |
| **THE UNITED STATES of AMERICA,** | ) | |
| **Defendant.** | ) | |

**CARLSON'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone: (703) 760-1600
Facsimile: (703) 760-1623 (Protected)

*Of Counsel:*
Michael W. Robinson
Benjamin A. Winter
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182

Dated August 23, 2004

# TABLE OF CONTENTS


TABLE OF CONTENTS .......... I

TABLE OF AUTHORITIES .......... III

STATEMENT OF THE FACTS .......... 6

A. THE ARMY AWARDS FOUR ARMY CONTRACTS THAT GRANT CARLSON THE EXCLUSIVE RIGHT TO PROVIDE TRAVEL MANAGEMENT SERVICES TO DESIGNATED MEPS .......... 6

B. THE ARMY ISSUES A SOLICITATION SEEKING TO PROCURE TRAVEL SERVICES FOR MEPS SITES COVERED BY CARLSON'S EXCLUSIVE CONTRACTS .......... 10

C. CARLSON SUBMITS A CLAIM FOR A CONTRACTING OFFICER'S FINAL DECISION .......... 11

ARGUMENT .......... 18

I. THIS COURT POSSESSES JURISDICTION TO ENTERTAIN CARLSON'S COMPLAINT BECAUSE CARLSON FILED A CLAIM WITHIN THE MEANING OF THE CONTRACT DISPUTES ACT . 18

II. THIS COURT POSSESSES JURISDICTION TO ENTERTAIN CARLSON'S COMPLAINT BECAUSE THE CONTRACTING OFFICER ISSUED A FINAL DECISION ON THE CLAIM .......... 22

III. THIS COURT POSSESSES JURISDICTION BECAUSE CARLSON'S COMPLAINT IS RIPE FOR ADJUDICATION .......... 24

IV. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT .......... 31

A. There Are Material Facts In Dispute .......... 32

B. The Government Attorney's Interpretation Of Carlson's DTR Contracts Is Not Valid .......... 33

CONCLUSION .......... 37

APPENDIX

Exhibit 1 Contract DAMT01-02-C-0027 .......... EX 1

Exhibit 2 Solicitation W91QUZ-04-R-0007 .......... EX 84

Exhibit 3 Letter from Spell to Robinson-Burnette of 10/8/03 .......... EX 336

Exhibit 4 Letter from Robinson-Burnette to Spell of 10/17/03 .......... EX 338

Exhibit 5 Letter from Spell to Robinson-Burnette of 11/03/03 .......... EX 339

Exhibit 6 Letter from Robinson-Burnette to Thompson of 11/17/03…………………EX 341

Exhibit 7 Letter from Robinson-Burnette to Thompson of 11/18/03…………………EX 346

Exhibit 8 Letter from Thompson to Robinson-Burnette of 12/1/03…………………..EX 351

Exhibit 9 Letter from Robinson-Burnette to Spell of 12/29/03……………………….EX 353

Exhibit 10 Letter from Spell to Robinson-Burnette of 1/6/04………………………….EX 355

Exhibit 11 Letter from Robinson-Burnette to Spell of 3/1/04………………………….EX 358

**TABLE OF AUTHORITIES**

**CASES**

*AirTrak Travel*, B-292101; B-292101.2; B-292101.3; B-292101.4; B-292101.5, June 30, 2003, 2003 CPD ¶ 117 ........................................ 8, 10, 33, 36

*Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260 (Fed. Cir. 1999) ..........................passim

*Bowles v. United States*, 23 C. Ct. 443 (1991)........................................ 5

*CW Government Travel, Inc. v. United States*, _____ Fed. Cl. _____ (2004) (No. 03-1274C).. 21, 24

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999)........................................ 30

*Litton Sys., Inc. v. Untied States*, 27 Fed. Cl. 306 (1992)........................................ 23

*Serco Servs. Co. v. Kelley Co.*, 51 F.3d 1037 (Fed. Cir. 1995) ........................................ 6

*W.R. Cooper Gen. Contractor, Inc. v. United States*, 843 F.2d 1362 (Fed. Cir. 1988) ................ 30

**STATUTES**

28 U.S.C. § 1491(a)(2)........................................ 19

41 U.S.C. § 605(c)(5)........................................ 19, 22

41 U.S.C. §§ 601-613 ........................................ 12

**REGULATIONS**

48 C.F.R. § 33.201 ........................................ 14, 19, 27

CW Government Travel, Inc. ("Carlson") respectfully submits this Response in Opposition to Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.

**INTRODUCTION**

This case is complicated by the fact that two different Army Commands, with different agendas and apparently limited communications, are involved. The Military Surface Deployment and Distribution Command ("SDDC") (formerly the Military Traffic Management Command or "MTMC") awarded the Carlson DTR Contracts and is responsible for their administration. Another Army procurement activity, the Army Contracting Agency Information Technology, E-Commerce and Commercial Contracting Center ("ITEC4"), working for the Defense Travel System Program Management Office ("DTS PMO"), has issued solicitations for small business contractors to provide travel management services to 54 Military Entrance Processing Stations ("MEPS") currently under Carlson's DTR Contracts. The ITEC4 Solicitation No. W91QUZ-R-0007, to transfer the MEPS work, is proceeding with proposals received on or about June 14, 2004. The Government recently represented to this Court in another case that it intended to award contracts by October 29, 2004, and that the work would be transferred from Carlson to the new contractors on April 1, 2005. Thus, by October 29, 2004, the Government will be in the position in which it is contractually obligated to six small business contractors[1] under ITEC4's contracts, and to Carlson under the DTR Contracts, to have all of them provide travel management services to the same 54 MEPS sites.

---

[1] Under the ITEC4 Solicitation W91QUZ-R-0007, the MEPS locations are divided into six separate contractual regions. These will be separately awarded, but a single contractor could win more than one region.

In the context of repeated and unambiguous expressions of the Government's intent to transfer the MEPS travel requirements, Carlson repeatedly asked its SDDC Contracting Officer for an interpretation of the Exclusivity Clauses in Carlson's contracts and its rights to perform all of the services in those contracts.[2] Carlson interprets the contracts to preclude the Government from carving this work out of Carlson's DTR Contracts and awarding it to others as long as Carlson's DTR Contracts are in effect. The responses from the SDDC Contracting Officer have been evasive, but the ITEC4 procurement actions and public announcements to the travel industry indicate that the Government is ignoring Carlson's contractual rights and intends to transfer the MEPS travel requirements to other contractors, while Carlson's DTR Contracts remain in effect.

Carlson's DTR Contracts have a firm one-year contract period (October 1, 2002 – October 1, 2003) and a series of six-month options that the Government has been exercising routinely. The Government has currently exercised the options to extend the contracts through March 31, 2005, with the next option period running from April 1, 2005 through September 30, 2005. The DTR Contracts clearly and unambiguously contemplate that the options will be exercised unless new contracts replacing all current Department of Defense ("DoD") travel management service contracts are awarded. Moreover, it is believed that SDDC in fact intends to exercise the options to extend the Carlson DTR Contracts at least through March 31, 2006.

Notwithstanding clear requests, the SDDC Contracting Officer has refused to interpret Carlson's DTR Contract rights in direct reference to ITEC4's Solicitation W91QUZ-R-0007

---

[2] As discussed further below, Carlson contends that the Exclusivity Clauses limit the Government's right to partially terminate these contracts for convenience. In other words, the Exclusivity Clauses prohibit the Government from partially terminating the contracts for convenience if the purpose is to transfer some of the work from Carlson's DTR Contracts to other contractors.

obligations to award contracts that provide for other contractors to commence providing travel management services to the 54 MEPS sites in Carlson's DTR Contracts. The SDDC Contracting Officer has certainly implied that the Government will award the MEPS portions of Carlson's work to other contractors, while simultaneously insisting that Carlson proceed to perform that work that was not carved out and awarded to others.

The Government contends that there is no actual dispute at issue and that the Court should decline to review the Government's action because, notwithstanding the DTR Contract language regarding the intent to exercise options and the Government's current intent (and need) to exercise the options, the Government has not yet exercised its option for the April 1 through September 30, 2005 contract period. That suggestion ignores the role of the Court under the Contract Disputes Act ("CDA"), misconstrues the issue before the Court, and sets the stage for far more uncertainty and far more difficult proceedings in the near future. The Government's suggestion certainly does not further interests of judicial economy or further the policies in the CDA that contemplate prompt resolution of such issues. The Government says that the Court should wait until March 2005 to see if Carlson's DTR Contracts are extended from April 1, 2005 through September 30, 2005. But in March 2005, the Court will face a far different and more complex situation; the Government will have already awarded the same work to six other contractors to commence on April 1, 2005. Thus, rather than addressing the simple issue of contract interpretation on Carlson's DTR Contracts, the Court will be faced with determining, under motions for TROs, which of up to ten Government contracts (Carlson's four DTR Contracts and ITEC4's six small business contracts) the Government must breach and the need to balance the competing interests of multiple parties. Moreover, the cost to the parties and Government will increase substantially if the Court defers this case until March 2005, since the

six small business contractors will commence work promptly upon the October 29, 2004 awards under Solicitation W91QUZ-R-0007 to prepare to commence full performance on April 1, 2005 at the 54 MEPS sites. Those same small business contractors will undoubtedly attempt to recruit trained Carlson personnel who are currently performing the unique MEPS travel requirements and the status of the employees of both Carlson and the small business contractors will be up in the air as to whether they have jobs on April 1, 2005.

The Government's Motion presents the Court with four questions. The answer to each of those questions dictates that the Motion should be denied. First, the Government asks "whether this Court possesses jurisdiction to entertain plaintiff's complaint where plaintiff did not first file a claim, within the meaning of the Contract Disputes Act, with its contracting officer." The question rests on a false premise. Carlson submitted specific requests for contract interpretation. The CDA recognizes that such a request is a claim and this Court has repeatedly (and just recently) reaffirmed that uncontested principle. Second, the Government asks whether the Court "possesses jurisdiction to entertain plaintiff's complaint where the contracting officer did not issue a final decision." The refusal to address a claim is deemed a denial and establishes jurisdiction; a point established under the CDA and again reaffirmed by this Court. Moreover, the interpretation advanced by the Government is clearly antagonistic to Carlson's claimed contract rights. Third, the Government asks whether the Court has "jurisdiction to entertain plaintiff's complaint where it requests relief that is not ripe for adjudication." Carlson has submitted a current dispute as to the meaning of the Exclusivity Clauses in its contracts and its contract rights. The Government has consistently attempted to avoid providing any such interpretation, while simultaneously undertaking extensive efforts to transfer Carlson's work to others in a situation that Carlson contends would violate its DTR Contracts. This situation is the

very purpose of having a means for a prompt judicial resolution. Finally, the Government suggests that the contracts actually authorize the Government to carve out any portions of the work with 90 days notice to Carlson. While the Contracting Officer has never suggested such an ability (although presumably could have in response to Carlson's repeated requests), the clauses relied on by the Government do not support the Government's new interpretation. However, the fact that the Government is now arguing to the Court that it can interpret the contracts to allow it to carve out and transfer work to others, while requiring Carlson to continue to perform its contracts, underscores the need for and desirability of having the contracts interpreted now (not later) so that the parties conduct can proceed in an orderly manner.

Carlson properly invoked this Court's jurisdiction to issue a declaratory judgment interpreting its contracts. Carlson presents this Court with a live controversy that is ripe for judicial review and warrants the Court's participation to prevent the Government from improperly acting in a manner that is at direct odds with the express terms of Carlson's contracts. Under the Government's suggested approach (and interpretation set forth in its Motion), the Government will be contractually obligated to purchase the exact same services from different contractors under different contracts, which inevitably will result in a breach that forces this Court to entertain complaints from multiple parties with multiple legal issues. Thus, judicial resolution is appropriate and serves the long-recognized purpose of a declaratory judgment, which is "preventive relief"[3] to "enable a person caught in controversy to obtain resolution of the dispute, instead of being forced to await the initiative of the antagonist.'" *Serco Servs. Co. v. Kelley Co.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995).

---

3 *Bowles v. United States*, 23 C. Ct. 443, 445 (1991) (stating that "[t]he purpose of a declaratory judgment is to provide preventive relief").

## STATEMENT OF THE FACTS

### A. The Army Awards Four Army Contracts That Grant Carlson The Exclusive Right To Provide Travel Management Services To Designated MEPS

In 2002, after full and open competition, the Army awarded four contracts to Carlson to provide traditional travel services in designated regions known as Defense Travel Regions ("DTRs"). The DTRs awarded to Carlson included:

> **DTR-1**: Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington and Wyoming
>
> **DTR-2**: Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, Puerto Rico, and the Virgin Islands
>
> **DTR-4**: Connecticut, Delaware, Kentucky, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, Virginia and West Virginia
>
> **DTR-5**: Arkansas, Kansas, Louisiana, Missouri, Nebraska, New Mexico, Oklahoma and Texas

Contract Numbers DAMT01-02-C-0025, DAMT01-02-C-0026, DAMT01-02-C-0027, and DAMT01-02-C-0028 (Contract DAMT01-02-C-0027 for DTR-2 is attached as Exhibit 1). Under its contracts, Carlson is required to provide, fully-trained staff, and equip Commercial Travel Offices, as well as offices located onsite at Government facilities (collectively "CTOs"). The professional staff at these CTOs must provide a full range of travel management services to the Government.

Carlson's contracts also include providing travel services to 54 Military Entrance Processing Stations located through the DTR regions. These facilities, commonly referred to as MEPS, process military recruits for enlistment or induction into the armed services. Carlson is required to provide travel services to accommodate the unique travel of these military recruits from the MEPS locations to their assigned training camps. The recruits report to the MEPS early in the morning for physicals and processing. Their travel arrangements must be made that same

morning for travel later the same day in groups to military bases to commence basic training. At least 95% of MEPS travel is group travel. Solicitation W91QUZ-04-R-0007, at § L.10.4.3.13.9 (attached as Exhibit 2). Moreover, the MEPS travel service requirements are concentrated in the morning hours, with the vast majority of the annual workload is concentrated in the summer months as recruits finish school.

Each of Carlson's contracts contains an Exclusivity Clause stating that Carlson "has the exclusive right to provide all official commercial travel services at all sites covered under this contract," including the 54 MEPS sites. *See, e.g.,* Exhibit 1 at § 1.7. The contracts further provide that "[n]o person, private organization, or commercial travel service, including competing travel agencies, direct suppliers, or travel software vendors, will be permitted direct access to areas under DoD control to advertise, sell, provide or promote official travel services to those sites, unless the Contractor has first declined to provide the particular service or the Contractor's levels of service are determined by the Contracting Officer to be unresponsive and/or unsatisfactory." *Id.* at § 1.7.2. Under the express terms of the contracts, Carlson has the exclusive right to provide travel services to the Government in the designated DTRs covered by its four contracts, including the 54 MEPS sites.

The contracts provide a base period of one year and a series of six-month options that may extend the contract through September 30, 2007. With regard to the exercise of options, the contracts contemplate only two circumstances in which the Government might not exercise the options:

> 1.1.1.2. The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract resulting from this solicitation."

*Id.* at § 1.1.1.2. The contracts therefore provide that options will be exercised unless the DoD implements the DTS.[4] At the time Carlson's four contracts were awarded, all parties understood and agreed that the phrase "DoD implements the Defense Travel System (DTS)" meant the implementation of a fully functional, end-to-end travel management system to perform all of DoD's travel services electronically. The Government has yet to implement a fully functional DTS although deployment has begun of a limited capability DTS. As a consequence, the Government has no basis for failing to exercise an option to extend Carlson's DTR Contracts. Moreover, with regard to travel services for the MEPS that are at issue in this case, the Government has stated that the DTS will not be functional and capable of facilitating MEPS travel until Fiscal Year 2006 ("FY 2006") at the earliest.[5] Thus, the Government would have no basis for failing to exercise Carlson's DTR Contract options before FY 2006.

---

[4] Carlson's DTR Contracts (Exhibit 1 at §3.25) also provided the Government with the option of having Carlson continue providing travel services utilizing the automated DTS. The Government has exercised such options and Carlson is currently using the DTS at 31 locations in the DTR Contracts.

[5] Indeed, a decision by the United States Government Accountability Office ("GAO") issued in a bid protest last year involving the predecessor solicitation to the MEPS solicitation Carlson is now challenging stated that "[w]ith regard to the MEPS locations, the record does not reasonably reflect when, whether or to what extent the DTS will be used in view of the different nature of the travel at those locations." *AirTrak Travel*, B-292101; B-292101.2; B-292101.3; B-292101.4; B-292101.5, June 30, 2003, 2003 CPD ¶ 117. The GAO went on to note that:

> [T]he solicitation did not disclose when the DTS will be fully deployed for use by the CTOs and the agency has advised offerors that 95 percent of travel at the MEPS would constitute group travel. See Tr., June 6, 2003, at 91-92. From the testimony of the agency officials, it was not clear whether the DTS can be utilized to book group travel at the MEPS because the DTS is currently configured to operate through the GDS, and the protesters have maintained that the GDS, which is controlled by the airlines, does not permit booking groups of 10 or more through the GDS, particularly where the names are unavailable; as a result, such arrangements typically are done through traditional means. See Tr.,

The only other provision in the contracts that authorized the Government to remove services was a provision in the section titled "Transition Plan (Phase-in/Phase-Out)" that related to the transition of services in the event that sometime in the future the Government awarded global DoD travel service contracts, to replace all existing travel management service contracts. According to Carlson's contracts, once the DoD-wide travel services contracts were awarded, the Government could remove workload from Carlson's contracts by providing 90 days written notice from the Contracting Officer identifying the workload to be deleted.[6] Absent the award of DoD-wide travel services contracts, however, this provision provides no independent authority for the Government to remove services from Carlson's contracts. It certainly does not provide authority to transfer the MEPS requirements to contracts awarded under ITEC4's Solicitation W91QUZ-R-0007.

---

> June 6, 2003, at 91-93. Agency officials gave varying testimony on whether the DTS would accomplish MEPS travel, only definitively representing that the DTS will automate some aspects of the DoD travel process at the MEPS, such as reconciliation of accounts. While the agency expresses optimism that the DTS will eventually be fully utilized for the MEPS locations, it has set no dates for the deployment and admits that there are obstacles to achieving this goal.

*Id.*

[6] The contracts specifically state:

> 1.6.7. At a future date a DOD travel services contract(s) will be awarded replacing this contract and all other Service/Agency existing travel service contracts. Once the DOD travel services contract is awarded all DOD sites will transition in accordance with the implementation dates to the DOD travel services contract.
>
> 1.6.8. At any time after the base period of this contract, with a 90-day notice from the Contracting Officer to the Contractor, the Government may identify any/or all workload included in this contract to be deleted.

*See, e.g.,* Exhibit 1 at §§ 1.6.7, 1.6.8.

**B. The Army Issues A Solicitation Seeking To Procure Travel Services For MEPS Sites Covered By Carlson's Exclusive Contracts**

ITEC4 issued Solicitation No. DABL01-03-R-1001 in November 2002, as a small business set-aside to provide travel management services using a combination of traditional travel services and the automated DTS system for a number of Air Force bases throughout the United States. In early 2003, the Solicitation was amended to include 54 MEPS sites that are also included in Carlson's DTR Contracts. A number of small business travel service contractors filed protests challenging the terms of the Solicitation before the Government Accountability Office ("GAO"). The GAO issued a decision on June 30, 2003, sustaining the protests due to a number of significant defects in the terms and conditions of the Solicitation. *See AirTrak Travel*, B-292101 – B-292101.5, (June 30, 2003) 2003 CPD ¶ 117.

As a result of the June 30, 2003 GAO adverse decision, ITEC4 cancelled Solicitation No. DABL01-03-R-1001, but announced that it intended to promptly reissue a corrected a solicitation for such travel services. In the Fall of 2003, ITEC4 issued two draft solicitations for industry comments. One solicitation contained the travel requirements for the Air Force bases and the other contained only the travel requirements for 63 MEPS locations, including 54 MEPS locations contained in Carlson's DTR Contracts.

On February 13, 2004, ITEC4 released the final Solicitation Number W91QUZ-04-R-0007 (the "MEPS Solicitation"), which invites small businesses to submit proposals to provide travel management services to 63 MEPS sites divided into six contractual regions. The MEPS locations included in the MEPS Solicitation include 54 that are the same locations covered by Carlson's DTR Contracts. *Id.* at Travel Area Workload Counts. Proposals were submitted on

June 11, 2004, and the Government plans to award contracts on or around October 29, 2004. Performance of these contracts is scheduled to begin on April 1, 2005.[7]

### C. Carlson Submits A Claim For A Contracting Officer's Final Decision

After discovering that ITEC4 planned to issue another solicitation[8] seeking to procure travel management services for MEPS sites covered by Carlson's DTR Contracts, Carlson submitted a written claim on October 8, 2003. Carlson first quoted the Exclusivity Provisions in its DTR Contracts (Exhibit 1 at §§ 1.7.1 and 1.7.2) and cited the previous solicitation for MEPS travel services issued by ITEC4 that had been found defective by the GAO. Carlson requesting that the SDDC Contracting Officer provide a final decision interpreting Carlson's contracts:

> It is requested that you confirm that the travel requirements for all the MEPS sites included in the four DTR Contracts cited above will continue to be performed by CWGT throughout the total contract period of each contract, including all options that are exercised by the Government. In other words, so long as a DTR Contract remains in effect, none of the travel requirements of the MEPS sites currently in that DTR Contract may be transferred to any other contractor.
>
> If it is the Government's position that the travel requirements of the MEPS sites covered by the DTS Contracts may be transferred to another contractor, including pursuant to a small business set-aside procurement, then it is requested that you promptly issue a Final

---

7 In another case pending before the United States Court of Federal Claims, the Government submitted a proposed timetable in which it asserted its intention to award contracts under the MEPS Solicitation on October 29, 2004, with awardees scheduled to begin performance on April 1, 2005. Proposed Timetable and Actions to Implement Order Dated July 26, 2004 at 2-3, *CW Government Travel, Inc. v. United States*, _____ Fed. Cl. _____ (2004) (No. 03-1274 C).

8 ITEC4 and the DTS PMO had announced to the industry that they planned to issue two draft solicitations, separating the Air Force bases and the MEPS travel requirements that had been combined in the solicitation found defective by GAO in June 2003. The two solicitations purported to correct the defects found by GAO and were to be circulated in draft form for industry comment.

> Decision pursuant to the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-613) and FAR Subpart 33.2.

(Letter from Spell to Robinson-Burnette of 10/8/04, at 2 (attached as Exhibit 3).) Thus, Carlson unambiguously requested that the Contracting Officer make a final determination pursuant to the CDA about whether it believed Carlson's contracts could be interpreted as allowing the Government to transfer services to another contractor during the life of the contract, including any exercised options. *Id.* In this same letter, Carlson also stated its position that, because the travel services required by MEPS could not be booked through the DTS CUI, the Army could not justify the removal of the MEPS locations from Carlson's Army Contracts on the basis that the DTS CUI had been implemented. *Id.* The following day, ITEC4 issued a draft Request for Proposals ("RFP") that included requirements to provide traditional travel services to MEPS covered by Carlson's four existing Army contracts.

On October 17, 2003, the Contracting Officer responded to Carlson's letter and stated:

> At this time, the Military Traffic Management Command has no plans to delete the MEPS travel service requirements from these contracts.
>
> I cannot promise that the MEPS requirements never will be removed from these contracts. As you know, the contracts (in Performance Work Statement, paragraph 1.6.7) provide for the transition of travel services in accordance with implementation dates of future DoD travel services contracts. The contracts also contain the standard termination for convenience clauses. Moreover, there is no guarantee that future options will be exercised.

(Letter from Robinson-Burnette to Spell of 10/17/03 (attached as Exhibit 4).) The SDDC Contracting Officer avoided discussing ITEC4's plans, as evidenced by the circulating draft solicitation. However, the Contracting Officer apparently did in fact interpret Carlson's contracts as allowing the Government to transfer services in accordance with the implementation

of the planned DoD-wide travel services contracts, the termination for convenience clause or by declining to exercise an option. *Id.* Notwithstanding conceding the interpretation quoted above, however, the Contracting Officer attempted to dodge having her letter deemed a final decision by claiming that she could not provide such a decision because she did "not know whether these MEPS requirements ever will be deleted from these contracts or (if so) what the circumstances of such a removal of work may be." *Id.* However, on October 27, 2003, ITEC4 held an industry-wide pre-proposal conference to discuss the draft MEPS Solicitation. (Exhibit 2 at § L.5.1.)

Recognizing that the Contracting Officer's response was evasive, Carlson again made another written demand for a final decision interpreting the contracts. (Letter from Spell to Robinson-Burnette of 11/3/04 (attached as Exhibit 5).) In this November 3, 2003 letter, Carlson explained that:

> As pointed out in my letter of October 7, 2003, the DTR Contracts unequivocally provide that CWGT will be the 'exclusive' provider of official travel services for all sites covered in those contracts, so long as the contracts are in effect. I simply requested that you confirm this fundamental contract right, particularly in light of contrary action by ITEC4 and the DTS PMO.

*Id.* In view of the Contracting Officer's attempt to characterize Carlson's request as "hypothetical," Carlson further noted that:

> I did not ask you to guarantee that all the options under the DTR Contracts would be exercised to extend them through September 30, 2007. I did not ask you to guarantee that each and every MEPS site would remain open and continue to require official travel services through September 30, 2007. I did not ask you to guarantee that the Government would never exercise its rights to terminate some contract requirements for the convenience of the Government. However, it is noted that if such a partial termination for convenience was done in order to transfer the requirements to another contractor, that would not be a good faith exercise of such a termination for convenience. In that situation, we would contend it is a material breach of CWGT's contractual rights. Even if it were permissible to remove the MEPS sites from the DTR

> Contracts via the rouse of a termination for convenience, the equitable adjustment that CWGT would be entitled to would be very substantial.
>
> It is requested that you confirm that the official travel requirements for all the MEPS sites included in the four DTR Contracts cited above will continue to be performed by CWGT throughout the total contract period of each contract, including all options that are exercised by the Government. In other words, so long as a DTR Contract remains in effect, <u>none</u> of the then-current official travel requirements of the MEPS sites currently in that DTR Contract may be transferred to any other contractor, including any contractor receiving an award pursuant to a Small Business Set-Aside Solicitation issued by ITEC4.

*Id.* at 1-2. Carlson then requested again that the Contracting Officer issue a final decision in accordance with the CDA and FAR Subpart 33.2. *Id.* at 2. Carlson added that "if we receive another response similar to your letter of October 17, 2003, or ITEC4 issues a Solicitation for contractors to provide official travel services to MEPS sites included in the DTR Contracts that could result in a transfer of such requirements to another contractor while a DTR Contract remains in effect, we shall consider such action to be an adverse Final Decision and proceed accordingly." *Id.*

Ignoring Carlson's second request for a final decision, the Contracting Officer instead issued two letters notifying Carlson that the Army was planning to modify Carlson's contracts to require that Carlson produce extensive workload data relating to the MEPS sites served by its four contracts. The workload data was specifically required by ITEC4 for use in issuance of the MEPS Solicitation sponsored by the DTS PMO. (Letters from Robinson-Burnette to Thompson of 11/17/03 & 11/18/03 (attached as Exhibits 6 & 7).) Carlson responded by letter dated December 1, 2003, and objected to the Government's requirement for the MEPS workload data on the ground that "[t]he request that CWGT produce extensive workload data for the MEPS under its Army Contracts, and the referenced DTS web-site, indicate that the Government does,

in fact, intend to procure other contractors to perform the MEPS travel requirements in clear violation of CWGT's exclusive contract rights." (Letter from Thompson to Robinson-Burnette of 12/1/03 at 1 (attached as Exhibit 8).) Carlson then made yet another demand that the SDDC Contracting Officer "respond to CWGT's outstanding requests for a Contracting Officer's final decision on this subject without further delay." *Id.* at 2. Carlson then advised the Government that "although we will promptly and fully respond to your demand for MEPS workload data, such a request is considered to be an anticipatory breach of CWGT's Army contracts." *Id.*

On December 29, 2003, the SDDC Contracting Officer finally responded to Carlson's November and December letters. (Letter from Robinson-Burnette to Spell of 12/29/03 (attached as Exhibit 9.) In her response, the Contracting Officer conceded that a draft solicitation seeking services covered by Carlson's contracts had been released. *Id.* (stating that "[a]s referenced in your letters, the DTS PMO has issued a draft solicitation for those travel services. I have no control over that solicitation."). The Contracting Officer also conceded that she interpreted Carlson's contracts as allowing the Government to procure services covered by Carlson's contracts from another contractor. *Id.* (stating "[i]f the contemplated contract is awarded for those services during the performance of your contracts, DTS PMO will need to coordinate the transition of the MEPS travel services with the Army"). The Contracting Officer claimed that she may transfer the MEPS travel services "in conjunction with a non-exercise of options for your contracts." *Id.* The Contracting Officer also indicated that she believed the Government could effect a transfer of the MEPS travel services via a partial termination for convenience:

> Your letter asserts that a partial termination for convenience that results in a transfer of these MEPS services from the Army contracts to a DTS contract would breach your contract. Your interpretation will be considered in any decision to transfer MEPS requirements from the Army contracts to a DTS contract.

> However, under the existing contracts, such an action may be allowable under some circumstances.

*Id.* at 2. Despite the Contracting Officer's stated position, she nevertheless again tried to avoid having her letter characterized as a final decision by taking the self-serving stance that "I do not consider this inability to provide the absolute commitment that you have requested to be a Final Decision under CDA." *Id.* at 2.

After receiving the Contracting Officer's latest response, Carlson submitted its last claim on January 6, 2004 (Letter from Spell to Robinson-Burnette of 1/6/04, Exhibit 10) disputing the Contracting Officer's contention that she could not provide a final decision interpreting Carlson's contracts because she "cannot speak for the DTS PMO or fully anticipate what it may request from the Army in the future:"[9]

> Your letter of December 29, 2003, indicates that you cannot provide a final decision in regard to the interpretation of CWGT's contract terms because you do not know what the DTS PMO intends to do in regard to the MEPS sites included in CWGT's contracts. Your letter further indicates that, if the DTS PMO awards contracts for travel services to these MEPS sites, then the MEPS travel requirements in CWGT's contracts would be transferred, and the only question is timing of such a transfer. Again, you state such a determination would essentially be made by the DTS PMO.
>
> CWGT is entitled, as a matter of right, to your independent determination in regard to all matters relating to these contracts, including an interpretation of the contract terms. The interpretation of the terms of the above contracts should not depend upon the intent of the DTS PMO, or other Government solicitations. It is also noted that these contracts do bind the entire U.S. Government, including the DTS PMO. Moreover, as the Contracting Officer responsible for these contracts, your final determination in regard to the interpretation of contract terms also binds the entire U.S. Government. We understand and appreciate that you cannot control the actions of the DTS PMO and ITEC4.

---

9 *Id.*

> However, you, not they, are responsible for the interpretation of the above contracts, and resolution of any disputes or controversy arising thereunder.

*Id.* Accordingly, Carlson made a final claim demanding a final decision interpreting the contract:

> It is requested that you confirm, without equivocation, that so long as the above-cited contracts are in effect, and CWGT is satisfactorily performing, none of the MEPS travel requirements currently included in these contracts may be transferred to another contractor.

*Id.*

On February 13, 2004, ITEC4 issued final Solicitation W91QUZ-R-0007 for the MEPS travel service requirements and announced an industry –wide pre-proposal conference would be held on March 10, 2004. (Exhibit 2 § L.5.2.) The Contracting Officer responded about two months later by taking the position that she considered Carlson's latest claim to request a slightly different interpretation of the contracts' Exclusivity Clauses. (Letter from Robinson-Burnette to Spell of 3/1/04 (Exhibit 11) stating that "I note that your most recent request differs slightly from the prior requests for a contracting officer decision in other letters referenced in the subject letter.") The Contracting Officer therefore stated that she interpreted the Exclusivity Clauses as follows:

> [Y]ou are asking me to agree that the exclusivity clauses absolutely prohibit a transfer of travel service businesses (including Military Entrance Processing Stations or "MEPS" services) to another contractor.
>
> The exclusivity clauses clearly prohibit the Government from obtaining like services from another contractor while the services are part of your contract requirements. However, the exclusivity clauses do not absolutely prohibit a transfer of services. The subject contract allow for the non-exercise of options and a termination of services for the convenience of the government.

*Id.* at 1. Although claiming that the Government could, in fact, transfer services via a termination for convenience, the Contracting Officer nevertheless admitted that "[o]f course, consistent with its contractual obligations, the Government may not terminate for convenience the services in a requirements contract *in bad faith* in order to transfer such services to another contractor." *Id.* at 2 (emphasis in original). Yet again, however, the Contracting Officer refused to characterize her interpretation as a "Final Decision" under the CDA. *Id.* (Stating that "[o]nce again, I do not consider this inability to provide the commitment that you have requested as a Final Decision under the Contract Disputes Act.")

Carlson filed this action on April 26, 2004, seeking a declaratory judgment validating Carlson's interpretation of its DTR Contracts and a permanent injunction ordering the Army to refrain from transferring requirements to provide travel management services for MEPS locations covered by Carlson's Army contracts until a DTS CUI is operationally deployed and able to provide the required services at those sites.

## ARGUMENT

### I. THIS COURT POSSESSES JURISDICTION TO ENTERTAIN CARLSON'S COMPLAINT BECAUSE CARLSON FILED A CLAIM WITHIN THE MEANING OF THE CONTRACT DISPUTES ACT

The Government initially challenges the Court's jurisdiction on the ground that Carlson failed to file a valid "claim" within the meaning of the CDA; it contends that Carlson "was not asking for an 'interpretation' of the contract terms, but rather, for a guarantee of how the Government would act if, in the future, the DTS PMO requested a transfer of MEPS sites to its proposed small business set-aside contracts." *Id.* at 10 (emphasis omitted). The argument tries to rewrite Carlson's submissions to fit the Government's tactics to deny Carlson its rights under the CDA of 1978. But Carlson repeatedly asked for nothing more than a confirmation of the meaning of the Exclusivity Clauses and its contractual rights in the context of specific

Governmental actions to violate such contractual rights. Indeed, the Government grudgingly concedes that Carlson's January 6, 2004 letter "plainly submitted a demand couched in terms of requesting an interpretation of contract terms." *Id.* at 9. While each of Carlson's letters submit a valid "claim" for purposes of the CDA, it matters little whether there is one or four letters constituting a demand. The fact remains that Carlson "plainly" submitted a valid claim under the CDA. Accordingly, the Court has jurisdiction.

The Tucker Act defines the jurisdiction of this Court over disputes arising under the CDA and provides that "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including . . . nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.." 28 U.S.C. § 1491(a)(2). Thus, as the Government concedes,[10] this Court may exercise jurisdiction if Carlson submitted a claim to the Contracting Officer and the Contracting Officer issued a final decision on that claim. *See Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1264 (Fed. Cir. 1999). The Federal Acquisition Regulation ("FAR") defines a "claim" as a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment *or interpretation of contract terms*, or other relief arising from or relating to the contract . . . ." 48 C.F.R. § 33.201 (emphasis added).

Carlson's October 8, 2003, November 3, 2003, December 1, 2003, and January 6, 2004 letters each constitute a valid claim for purposes of establishing jurisdiction under the Tucker Act. Each letter contains Carlson's written demand seeking, as a matter of right, an

---

[10] Defendant's Brief at 8 (stating that "[t]his Court's jurisdiction under the CDA is predicated upon the fulfillment of two fundamental requirements: the contractor's submission of a valid written claim to its contracting officer, 41 U.S.C. § 605(a), and the agency's issuance of a final decision upon that claim").

interpretation of the contract terms. In each case, Carlson unambiguously requested an interpretation of its contract rights in relation to specific acts of the Government that were viewed as contrary to Carlson's DTR Contracts. *See, e.g.,* Letter from Spell to Robinson-Burnette of 10/8/03 (stating that "[i]f it is the Government's position that the travel requirements of the MEPS sites covered by the DTS Contracts may be transferred to another contractor, including pursuant to a small business set-aside procurement, then it is requested that you promptly issue a Final Decision pursuant to the Contract Disputes Act of 1978"); Letter from Thompson to Robinson-Burnette of 12/1/03 (stating "[w]e have twice requested a Contracting Officer's final decision under the Disputes Clause in regard to CWGT's exclusive rights to provide travel services to the MEPS sites"); Letter from Spell to Robinson-Burnette of 1/6/04 (stating that Carlson "is entitled to a non-evasive final decision regarding the interpretation of contract terms"). Thus, notwithstanding the Government's effort to recast Carlson's claims as requests for information about a hypothetical future event, each letter unequivocally states that it is requesting that the Contracting Officer provide her interpretation about whether the contracts ensure Carlson the exclusive right to provide travel services to the MEPS sites while the Army contracts are in effect, notwithstanding the pending ITEC4 MEPS Solicitation. Accordingly, each letter seeks, as a matter of right, the interpretation of contract terms and therefore meets the legal definition of a "claim."

The Government's citation to the *Alliant* decision to support the argument that Carlson's letters do not constitute "claims" is misplaced. As the Government concedes, in *Alliant*, the plaintiff's letter was challenged on the ground that it failed to seek relief "as a matter of right," not that the letter failed to constitute a written demand seeking an interpretation of a contract term. In fact, in *Alliant*, the Court noted that "[t]he government *does not dispute* that the

September 11 letter was a written demand seeking adjustment or interpretation of a contract term . . . ." *Alliant*, 178 F.3d at 1265 (emphasis added). Here, however, the Government is alleging that Carlson's letters fail because they purportedly fail to demand "an 'interpretation' of the contract terms." Defendant's Brief at 10. Consequently, the decision in *Alliant* is inapposite and fails to support the Government's argument that Carlson's letters are not "claims."

Moreover, to the extent that the Government cites the decision in *Alliant* for the proposition that Carlson's letters cannot constitute "claims" because "the Government has not executed any contract change," this argument is essentially a mislaid assertion that Carlson's CDA claim is not ripe for review. As this Court has very recently noted, however, "[t]he plain language of the CDA anticipates that parties will challenge the Government's interpretation of a contract *during* performance." *CW Government Travel, Inc. v. United States*, _____ Fed. Cl. _____ (2004) (No. 03-1274C). Accordingly, "[t]he CDA recognizes that contractors do not have to wait for the actual contract violation to occur." *Id. See, e.g., Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1266 (Fed. Cir. 1999) (noting that "[t]o hold that the disputes clause bars any pre-performance claim seeking an interpretation of contract terms would render largely meaningless those portions of the definition of claim that refer to requests for nonmonetary relief").

As demonstrated, Carlson's letters meet the definition of a "claim" on their face because each letter constitutes a written demand, as a matter of right, for a contract interpretation. Moreover, there was nothing hypothetical concerning the context of the requested interpretation since it was in regard to ITEC4 MEPS Solicitations. Thus, the Government's arguments to the contrary patently lack merit and fail to support the assertion that this Court cannot exercise jurisdiction. The Government's Motion to Dismiss therefore should be denied.

## II. THIS COURT POSSESSES JURISDICTION TO ENTERTAIN CARLSON'S COMPLAINT BECAUSE THE CONTRACTING OFFICER ISSUED A FINAL DECISION ON THE CLAIM

The Government also contends that this Court lacks jurisdiction because the Contracting Officer never issued a final decision. Defendant's Brief at 13. The Government admits, however, that the Contracting Officer "provided an interpretation of the exclusivity contract clauses referenced by the contractor in its letter of January 6, 2004." *Id.* Moreover, the Contracting Officer's letter of March 1, 2004 clearly states her adverse interpretation that notwithstanding the Exclusivity Provisions in Carlson's DTR Contracts, the Termination for Convenience Clause does permit a transfer of the MEPS travel services to the awardees of the ITEC4/DTS PMO MEPS Solicitation. Either position affords a basis for jurisdiction.

First, the very failure to issue a final decision qualifies as a denial for purposes of invoking judicial review. Carlson is entitled to consider its claim "deemed denied" after the passage of sixty days following the submission of its claim. 41 U.S.C. § 605(c)(5). Carlson first submitted a claim on October 8, 2003. *See* Exhibit 3. Carlson's fourth and final letter (Exhibit 10) was sent on January 6, 2004. Throughout this process, the Contracting Officer has repeatedly refused to issue a final decision on Carlson's claim. The Government affirmatively asserts that no final decision has been entered. Consequently, by operation of law the claim is deemed denied and therefore properly subject to this Court's jurisdiction.

Furthermore, the mere fact that the Government refused to describe its responsive letters as "final decisions" is not dispositive of the issue. It is well established that "the absence of a statement in the contracting officer's letter acknowledging that the letter constituted a final decision . . . is not fatal to [the contractor's] action." *Alliant*, 178 F.3d at 1267. "Whether a contracting officer's letter may be taken as a final expression of the agency's position on a claim in issue is ultimately to be judged by what the letter says and not by how it is labeled." *Litton*

*Sys., Inc. v. Untied States*, 27 Fed. Cl. 306, 309 (1992). Moreover, the Government agrees that it "cannot avoid jurisdiction by the neglect of a contracting officer to issue a final decision upon a valid claim." Defendant's Brief at 14.

In addition, the interpretation offered by the Government is plainly adverse to Carlson's interpretation and thus qualifies for review.[11] The Contracting Officer responded to Carlson's claims by interpreting the contracts to allow the Government to delete MEPS travel services from Carlson's contracts for the express purpose of transferring the MEPS travel services to ITEC4's MEPS Solicitation. In her December 29, 2003 letter, the Contracting Officer stated that "I . . . cannot assure you that at some future date these [MEPS] services will not be deleted and/or transferred to a Department of Defense travel service contract." *Id.* The Contracting Officer then went on to state that "[i]f the contemplated contract is awarded *for those services* during the performance of your contracts, DTS PMO will need to coordinate the transition of the MEPS travel services with the Army." *Id.* (emphasis added). In the March 1, 2004 letter, the Contracting Officer indicates that the Termination for Convenience Clause may permit the transfer of the MEPS service requirements to other contractors if requested by the DTS PMO (the sponsor of ITEC4's MEPS Solicitation). Accordingly, the Contracting Officer apparently interprets the contracts as allowing the Government to transfer travel services from Carlson's DTR Contracts to other contractors, notwithstanding Carlson's exclusivity rights. *Id.* Moreover, the action of ITEC4 to proceed with the award of contracts pursuant to the MEPS Solicitation represents a manifest adverse interpretation of Carlson's contractual rights by the Government.

---

11 In its brief, the Government asserts that "[a]ssuming, for the sake of argument, that this demand represents a valid claim, the contracting officer did not decide the matter adversely to the contractor." Defendant's Brief at 13.

The Government has adopted a position clearly adverse to Carlson and clearly at odds with Carlson's interpretation of its contractual rights. That is the essence of an adverse final decision when addressing claims involving contract interpretation issues. Carlson is not required to wait for adverse contractual action to seek a declaration of its rights. As this Court has very recently noted in regard to two of these same Carlson DTR Contracts and a different dispute involving the Exclusivity Clauses, "[t]he plain language of the CDA anticipates that parties will challenge the Government's interpretation of a contract *during* performance" and "[t]he CDA recognizes that contractors do not have to wait for the actual contract violation to occur." *CW Government Travel, Inc. v. United States*, _____ Fed. Cl. _____ (2004) (No. 03-1274C) (emphasis in original).

## III. THIS COURT POSSESSES JURISDICTION BECAUSE CARLSON'S COMPLAINT IS RIPE FOR ADJUDICATION AND CARLSON IS ENTITLED TO THE RELIEF REQUESTED

Carlson's Complaint sets forth sufficient facts demonstrating its entitlement to declaratory relief interpreting its contracts with the Army. Carlson's Complaint sets forth a live dispute over the interpretation of its contract. Furthermore, the declarations it seeks will resolve the dispute over the interpretation. Finally, the declaratory relief requested is the only means of adequately protecting Carlson's interests. Therefore, the Court should deny the Government's Motion to Dismiss for failure to state a claim.[12]

---

[12] There are indications in the Government's Motion that it believes that Carlson is not entitled to the declaratory judgment its seeks for jurisdictional purposes. The Government's Motion, however, is best characterized as asserting that Carlson's Complaint has failed to establish the factual predicate to entitlement for the relief requested. The introductory paragraph of the applicable part of the Government's Motion to Dismiss requests that the Court dismiss Carlson's Complaint because it has "failed to state a claim upon which relief could be granted" rather than for lack of jurisdiction. Moreover, in *Alliant Techsystems, Inc. v. United States*, the Federal Circuit rejected the Government's argument that the Court of Federal Claims did not have jurisdiction to enter declaratory judgment "if the contractor has not completed work on

The Government is correct in noting that *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260 (Fed. Cir. 1999) sets forth the relevant law. In *Alliant*, the Federal Circuit considered a contract for the demilitarization of bombs which contained an option clause to increase the number of bombs to be demilitarized. *Id.* at 1263. The Government sought to exercise the option, but the contractor argued that the attempt was legally ineffective because it was untimely. *Id.* The Government ordered the contractor to perform the option, and the contractor filed suit in the Court of Federal Claims seeking a declaration that it was not obligated to perform. *Id.* The Court of Federal Claims found that it had jurisdiction over the claim, but that the contractor was required to perform the option, albeit at a lower rate. *Id.* Both parties appealed to the Federal Circuit.

The Government made several arguments that the plaintiff's claim was outside the jurisdiction of the Court of Federal Claims, all of which were rejected by the Federal Circuit. Most importantly, for the purposes of this case, the Government argued that "prudential considerations" counsel against holding that the Court of Federal Claims had jurisdiction over a contractor's request for declaratory relief. *Id.* The Government contended that allowing the contractor access to the court before it has completed performance of the contract would result in "piecemeal review of routine matters of contract administration." *Id.* The Federal Circuit, however, found that:

> The Government's argument, however, confuses the question whether the Court of Federal Claims had jurisdiction to entertain Alliant's complaint with the question whether the court should grant relief on the merits and what form such relief should take. *See Spruill v. Merit Sys. Protection Bd.*, 978 F.2d 679, 686

---

the contract and if the contractor, by doing particular designated work, could convert the claim into one for monetary relief." 178 F.3d at 1268. Finally, as described above, the section of *Alliant* relied on by the Government applies to the consideration of whether the plaintiff has met the standard for equitable relief, which is not a jurisdictional bar, but a discretion inherent in the Court.

> (Fed. Cir. 1992). We have held above that the Tucker Act grants the Court of Federal Claims jurisdiction to grant nonmonetary relief in connection with contractor claims, including claims requesting an interpretation of contract terms. The jurisdiction of that court is defined by Congress, and the "prudential considerations" that the Government presses upon us cannot alter the jurisdictional lines that Congress has drawn.

*Id.* The Court concluded: "We are therefore persuaded that neither Congress nor the drafters of the FAR intended to create a comprehensive 'prudential' basis for dismissing all but a narrow class of actions on nonmonetary claims brought in the Court of Federal Claims." *Id.* at 1271.

The Court admitted, however, that while Court of Federal Claims had jurisdiction to consider a claim for declaratory relief, it is not "required to issue a declaration of rights whenever a contractor raises a question of contract interpretation during the course of contract interpretation." *Id.* In this regard, the Federal Circuit recognized that principles of equitable relief gave the court discretion over whether to issue a declaratory judgment. *Id.* Thus, the Federal Circuit found:

> In responding to such a request, the court or board is free to consider the appropriateness of declaratory relief, including whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests.

*Id.* By applying these general, and nonexclusive factors, the Federal Circuit reasoned that the Court of Federal Claims could distinguish between those cases where the "contractor may want to know ahead of time how a contract issue will be resolved," which were not suitable for declaratory relief, and those cases that concerned the question "whether the contractor is obligated to perform at all." *Id.* The Court analogized this principle to the "traditional rule that courts will not grant equitable relief when money damages are adequate." *Id.*[13] The Circuit then

---

13 If the Court needs to consider whether monetary damages are adequate, Plaintiff requires an opportunity to present evidence to establish that monetary damages would not

noted that the Court of Federal Claims considered the case suitable for declaratory relief because the dispute centered over the contractor's obligation to perform the option. *Id.*

Carlson's request for declaratory judgment interpreting its contracts with the Army is analogous to the request made by the contractor in *Alliant*. Both requests involve a specific, ongoing dispute that can only be adequately settled by early declaratory relief.

Carlson, like the contractor in *Alliant*, requests that the Court address a live dispute between the parties, involving the interpretation of Carlson's rights under the DTR Contracts. Carlson believes that the contract's terms do not allow the Government to delete some requirements via the Termination for Convenience Clause, or otherwise, for the purpose of transferring the work to contracts awarded under ITEC4's MEPS Solicitation. The Government apparently believes that the Carlson DTR Contracts do allow it to remove the requirements at any time it desires. Thus, the parties dispute the terms of the DTR Contracts.

The Government, however, argues that the Court should grant its Motion to Dismiss because "there is no current or imminent decision by the Army to delete MEPS locations from the CW travel services contracts." Aside from being incorrect (the Government's stated intention is to award contracts by October 29, 2004 to small businesses pursuant to ITEC4's MEPS Solicitation), that fact is also irrelevant because accepting the Government's theory would result in denying effect to specific provisions of the CDA and the FAR. The CDA gives the contractor the right to submit a claim on a nonmonetary basis. The FAR defines a "claim" as including a request for "the adjustment or interpretation of contract terms . . . ." 48 C.F.R. § 33.201. Thus, the contractor may bring a claim for an interpretation of the contract's terms

---

adequately compensate Carlson if the MEPS travel service requirements are transferred to the contractors under the ITEC4 MEPS Contract. In addition, Carlson pled facts supporting its contention that it would be irreparably injured; allegations that must be accepted as true. *See, e.g.*, Complaint, ¶ 142.

irregardless of any contractual action undertaken, or not undertaken, by the Government. Under the Government's theory, however, Carlson would have to wait until some contractual action by the Government under the DTR Contracts to trigger Carlson's right to submit a claim. There is no such restriction, however, in the FAR or the CDA.

The Federal Circuit dealt with a similar argument in *Alliant*. There, the Government argued that, under the disputes clause, the contractor must wait until after completing performance of the contract to submit its claim for an interpretation of the contract's terms. *Alliant*, 178 F.3d at 1265. The Circuit rejected the argument, stating that: "To hold that the disputes clause bars any pre-performance claim seeking an interpretation of contract terms would render largely meaningless those portions of the definition of claim that refer to requests for nonmonetary relief." *Id.* at 1267. Thus, neither the CDA, nor the FAR nor applicable case law require the contractor to wait until the Government acts in furtherance of its contrary interpretation to submit a claim requesting an interpretation of a contract's terms. All that is required to demonstrate a live dispute for purposes of entitlement to declaratory judgment interpreting the contract is that the parties actually disagree as to the contract's interpretation.[14]

Moreover, Carlson has specifically pled the Government's intent to carve this work out of Carlson's contract and award it to others pursuant to ITEC4's MEPS Solicitation. *See, e.g.*, Complaint, ¶ 146. The Court must accept that as true.[15] *2 Moore's Federal Practice*, ¶ 12.34[1][b](2004).

---

[14] The Government intends to award up to six contracts under the ITEC4 MEPS Solicitation on October 29, 2004. As of that time, there will be multiple contractors claiming the exclusive right to provide travel services for the 54 MEPS sites in Carlson's DTR Contracts, commencing on April 1, 2005.

[15] To the extent that there is any dispute on the Government's intent, which there should not be on the 12(b)(6) Motion, discovery would likely confirm the Government's intent to

The Government is also incorrect in arguing that the declaratory relief requested will not resolve the current dispute over the contract's terms. Carlson requested, among other things, that the Court issue a declaratory judgment finding that: "Carlson is the exclusive provider of travel services for all the MEPS sites identified in Carlson's competitively-awarded Army DTR Contracts, so long as those Contracts are in effect" or in the alternative that "Carlson is the exclusive provider of travel services for all the MEPS sites identified in Carlson's competitively-awarded Army DTR Contracts, unless and until the DTS CUI is operationally deployed to and capable of performing the majority of travel requirements at each MEPS site." Complaint at 25-26.

The Government concedes that the first requested declaratory judgment would resolve the dispute. Def. Mot. at 18. This concession is enough to destroy the Government's Motion to Dismiss because it establishes a "possible basis on which the non-movant might prevail . . . ." *W.R. Cooper Gen. Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed. Cir. 1988).

Moreover, the Government's argument with regard to the alternative request for declaratory judgment is also without merit. The Government argues that granting the requested relief would cause an additional dispute to spring forth regarding whether the DTS CUI is "operationally deployed to and capable of performing" the travel requirements. *Id.* According to the Government: "The determination of that event, though, is not readily ascertainable and *probably* would be disputed. Therefore, if adopted, the alternative form of declaratory judgment *likely* would lead to further controversy and litigation . . . ." *Id.* (emphasis added). The Government's rigid application of the relief suggested by Carlson is improper. The Court has broad discretion in fashioning a remedy and describing appropriate declaratory judgment.

---

both (1) exercise Carlson's option, and (2) carve out the MEPS services and award that work to others regardless of the exercise of Carlson's option.

Therefore, if the Court determines that the MEPS travel services may not be deleted from Carlson's DTR Contracts for the purpose of transferring the work to contracts awarded under ITEC4's MEPS Solicitation, there would be no difficulty in drafting a suitable order. Further, the Government's argument is devoid of fact and relies on words such as "likely" and "probably." Words of such supposition and speculation do not support a conclusion that "it appears beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654 (1999).

Finally, the only remedy that will adequately protect Carlson's interest is the issuance of a declaratory judgment interpreting the contract's terms. The Government argues that Carlson must wait for the Army's adverse action removing the requirements from Carlson's contracts because "the law provides for a full recovery of any costs or damages it may sustain in the future due to a possible deletion of work from the CW contracts." Def. Mot. at 19. The Government is incorrect. The consequences of having six small business contractors and Carlson attempting to hire, train, or retain personnel to perform the same MEPS travel services as of April 1, 2005, will cause tremendous hardship for all personnel involved that would not be compensated by the Government. Carlson pled facts supporting irreparable injury; facts that must be accepted as true. *See* Complaint, ¶ 142. Aside from the difficulty in recouping the costs of the inefficiencies involved in disrupting the ongoing operations servicing multiple Government travel offices and placing a value on the operational restructuring needed to move or eliminate personnel, the Government fails to address one specific, and substantial loss: profits. If Carlson is deprived of the right to perform the DTR Contract's requirements, it is in a similar situation to a contractor who submits a bid protest. It cannot recover anticipated profit. *See, e.g., Hawaiian Dredging Constr. Co. v. United States*, 59 Fed. Cl. 305 (2004). If the Government were to remove the

requirements from Carlson's contracts, the profits Carlson would have earned will be lost forever.

Further, the facts of the instant case are analogous to the situation described in *Alliant*. As noted above, the Federal Circuit distinguished between those cases which are unsuitable for declaratory judgment because the contractor only "want[s] to know ahead of time how a contract issue will be resolved" and those cases that are suitable for declaratory relief because they concern the question "whether the contractor is obligated to perform at all." The instant dispute concerns the latter. When the Government acts on its improper interpretation, it will remove the requirements from Carlson's contracts, removing its obligation to perform the requirements. Only a declaratory judgment will effectively preserve Carlson's interests.[16] Consequently, the Court should deny the Government's Motion to Dismiss.

## IV. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT

The Government also claims it is entitled to summary judgment based solely on the contract language. But this too raises issues more in the context of a Rule 12(b)(16) Motion than a true summary judgment issue.[17] Nevertheless, the Government is incorrect. First, the Contracting Officer has never interpreted the contract in the manner now advanced and Carlson is entitled to the Contracting Officer's independent analysis. Far 33.2. Second, the language of the contract does not support the Government's interpretation, and, to the extent that there is any doubt in meaning, discovery from the SDDC Contracting Officer and the course of conduct

---

16 An early declaratory judgment regarding Carlson's contractual rights is also essential to prevent undue harm to the small business contractors who are competing for awards under ITEC4's MEPS Solicitation.

17 The Court could consider the terms of the contract as part of a 12(b)(6) Motion, and the Government's position is that even accepting all the Plaintiff's allegations as true, the contract allows the Government to carve out portions of Carlson's work.

under similar existing DoD travel service contracts would almost assuredly confirm Carlson's interpretation.

**A. There Are Material Facts In Dispute**

Contrary to the Government's assertion, while there is no dispute as to the language of the contract, there are a number of material facts in dispute. As set forth in Plaintiff's Counter-Statement of Facts to Defendant's Proposed Uncontroverted Facts and Plaintiff's Statement of Additional Facts, there are disputes in regard to the alleged uncontroverted facts upon which Defendant relies. Moreover, Plaintiff has identified a number of relevant additional facts that counter many of Defendant's assertions or assumptions.

In its Motion and Statement of Proposed Uncontroverted Facts, the Government utterly fails to address the existence and consequence of Solicitation W91QUZ-R-0007 that seeks up to six small business contractors to perform all the MEPS travel service requirements included in Carlson's DTR Contracts. The Government's Motion fails to address the acknowledged fact that ITEC4 intends to award contracts under Solicitation W91QUZ-R-0007 on or before October 29, 2004. The Government's Motion fails to address the fact that Solicitation W91QUZ-R-0007 requires the new contractors to start performing the MEPS travel services on April 1, 2005, regardless as to status of Carlson's DTR Contracts. (Exhibit 2, § C.4.2.1.) The Government's Motion fails to address the fact that currently the Army plans to exercise the options to extend all of Carlson's DTR Contracts from March 31, 2005 through at least September 30, 2005.

The Government's Motion disputes Plaintiff's interpretation of "DTS" in Section 1.1.1.2 of Carlson's DTR Contracts and attempts to interpret that Section by also ignoring half of it. There is a tremendous volume of documentation, testimony by Government officials, and common usage to establish that "DTS" in Section 1.1.1.2 means the electronic, web-based, end-

to-end travel management system currently being developed for the DTS PMO by Northrop Grumman under Contract No. DAMT01-98-D-1005. There is also extensive testimony from Government officials during the GAO protest, *AirTrak Travel*, B-292101 – B-292101.5, (June 30, 2003) 2003 CPD ¶ 117 of the earlier solicitation for small business contractors to perform the travel management services for the MEPS sites contained in Carlson's DTR Contracts. Carlson contends that such testimony is contrary to some of the facts asserted to support the Government's Motions but, due to the GAO Protective Order, Carlson may not use such prior testimony by Government officials unless this Court issues a protective order and requests that GAO allow use of the prior testimony in this case.

**B. The Government Attorney's Interpretation Of Carlson's DTR Contracts Is Not Valid**

The Government's Motion is based upon an interpretation of Carlson's DTR Contracts that was not advanced by the Contracting Officer, despite repeated requests. Under the CDA of 1978 and FAR Part 33.2, Carlson is entitled to an independent interpretation of its contracts from the Contracting Officer. Since the contract interpretation advanced by the Government to support its Motion does not represent interpretations given by the Contracting Officer, the Court should dismiss the Government's Motion.

Carlson relies upon, and has repeatedly requested the Contracting Officer to provide, a favorable interpretation or a Final Decision, in regard to the Exclusivity Provisions in the contracts as they relate to the action of the Army in the ITEC4 MEPS Solicitation. Carlson's DTR Contracts provide:

1.7 Exclusivity

1.7.1. The Contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract.

1.7.2. No person, private organization, or commercial travel service, including competing travel agencies, direct suppliers, or travel software vendors, will be permitted direct access to areas under DoD control to advertise, sell, provide or promote official travel services to those sites, unless the Contractor has first declined to provide the particular service or the Contractor's levels of service are determined by the Contracting Officer to be unresponsive and/or unsatisfactory.

The Government acknowledges that the above-cited clauses "prevent the Army (or other DoD organizations) from obtaining travel services from a competitor to the plaintiff while CW has the contractual obligation to perform such services." (Govt.'s Motion, at 22.) The Government then asserts "these clauses do not prevent the Army from deleting these requirements, and transferring them to another contractor." Such an interpretation would totally negate the Exclusivity Clause of the contracts, if the Government, at any time, can simply remove requirements from Carlson's contracts for the purpose of transferring them to another contractor, there is no exclusivity whatsoever. Significantly, no Contracting Officer has espoused such an interpretation.

The Government's Motion also ignores or misstates other clauses in Carlson's DTR Contracts. Section 1.1.1 of the contracts provides that "due to projected base closures and realignments" sites covered by the contracts may be added or deleted. That does not permit deletion from Carlson's contracts for the purpose of transferring the travel service requirements for sites to another contractor. Moreover, by including such a clause identifying when the Government may delete requirements, the Government is restricted to such specified events.

The Government argues that Section 1.6.8 of the DTR Contracts provides unlimited rights of the Government to delete requirements after the base period of the DTR Contracts. The Government's interpretation ignores the crucial fact that 1.6.8 implements Section 1.6.7, which provides that, at some future time, new DoD travel services contracts will be issued "replacing

this contract and all other Service/Agency existing travel contracts."[18] In fact, the DTS PMO has publicly announced an intent to issue a global DoD travel services, multiple award IDIQ Contract that could result in replacement of all existing DoD travel service contracts commencing in late 2005, or early 2006. Sections 1.6.7 and 1.6.8 merely provide that, if all existing DoD travel service contracts, such as Carlson's DTR Contracts, are replaced by a global DoD travel service contract(s), the current contractors will be given 90 days notice before the workload is actually deleted. Section 1.6.8 does not independently authorize the deletion of the MEPS sites from the Carlson DTR Contracts in order to transfer the work to contracts awarded under Solicitation No. W91QUZ-R-0007.[19]

The Government's Motion cites Section 1.1.1.2, which provides:

> The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract resulting from this Solicitation.

Carlson contends that the reference in Section 1.1.1.2 to "DTS" is to the automated, web-based, end-to-end travel management system being developed for the DTS PMO by Northrop Grumman under Contract No. DAMT01-98-D-1005. The Government's Motion (at page 23) disputes this interpretation. However, Carlson's interpretation is supported by reference to the pending Solicitation W91QUZ-R-0007 for the MEPS travel service requirements where DTS is used

---

18 Section 1.6.7 is consistent with the Exclusivity Provisions in that it identifies the only situation that permits portions of Carlson's DTR Contracts to be deleted and transferred to other contractors.

19 The attempt by Government attorneys to portray Section 1.6.8 as a stand-alone contract provision that permits deletion of sites from Carlson's DTR Contracts at any time, for any reason, during option periods upon 90 days notice, is also inconsistent with Section 1.1.1.2. that requires 60 days notice to delete requirements as a result of base closings and realignments and inconsistent with the Termination for Convenience Clause.

throughout as reference to the automated system. That DTS is the commonly accepted reference to the automated , web-based, end-to-end travel management system under development is also proven by a review of the GAO decision of protests against the 2003 Solicitation for MEPS travel services, *AirTrak Travel*, B-292101 – B-292101.5, (June 30, 2003) 2003 CPD ¶ 117, and the testimony of Government officials during that GAO protest.[20] There can be no doubt that limited discovery and testimony from Government officials would confirm Carlson's interpretation of the term "DTS," as used in § 1.1.1.2 of the DTR Contracts.

Furthermore, Section 1.1.1.2 only permits the Government to fail to exercise an option to extend one of more of Carlson's DTR Contracts. It does not, by its clear terms, authorize the deletion of only some of the sites included, such as the MEPS, for the purpose of transferring the work to another contractor. Section 1.1.1.2 specifically limits the right of the Government to fail to exercise an option. If it did not limit the Government's right to fail to exercise an option, the clause would be meaningless. In other words, if the Government could fail to exercise an option to extend Carlson's DTR Contracts for any reason, there would be no need to include Section 1.1.1.2.[21]

The Exclusivity Clauses (§ 1.7.1 and 1.7.2) limit the Government's right to partially terminate the contracts for convenience. Similarly, § 1.6.7 and § 1.6.8 also limit the

---

[20] Contrary to the Defendant's Motion at pages 24-25, Carlson does not contend that Section 1.6.7 is limited to the meaning of "DTS" in Section 1.1.1.2. Given the problems that have plagued the DTS, it is recognized that a new, global DoD travel service contracts may necessarily have to be awarded well before the DTS is fully functional.

[21] Carlson is confident that if the Contracting Officer is required to testify in this case, she would confirm that currently, the Military Surface Deployment and Distribution Command intends to exercise the options to extend all Carlson's DTR Contracts from April 1, 2005 through September 30, 2005.

Government's right not to exercise options or to issue partial or complete terminations for convenience.

The Government's Motion should be denied because it is not consistent with Carlson's DTR Contracts, or the limited record currently available to this Court. Moreover, it is premised upon material facts very much in dispute and does not reflect the opinion of the SDDC Contracting Officer responsible for the proper administration of Carlson's DTR Contracts.

## CONCLUSION

For the foregoing reasons, this Court should deny the Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, and set a schedule for discovery. If the Court has not determined to deny Defendant's Motion, it is respectfully requested that oral arguments be held.

Respectfully submitted:

/s/Lars E. Anderson

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

*Of Counsel:*
Michael W. Robinson
Benjamin A. Winter
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)
*Attorneys for Plaintiff*

Dated: August 23, 2004
mc1docs/168453.03

**CERTIFICATE OF FILING**

I hereby certify that on August 23, 2004, a copy of the foregoing CARLSON'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT, was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. The Appendix will be sent via overnight delivery to:

Lisa B. Donis, Esquire
Attorney
Commercial Litigation Branch, Civil Division
U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W., Eighth Floor
Washington, D.C. 20530
(202) 307-7561 (telephone)
(202) 305-7644 (facsimile)
*Counsel for Defendant*

/s/Lars E. Anderson
Lars E. Anderson