# In the United States Court of Federal Claims

| | | |
|---|---|---|
| **CW GOVERNMENT TRAVEL, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 04-718C** |
| | ) | **(Judge Emily C. Hewitt)** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## **PLAINTIFF'S COUNTERSTATEMENT OF FACTS AND PROPOSED ADDITIONAL FACTS**

Pursuant to Rule 56(b)(2), Plaintiff, CW Government Travel, Inc. ("Carlson") respectfully submits this Counterstatement of Facts and Proposed Additional Facts in response to Defendant's Proposed Findings of Uncontroverted Facts. Defendant's proposed uncontroverted facts are set forth in *italics* in the numerical order submitted, and Carlson's response is set forth immediately thereafter.

*1. CW Government Travel, Inc. ("CW") entered into contracts with the Military Surface Deployment and Distribution Command to supply travel services to the Army in five Defense Travel Regions ("DTRs"). Pl. Compl. ¶ 1A.*

**Undisputed, But Incomplete:** The five contracts were awarded to Carlson as a result of a full and open competition, and included the traditional travel service requirements of a number of Department of Defense ("DoD") installations, bases and activities located in 42 states, plus Puerto Rico and the Virgin Islands. *See, e.g.,* Contract Number DAMT01-02-C-0027 (attached as Exhibit 1 to Carlson's Response in Opposition to Defendant's Motion to Dismiss or, in the Alternative, Motion for

Summary Judgment).[1]

*2. Four of the DTRs include requirements for travel services at a total of 54 Military Entrance Processing ("MEPS") locations. Pl. Compl. pp. 1-2.*

**Undisputed, But Incomplete:** those four DTR Contracts also included the travel service requirements for hundreds of DoD installations, bases, and activities in addition to the 54 MEPS locations. *See, e.g.*, Exhibit 1, at Title 1, Scope of Work.

*3. The travel service contracts are requirements contracts and contain the following clauses in Section 1.7 of the Performance Work Statement (PWS):*

> ***1.7.1** The contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract.*
>
> ***1.7.2** No person, private organization, or commercial travel service, including competing travel agencies, direct suppliers, or travel software vendors will be permitted direct access to areas under DoD control to advertise, sell, provide or promote official travel services to those sites, unless the Contractor has first declined to provide the particular service of the Contractor's levels of service are determined by the Contracting Officer to be unresponsive and/or unsatisfactory.*

*App. 4-5.*[2]

**Undisputed.**

*4. The contracts contained a base term of one year (October 1, 2002 through September 30, 2003), and eight option periods of six months each, for a maximum term of five years ending on September 30, 2007. Options have been exercised upon all the contracts, currently extending performance to September 30, 2004. Pl. Compl. ¶ 17.*

---

1 Hereinafter, when a citation states that the document is "attached as Exhibit ___," the citation refers to the Exhibits attached to Carlson's Response in Opposition to Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.

2 "App." refers to the Appendix filed with Defendant's Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment."

**<u>Undisputed, But Incomplete</u>:** As of July 29, 2004, options have been exercised for all of Carlson's contracts, thereby extending performance through March 31, 2005.

*5. The contracts include the standard "Option to Extend the Term of the Contract" clause, FAR § 52.217-9, that permits, but does not require, the Government to exercise options.*

**<u>Disputed And Incomplete</u>:** The DTR Contracts do include FAR §52.217-9, which permits the Government to exercise options. Exhibit 1, at 78 of 83. However, the DTR Contracts also contain Clause 1.1.1.2, which provides:

> The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract resulting from this solicitation.

*Id.* at § 1.1.1.2. This specific clause reflects the Government's intention to exercise all the options in the Carlson DTR Contracts, unless the automated, electronic end-to-end travel management system known as the "DTS" is capable of providing the required travel services and is operationally deployed throughout each DTR. Currently, that is not scheduled to occur until 2006, and it is Carlson's understanding that even that schedule has been further delayed. *See AirTrak Travel et al.*, B-292101; B-292101.2; B-29210.3; B-292101.4; B-292101.5, June 30, 2003, 2003 CPD ¶ 117. It is Carlson's contention that the above clause supercedes and takes precedence over the standard FAR Clause cited by the Government.

*6. The contracts additionally incorporate, by reference, the standard contract clause for commercial items (FAR 52.212-4). Paragraph (l) of that clause contains a provision allowing termination of the contract for the Government's convenience. The first sentence of that paragraph states: "The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience."*

**Disputed And Incomplete:** FAR § 52.212-4 "Termination for Convenience" does not permit the Government to terminate the DTR Contracts, in whole or part, for the purpose of transferring the travel service requirements to another contractor. Such a termination for the purpose of transferring travel service requirements to another contractor in violation of the express terms of the DTR Contract guaranteeing Carlson exclusivity rights would be an act of bad faith that is not permitted by the standard Termination for Convenience Clause. The Termination for Convenience Clause is consistent with other DTR Contract provisions permitting the reduction of requirements due to base closings, realignments, etc., for example, when events result in the reduction or elimination of the need for travel management services at a particular military installation, base, or activity. The exclusivity clause and Termination for Convenience Clauses have been included in DoD travel management service contracts for decades and customary practice has established that the Termination for Convenience Clause may not be used to avoid or negate the exclusivity clause.

*7. The Performance Work Statement ("PWS") included other clauses intended to facilitate a smooth transition of requirements between Army and Defense Travel Service ("DTS") requirements. These included the following:*

> ***1.1.1*** *Due to projected base closures and realignments, the Government cannot forecast how the revenue for official travel will be affected. As sites(s) are identified for addition or deletion, the Contracting Officer will issue a modification to the contract. A 60-day written notice will be provided to the contractor. In addition, Offerors are hereby notified that upon implementation of the Defense Travel Region 6 (DTR 6) contract the following locations (Ft Campbell, KY, Missouri; and Nebraska) will be deleted from the respective regions and incorporated into the DTR 6 contract.*
>
> ***1.1.1.2*** *The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel*

> *services under the new system, some or all options may not be exercised under the contract resulting from this solicitation.*
>
> ***1.6.7*** *At a future date a DOD travel services contract(s) will be awarded replacing this contract and all other Service/Agency existing travel service contracts. Once the DOD travel services contract is awarded all DOD sites will transition in accordance with the implementation dates to the DOD travel services contract.*
>
> ***1.6.8*** *At any time after the base period of this contract, with a 90-day notice from the Contracting Officer to the Contractor, the Government may identify any/or all workload included in this contract to be deleted.*

*App. 1-4.*

**Disputed And Incomplete:** None of the above clauses cited by Defendant permit the Government to transfer the MEPS travel service requirements from the Carlson DTR Contracts to other contractors who may receive contract awards pursuant to Solicitation W91QUZ-04-R-0007 (the "MEPS Solicitation") issued by the Army Contracting Agency, Information Technology, E-Commerce and Commercial Contracting Center ("ITEC4") on February 13, 2004. The MEPS Solicitation seeks six contractors to provide similar travel management services commencing on April 1, 2005, to 63 MEPS sites, including the 54 MEPS sites in four of Carlson's DTR Contracts. Solicitation W91QUZ-04-R-0007 (attached as Exhibit 2). The MEPS Solicitation covers only MEPS sites and no other military bases, installations, or activities included in the Carlson DTR Contracts. *Id.*

Clause 1.1.1, cited above, provides that requirements may be added or deleted to or from the DTR Contracts as a result of base closures and realignments. Exhibit 1 at § 1.1.1. The transfer of travel management service requirements from the Carlson DTR Contracts to six other contractors, pursuant to the MEPS Solicitation, is not caused by, or a reflection of, any base closures or

realignments. Moreover, it is contended that by identifying the specific events that permit deletions from the DTR Contracts, the Government is precluded from deleting work due to unspecified events.

Clause 1.1.1.2 of Carlson's DTR Contracts provides that in the event a web-based, end-to-end electronic travel management system (i.e., the DTS) is implemented (e.g., operationally deployed) and is able to provide the required travel services being provided under the Carlson DTR Contracts, some or all of the six-month options may not be exercised. *Id.* at § 1.1.1.2. This Clause indicates that the Government shall exercise all the options under the Carlson DTR Contracts, unless such a DTS System is capable of providing all the travel management services provided by a Carlson DTR Contract. If a DTS System is capable of providing all the travel management service requirements currently provided by Carlson under a DTR Contract, then the Government may decide not to exercise an option to extend the Carlson DTR Contract and the Contract simply expires. Clause 1.1.1.2 does not, however, permit the Government to transfer a portion of the Carlson DTR Contract requirements to another contractor, even if the DTS System is capable of providing the required travel services. Nor does this Clause permit the Government to fail to exercise an option and transfer the entire travel service requirements of a Carlson DTR Contract to another contractor providing the same or similar traditional travel management services.

Clause 1.6.7 provides that if, in the future, global DoD travel services contracts are awarded to replace the Carlson DTR Contracts "and all other Service/Agency existing travel service contracts," then the DoD sites within the Carlson DTR Contracts will be transferred to the new DoD Contracts. *Id.* at § 1.6.7. This Clause does not permit the transfer of the MEPS sites from the Carlson DoD Contracts to contracts awarded pursuant to the MEPS Solicitation.

The proceeding Clause 1.6.8. merely implements Clause 1.6.7 by providing a 90-day notice of the workload to be deleted as a result of the transition to the new DoD travel services contracts that cover the entire DoD. *Id.* at § 1.6.7. The combination of Clauses 1.6.7 and 1.6.8 also modify the Government's rights under the standard Termination for Convenience Clause. Clause 1.6.8 cannot be read as a stand-alone clause. To do so would be contrary not only to the Exclusivity Clause 1.7, but also to the other clauses cited above.

*8. On October 8, 2003, CW sent a letter addressed to its contracting officer, Jackie Robinson-Burnette, and raised the question of a possible transfer of MEPS travel requirements to the DTS. The letter referenced its contracts' "exclusivity clauses," PWS ¶ ¶ 1.7.1 and 1.7.2, and asserted that CW believed that it was the exclusive provider of MEPS travel service as long as the contract were in effect. The letter requested that the contracting officer issue a final decision if she did not agree with CW's interpretation. App. 6-7.*

**Disputed And Incomplete:** The description of Carlson's October 8, 2003 letter requesting a Contracting Officer's final decision on the interpretation of the DTR Contracts omits much of its contents that are relevant to the issues now before the Court. The October 8, 2003 letter cited a specific solicitation set-aside for small businesses that had been issued in February 2003 by ITEC4 for travel management services that included most of the MEPS locations in Carlson's DTR Contracts. (Letter from Spell to Robinson-Burnette of 10/8/03, attached as Exhibit 3.) That solicitation was cancelled as a result of a GAO protest decision issued on June 30, 2003. *See AirTrak Travel*, B-292101 – B-292101.5, June 30, 2003, 2003 CPD ¶ 117. However, the Defense Travel System Program Management Office ("DTS PMO"), which sponsored the procurement, and ITEC4 had issued public statements to the industry to the effect that they intended to promptly reissue the solicitation for the same MEPS travel management service requirements. Carlson's October 8, 2003 letter stated Carlson's interpretation of the DTR Contract provisions, including the Exclusivity Clause, which was

quoted in its entirety. Exhibit 3. Carlson specifically requested that the Contracting Officer confirm Carlson's interpretation of the Contract provisions that "so long as a DTR Contract remains in effect, none of the travel requirements of the MEPS sites currently in that DTR Contract may be transferred to any other contractor." *Id.* Carlson further requested that "if it is the Government's position that the travel requirements of the MEPS sites covered by the DTS Contracts may be transferred to another contractor, including pursuant to a small business set-aside procurement, then it is requested that you issue a Final Decision pursuant to the Contract Disputes Act of 1978, as amended(41 U.S.C. §§601-613) and FAR Subpart 33.2." *Id.* There can be no doubt that Carlson was requesting a Final Decision on the Contracting Officer's interpretation of the meaning and effect of the exclusivity provisions of the DTR Contracts. The Contracting Officer's interpretation was specifically directed not to a hypothetical fact situation, but to a specific solicitation issued by ITEC4, which if awarded, would result in the transfer of the MEPS travel requirements from Carlson's DTR Contracts to other contractors.

*9. The contracting officer responded on October 17, 2003. She stated that the Military Traffic Management Command had no plans to remove the MEPS requirements from CW's contracts, but that she could not promise that these requirements would never be removed. Ms. Robinson-Burnette noted that there were several clauses in the contract that permitted the Government to remove requirements. Ms. Robinson-Burnette did not provide a final decision. App. 8.*

**Disputed And Incomplete:** The Contracting Officer's letter of October 17, 2003 was evasive and did not respond to the requested interpretation of the Carlson DTR Contract provisions to a specific factual event – i.e., the issuance of a solicitation by ITEC4 that would result in the award of contracts to a number of small business travel companies to provide travel management services to the same MEPS locations as contained in Carlson's DTR Contracts. (Letter from Robinson-Burnette to Spell of 10/17/03, attached as Exhibit 4.) It is noteworthy that the Army contracting activity responsible

for the Carlson DTR Contracts (then the Military Traffic Management Command ("MTMC") and now renamed as the Military Surface Deployment and Distribution Command ("SDDC")) and ITEC4, the Army activity responsible for issuance of the MEPS Solicitation that would result in other contractors receiving contracts to provide travel management services to Carlson's MEPS sites, are both located within a couple of blocks of each other in Alexandria, Virginia. Thus, it was unreasonable for the MTMC Contracting Officer to feign ignorance about ITEC4's activities in furtherance of procuring other contractors to provide travel management services for the MEPS locations in Carlson's DTR Contracts. It also was unreasonable for the MTMC Contracting Officer to treat Carlson's request for a contract interpretation as "hypothetical and speculative" when it referenced very specific procurement action being conducted by a sister Army contracting activity. Furthermore, it was evasive and misleading for the Contracting Officer to state that MTMC had no plans to remove the MEPS from Carlson's DTR Contracts when in fact Carlson had identified the specific action by ITEC4 that obviously was a plan to remove the MEPS from the Carlson DTR Contracts.

*10. CW wrote another letter to the contracting officer on November 3, 2003. In this letter, CW opined that any action to partially terminate the contract for the Government's convenience would constitute a material breach of its contract. CW then again requested a final decision. App. 9-10.*

**Disputed And Incomplete:** This description of Carlson's November 3, 2003 letter again requesting a contract interpretation and/or a Final Decision is substantially misleading. Carlson's November 3, 2003 letter specifically referenced the new draft solicitation for travel management services issued by ITEC4 that included the MEPS locations covered by Carlson's DTR Contracts. (Letter from Spell to Robinson-Burnette of 11/3/03, attached as Exhibit 5.) ITEC4 issued this draft solicitation for industry comment because it included a number of changes required by the June 30,

2003 GAO protest decision that caused a cancellation of the first solicitation. However, the original protested and revised draft solicitations contained the basic requirement that other contractors would be awarded contracts to provide travel management services for the MEPS locations included in Carlson's DTR Contracts. ITEC4 and the DTS PMO conducted a pre-proposal conference for the industry on October 27, 2004, to discuss the draft MEPS Solicitation. (*See* Exhibit 2, § L.5.1.) Carlson emphasized that it was seeking the Contracting Officer's interpretation of the exclusivity provisions of the Carlson DTR Contracts in relation to the obviously conflicting solicitation issued by ITEC4. Carlson pointed out its interpretation to the effect that the FAR Termination for Convenience Clause could not be used to remove the MEPS travel requirements from the DTR Contracts for the purpose of transferring the requirements to other contractors. *Id.* Carlson again requested that the Contracting Officer confirm Carlson's contract interpretation that "so long as a DTR Contract remains in effect, <u>none</u> of the then-current official travel requirements of the MEPS sites currently in that DTR Contract may be transferred to any other contractor, including any contractor receiving an award pursuant to a Small Business Set-Aside Solicitation issued by ITEC4." *Id.* Again, Carlson requested a Contracting Officer's final decision on this discrete issue of contract interpretation pursuant to the Contract Disputes Act of 1978. *Id.*

*11. The Army did not specifically respond to CW's November 3, 2003 letter. In a letter dated November 18, 2003, the contracting officer requested workload data from CW regarding MEPS locations. Pl. Compl. ¶ 64.*

**<u>Disputed And Incomplete</u>:** This description of Carlson's November 18, 2003 letter is incomplete and misleading. The MTMC Contracting Officer sent letters on November 17 and November 18, 2003, requesting that Carlson provide detailed workload data for each of the MEPS locations in the DTR Contracts. (Letters from Robinson-Burnette to Thompson of 11/17/03 &

11/18/03, attached as Exhibits 6 & 7.) This workload data was expressly required for use by the Army activity, ITEC4, issuing the solicitation to procure other contractors to provide travel management services for those MEPS locations. The workload data was required so that other contractors could prepare prices to provide travel management services to the MEPS locations in the DTR Contracts. Carlson was instructed to send the workload data directly to ITEC4 and the DTS PMO via electronic means. *Id.* Thus, notwithstanding the Contracting Officer's previous representations that she did not know what ITEC4 intended with regard to replacing Carlson for MEPS travel management services, these letters of November 17 and 18, 2003 demonstrated an active role in assisting Government action that contravened the respective rights and obligations of the parties to the DTR Contracts.

*12. On December 1, 2003, CW sent a third letter to its contracting officer and alleged that the workload requests indicated the Government's intention to use other contractors to perform MEPS travel requirements. CW again requested a final decision. App. 11-12.*

**Disputed And Incomplete:** The Defendant's description of this communication is incomplete and misleading. Carlson's letter to the MTMC Contracting Officer dated December 1, 2003, emphasized the fact that the workload data for the MEPS locations was expressly required to enable ITEC4 to award contracts to small business concerns to perform the travel management services required to be performed under Carlson's DTR Contracts. (Letter from Thompson to Robinson-Burnette of 12/1/03, attached as Exhibit 8.) In the letter, Carlson pointed out that such action represents a firm and clear intent by the Army to procure other contractors to perform the MEPS travel requirements in clear violation of Carlson's exclusive contract rights. *Id.* The action by the Army in issuing such a solicitation indicated that it believed that it could transfer the MEPS travel requirements to other contractors notwithstanding the exclusivity provisions in Carlson's DTR Contracts. Once again,

Carlson requested a Contracting Officer's final decision on Carlson's interpretation of its contractual rights. *Id.*

*13. The contracting officer responded on December 29, 2003. Ms. Robinson-Burnette reiterated that there was no intention to delete MEPS requirements from CW's contracts. She noted that, although the DTS PMO did issue a small-business set aside draft solicitation for travel services at certain MEPS sites, no deletions of CW's requirements had been issued. She also maintained that CW's contracts contemplated a transfer of some requirements. Ms. Robinson-Burnette concluded that she did not consider her letter to be a final decision. She wrote: "In my opinion, there is no current dispute over the contract terms that govern your ongoing performance under these travel services contracts." App. 13-14.*

**Disputed And Incomplete:** The Defendant's description of this letter is incomplete and misleading. The Contracting Officer's December 29, 2003, letter purported to respond to Carlson's letters of November 3 and December 1, 2003. (Letter from Robinson-Burnette to Spell of 12/29/03, attached as Exhibit 9.) The Contracting Officer again refused to provide the requested interpretation of Carlson's DTR Contractual rights or issue a final decision. *Id.* The Contracting Officer stated that there was "no current intention to delete the MEPS requirements from" Carlson's DTR Contracts and that "as of this date," the DTS Program Management Office had not requested the transfer of the MEPS requirements to a DTS Contract. *Id.* The Contracting Officer stated: "I have no control over that solicitation" and that "I cannot speak for the DTS PMO or fully anticipate what it may request from the Army in the future." *Id.*

The Contracting Officer acknowledged that the transfer of the MEPS requirements from the DTR Contracts "depends primarily on the outcome of the proposed acquisition set-aside for small business by the Defense Travel System (DTS) Program Management Office (PMO) for travel services at MEPS sites, including those currently within your Army contract." *Id.* The Contracting Officer's refusal to provide her interpretation about whether or not the Carlson DTR Contracts prohibited the

transfer of MEPS travel requirements to contracts awarded under the pending MEPS small business solicitation while Carlson's DTR Contracts are in effect was unreasonable. The Contracting Officer further went on to suggest that Carlson might receive the commitment requested as part of a settlement offered by the Government in connection with a Court of Federal Claims case, *CW Government Travel v the United States*, No. 03-1274, which was pending before Judge George Miller. *Id.*

*14. On January 6, 2004, CW sent its fourth, and final, letter to Ms. Robinson-Burnette. CW argued that it was entitled to a final decision upon this matter. CW referenced its right under procurement regulations for an interpretation of contract terms and demanded that the contracting officer confirm the exclusivity of CW to fulfill MEPS travel requirements. App.15-17.*

**Disputed And Incomplete:** The Defendant's description of this letter is incomplete and misleading. Carlson's January 6, 2004, letter referenced "our repeated requests for a Contracting Officer's final decision regarding the interpretation of the exclusivity provisions in the [DTR Contracts] particularly as related to the MEPS sites." (Letter from Spell to Robinson-Burnette of 1/6/04, attached as Exhibit 10.) Carlson stated that: "the issue in controversy is simple, straightforward and the Contractor is entitled to a non-evasive final decision regarding the interpretation of the contract terms pursuant to the Contract Disputes Act of 1978 and the Disputes Clause" in the DTR Contracts. *Id.* Once again, Carlson quoted the exclusivity provisions of the DTR Contracts (Sections 1.7.1 and 1.7.2) and stated Carlson's interpretation "that, so long as the above DTR Contracts are in effect, Carlson is the exclusive provider of travel services to all the sites listed in the contracts, including the MEPS sites, and any transfer of such travel service business to another contractor, small business or otherwise, would constitute a breach of Carlson's DTR Contracts." *Id.* Carlson pointed out that the Contracting Officer's December 29, 2003, letter indicated that if the DTS PMO awarded travel service contracts for the MEPS sites, then the MEPS travel requirements would be transferred from the Carlson DTR

Contracts to other contracts and the only question was the timing of the transfer. *Id.* Carlson asserted that it was entitled to the Contracting Officer's independent interpretation of the Contract terms, referenced the exclusivity provisions, and again requested that the Contracting Officer "confirm, without equivocation, that so long as the [Carlson DTR Contracts] are in effect, and Carlson is satisfactorily performing, none of the MEPS travel requirements currently included in these contracts may be transferred to another contractor." *Id.* Carlson specifically stated that if ITEC4 issued the MEPS Solicitation to procure other contractors for the MEPS currently covered by Carlson's DTR Contracts, such action would be deemed an adverse decision under the Contract Disputes Act of 1978. *Id.*

*15. The contracting officer responded to this fourth and final CW letter on March 1, 2004. In her letter, the contracting officer noted that CW's exclusivity clauses prohibited the Government from obtaining "like services from another contractor while the services," were part of CW's contract. She continued: "However, the exclusivity clauses do not absolutely prohibit a transfer of services. The subject contracts allow for the non-exercise of options and a termination of services for the convenience of the government." Ms. Robinson-Burnette refused to provide a final decision, and concluded that, in her opinion, there was no current dispute that affected CW's performance. App. 18-19.*

**Disputed And Incomplete:** The Defendant's description of this letter is incomplete and misleading. The Contracting Officer's March 1, 2004, letter acknowledged that Carlson had requested an interpretation of the exclusivity clauses of the DTR Contracts (paragraphs 1.7.1 and 1.7.2 of the Performance Work Statement) and stated: "You are asking me to agree that the exclusivity clauses absolutely prohibit a transfer of travel service business (including Military Entrance Processing Stations or "MEPS" services) to another contractor." (Letter from Robinson-Burnette to Spell of 3/1/04, attached as Exhibit 11.) The Contracting Officer agreed that "the exclusivity clauses clearly prohibit the Government from obtaining like services from another contractor while the services are part of your contract requirements." *Id.* However, the Contracting Officer suggested that the MEPS requirements

could be removed from the Carlson DTR Contracts via a non-exercise of an option to extend a contract or by a termination for convenience. *Id.* This implies that the Contracting Officer interprets the contracts as allowing the Government to transfer the MEPS travel requirements to another contract if the Government first removes the requirements from Carlson's DTR Contracts. However, the Contracting Officer refused to issue a final decision as to whether the MEPS travel service requirements could be removed from the Carlson DTR Contracts for the purpose of transferring the MEPS requirements to contracts awarded by the DTS PMO under the pending solicitation issued by ITEC4. *Id.*

*16. CW filed its complaint in this Court on April 26, 2004.*

**Undisputed**.

*17. CW seeks a declaratory judgment that it remain as "the exclusive provider of travel services for all MEPS sites identified in CW's competitively-awarded Army DTR Contracts, so long as those Contracts are in effect." Pl. Compl. Prayer for Relief A.*

**Undisputed**. But asserts a legal, not purely factual, issue.

*18. In the alternative, CW seeks a declaratory judgment asserting that CW "is the exclusive provider of travel services for all MEPS sites identified in Carlson's competitively-awarded Army DTR Contracts, unless and until the DTS CUI is operationally deployed to and capable of performing the majority of travel requirements at each MEPS site." Pl. Compl. Prayer for Relief B.*

**Undisputed**. But asserts a legal, not purely factual, issue.

## PLAINTIFF'S PROPOSED ADDITIONAL FACTS

1. Each of Carlson's DTR Contracts require Carlson to perform travel management services at all of the military installations, bases and activities identified within a specified geographic region. *See, e.g.,* Exhibit 1.

2. The Carlson DTR Contracts permit Carlson to utilize a combination of on-site commercial travel offices at individual military installations or bases, central reservation centers, and on-line booking tools to provide the necessary levels of travel services to each and every location in a contract. *Id.* at Performance Work Statement.

3. The Carlson DTR Contracts require that all travel counselors employed by Carlson must be trained and knowledgeable about all the rules, regulations, and policy guidance applicable to official travel by DoD personnel. *Id.*

4. The MEPS travel requirements are unique because they involve groups of enlistees joining the military and traveling to basic training assignments. Exhibit 2, at § L.10.4.3.13.9. Such MEPS group travel requires personal attention by trained travel counselors, whose work is necessarily concentrated in the morning hours as enlistees report for duty early in a morning and travel the same day. Moreover, the enlistment cycle generally concentrates the vast majority of MEPS travel in the summer months as enlistees finish school. Thus, there is a heavy concentration of MEPS travel service requirements during the morning hours in June, July, and August that necessitates unusual and flexible staffing by the contractor.

5. Carlson's DTR Contracts – which involve responsibility for performance in multiple states for combinations of all types of official DoD travel, as well as performing the unique requirements that apply to MEPS – necessitate a comprehensive operational and staffing plan for each DTR Contract. The seasonal/fluctuating travel service requirements of the MEPS sites require a high degree of coordination and rotation of trained travel personnel.

6. Carlson has hired and trained hundreds of travel counselors, built and/or equipped central reservation facilities and on-site commercial travel offices to perform the travel management services required by the DTR Contracts.

7. Carlson's winning lowest prices for all of the DTR Contracts reflected the efficient and optimum utilization of staffing and technology throughout each region. Removing a large segment of travel requirements, such as the MEPS sites, would have widespread operational and personnel consequences, as well as causing economic damage.

8. ITEC4 issued Solicitation No. DABL01-03-R-1001 in November 2002, as a small business set-aside to provide travel management services using a combination of traditional travel services and the automated DTS system for a number of Air Force bases throughout the United States. *See AirTrak Travel*, B-292101 – B-292101.5, June 30, 2003, 2003 CPD ¶ 117. In early 2003, the Solicitation was amended to include 54 MEPS sites that are also included in Carlson's DTR Contracts.

9. A number of small business travel service contractors filed protests challenging the terms of the Solicitation before the Government Accountability Office ("GAO"). *Id.* The GAO issued a decision on June 30, 2003, sustaining the protests due to a number of significant defects in the terms and conditions of the Solicitation. *Id.*

10. As a result of the GAO's June 30, 2003 adverse decision, ITEC4 cancelled Solicitation No. DABL01-03-R-1001, but announced that it intended to reissue a corrected a solicitation in the Fall of 2003.

11. In the Fall of 2003, ITEC4 issued two draft solicitations for industry comments and held a pre-proposal conference on October 29, 2003. One solicitation contained the travel requirements for

the Air Force bases and the other contained only the travel requirements for 63 MEPS locations, including 54 MEPS locations contained in Carlson's DTR Contracts.

12. On February 13, 2004, ITEC4 issued the final Solicitation No. W91QUZ-04-R-007 (the "MEPS Solicitation") as a small business set-aside to provide travel management services for the 63 MEPS locations, grouped into six Travel Areas or contract groups. The MEPS Solicitation (Section C.4.2.1 and Section J, Attachment 9, Technical Exhibit A) required that "the implementation date for the Contractor to begin providing travel management services for each location in each Travel Area" is April 1, 2005. Exhibit 2.

13. The MEPS Solicitation required offerors to submit firm fixed-prices and technical proposals premised upon the start of contract performance on April 1, 2005, and extending for a total of five years. *Id.* at § L. The MEPS Solicitation provides that the Contractor must provide travel services for all the MEPS locations in a travel area and the travel service requirements will not be further divided into smaller travel areas. *Id.* at § L.3.

14. Offerors submitted proposals in response to the MEPS Solicitation on June 11, 2004. *Id.*

15. ITEC4 has publicly stated and represented to the Court of Federal Claims in *CW Government Travel Inc. v. United States*, _____ Fed. Cl. _____ (2004) (No. 03-1274), that contract awards under the MEPS Solicitation will be made by October 29, 2004, and that performance of those contracts to provide travel management services will commence on April 1, 2005.

16. SDDC currently expects to exercise options to extend all of Carlson's DTR Contracts beyond March 31, 2005.

17. When ITEC4 makes contract awards under the MEPS Solicitation in October 2004, the Government will be contractually obligated to permit those contractors to commence providing travel services to the MEPS sites currently within Carlson's DTR Contracts, whether or not the SDDC exercises options to extend Carlson's DTR Contracts beyond March 31, 2005, as expected.

18. When ITEC4 makes contract awards under the MEPS Solicitation and SDDC exercises the next option to extend the Carlson DTR Contracts beyond March 31, 2005, there will be up to seven contractors with claim to the exclusive right to provide travel management services for the 54 MEPS currently in Carlson's DTR Contracts as of April 1, 2005.

Respectfully submitted:

/s/Lars E. Anderson

Lars E. Anderson
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

*Of Counsel:*

Michael W. Robinson
Benjamin A. Winter
Julia M. Kiraly
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 760-1623 (Protected)

*Attorneys for Plaintiff*

Dated: August 23, 2004

::ODMA\PCDOCS\MC1DOCS1\168413\2

**CERTIFICATE OF FILING**

I hereby certify that on August 23, 2004, a copy of the foregoing PLAINTIFF'S COUNTERSTATEMENT OF FACTS AND PROPOSED ADDITIONAL FACTS was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Lars E. Anderson

Lars E. Anderson