# In the United States Court of Federal Claims

No. 04-718 C

(E-Filed: December 30, 2004)

| | |
|---|---|
| CW GOVERNMENT TRAVEL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Motion to Dismiss, RCFC 12(b)(1) and 12(b)(6); Summary Judgment, RCFC 56; Whether a "claim" and a "final decision" have been submitted under 41 U.S.C. § 605(a); Declaratory judgment interpreting contract terms; Anticipatory breach; Ambiguity of contract terms |

Lars E. Anderson, Washington, DC, for plaintiff. Michael W. Robinson, Benjamin A. Winter, and Julia M. Kiraly, Washington, DC, of counsel.

Lisa B. Donis, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

HEWITT, Judge

This contract case is before the court following oral argument on Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Def.'s Mot.).[1]

---

[1]In addition to defendant's motion, the court has before it Carlson's Response in Opposition to Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Pl.'s Opp.), Defendant's Reply to Plaintiff's Response in Opposition to Our Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Def.'s Reply), Defendant's Proposed Findings of Uncontroverted Fact (Def.'s Facts), and Plaintiff's Counterstatement of

Plaintiff CW Government Travel, Inc. (Carlson) filed its complaint in this action on April 26, 2004, seeking a declaratory judgment that it is the exclusive provider of "'traditional' travel services" to fifty-four Military Entrance Processing Stations (MEPS) under four competitively-awarded, long-term travel management contracts (Contract(s)) with the Department of the Army (defendant). See Compl. at 1–2; id. at 25–26, ¶¶ A, B. Carlson also asks this court to issue preliminary and permanent injunctions "ordering the Army not to transfer" MEPS travel service requirements to other contractors "so long as th[e] Contracts are in effect," id. at 26, ¶ C.

For the following reasons defendant's motion is DENIED in its entirety.

I. Background[2]

A. Carlson's Contracts

On February 27, 2002, "following full and open competition," the United States Army's Surface Deployment and Distribution Command awarded Carlson five contracts to provide "traditional travel services" for the Army in five Department of Defense (DoD) Defense Travel Regions (DTRs). Compl. at 3, ¶ 4; Def.'s Facts at 1, ¶ 1. "The basic terms of these contracts are identical; the location of requirements and prices are different." Def.'s Mot. at 3. Four of the five contracts contain clauses requiring Carlson to provide traditional travel services to "a total of 54 Military Entrance Processing [Stations]." Def.'s Facts at 1, ¶ 2; see also Compl. at 2.

Each Contract contains "exclusivity clauses," which provide:

> 1.7.1. The Contractor has the exclusive right to provide all official commercial travel services at all sites covered in this contract.
>
> 1.7.2. No person, private organization, or commercial travel service, including competing travel agencies, direct suppliers, or travel software vendors, will be permitted direct access to areas under DoD control to advertise, sell, provide or promote official travel services to those sites, unless the Contractor has first declined to provide the particular service or

Facts and Proposed Additional Facts (Pl.'s Facts).

[2]Unless otherwise noted, facts cited to the filings of only one party do not appear to be disputed in connection with the pending motion.

> the Contractor's levels of service are determined by the Contracting Officer to be unresponsive and/or unsatisfactory.

Pl.'s Opp., App. Ex. 1 (Contract) at 26, ¶ 1.7.1–.2. Each Contract also permits defendant to delete or add work sites to that Contract's Scope of Work provision, if the revision is prompted by military base closures and/or realignments:

> 1.1.1. Due to projected base closures and realignments, the Government cannot forecast how the revenue for official travel will be affected. As site(s) are identified for addition or deletion, the Contracting Officer will issue a modification to the contract. A 60-day written notice will be provided to the contractor.

Contract at 22, ¶ 1.1.1. See generally Defense Base Realignment and Closure Act of 1990 (BRAC), 10 U.S.C. § 2687 (2000); see also Transcript of Nov. 22, 2004 Oral Argument (Tr.) at 45:12–18 (statement of plaintiff's counsel that paragraph 1.1.1 permits deletion of work "in a BRAC situation"); id. at 60:8–9 (statement of defendant's counsel that "1.1.1 deals only with base closures"). "The contracts additionally incorporate, by reference, the standard contract clause for commercial items (FAR [§] 52.212-4)[,] . . . [which] contains a provision allowing termination of the contract for the Government's [sole] convenience." Def.'s Facts at 2, ¶ 6.

Carlson's Contracts provide for a base term of one year, which ran from October 1, 2002 through September 30, 2003, followed by eight six-month option periods which, if all exercised, would extend the Contracts through September 30, 2007. Def.'s Facts at 2, ¶ 4; Pl.'s Opp. at 7. In addition, "[t]he [C]ontracts include the standard 'Option to Extend the Term of the Contract' clause, FAR § 52.217-9, that permits, but does not require, the Government to exercise options." Def.'s Mot. at 4. To date, defendant has exercised options "for all of Carlson's contracts, thereby extending performance through March 31, 2005." Pl.'s Facts at 3, ¶ 4. Although defendant need not exercise its next option until March 1, 2005, see Tr. at 50:25–51:2, Carlson is "absolute[ly] certain[]" that defendant is "going to exercise the next six-month option and extend Carlson's [C]ontracts from 1 April to 30 September [2005]."[3] Id. at 36:19–22; cf. id. at 58:12–15 (statement of

---

[3]According to Carlson, defendant has "no alternative" but to exercise the next option: "There are hundreds and hundreds of military installations covered by these [Contracts] . . . and [defendant] can't not provide travel management services for all those facilities." Tr. at 50:18–21. Carlson claims that it would take "at least a year" to replace the existing Contracts; therefore, "[o]f necessity, they're going to exercise the option to extend Carlson's contracts." Id. at 51:8–11. See also id. at 36:23–37:8 ("Virtually they have no other option . . . because these

defendant's counsel that "[i]t looks like the government may exercise CW's [next] option. Something else could happen in the meantime to . . . cause the government not to exercise the option. We don't know what will happen.").

1. The "Traditional Travel Services" Requirement

Carlson's Contracts require it to provide "traditional travel services" to five Army DTRs. See generally Contract at 22–26. The term, "traditional travel services," id. at 26, ¶ 2, refers to "commercial travel services such as reservations and ticketing for all modes of travel, Government and commercial lodging reservations, rental car arrangements, ticket delivery, and support services . . . through conventional means," such as a travel agent, rather than through an automated or software-based travel management system. CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 563 (2004) (internal quotation and footnote omitted); see also Contract at 33, ¶ 7 (providing a similar, but more detailed, definition of "Commercial Travel Services"). Accordingly, Carlson is required to "equip and staff [contracted] travel office (CTO)[4] facilities at Government locations, and/or provide centralized reservation centers staffed with travel counselors thoroughly familiar with Government travel regulations and policies." Compl. at 7, ¶ 30; see also Contract at 23, ¶ 1.3.1 (requiring Carlson to employ "capable and qualified" personnel).

Under the Contracts, Carlson's travel counselors must personally handle all aspects of official government travel, to include (1) making confirmed airline, rental car and lodging reservations that comply with government programs and discounts, Compl. at 7–8, ¶¶ 31–36; (2) providing advice to travelers concerning their itineraries, expenses, and any penalties or travel restrictions, id. at 8, ¶¶ 37, 39, 41; and (3) issuing to the government reports that reconcile travel billing statements and detail the "travel performed," id. at 8, ¶¶ 43–45. See generally Contract at 26–33, ¶¶ 2.1–3.24, 5–6.2 (describing the "traditional travel services" contemplated by Carlson's Contracts).

2. The Defense Travel System Common User Interface

At the time Carlson's traditional travel services Contracts were drafted, DoD "[wa]s acquiring under a separate contract a Defense Travel System [(DTS)] software

---

contracts are providing [essential] travel services for hundreds of military bases. . . . We know they're going to exercise that option and we have no doubt that if the contracting officer were brought before you, she would tell you that yes, right now, we fully intend and know we have to exercise those options to extend Carlson's [Contracts].").

[4]Contracted Travel Offices (CTOs) "provid[e] commercial travel services for a DoD/Government activity and eligible patrons under the contract." Contract at 33, ¶ 7.

application that uses a Common User Interface (CUI) that will provide connectivity to commercial travel offices." Contract at 31–32, ¶ 3.25. The contract to develop the "DTS CUI," which was awarded in 1998, Def.'s Mot. at 2, n.1, has been the subject of litigation.[5]

When it becomes fully operational, the DTS CUI will enable DoD travelers "to directly access the information related to airline flights, hotels, and car rentals, and to make . . . reservations . . ., tasks currently being done by the CTOs using the traditional methods." AirTrak Travel, B-292,101, B-292,101.2, B-292,101.3, B-292,101.4, B-292,101.5, 2003 WL 21499653, at *3 (Comp. Gen. June 30, 2003) (GAO Bid Protest Decision); see also Tr. at 7:14–15 (statement of defendant's counsel that "[t]he goal [of the DTS CUI] is to have all of the military be able to get its travel requests from their desktop computers"). "The Government has yet to implement a fully functional DTS [CUI]"; however, "deployment has begun of a limited capability DTS [CUI]." Pl.'s Opp. at 8.

During oral argument, defendant's counsel noted that Carlson's "[C]ontract was entered into under the shadow of this DTS [CUI] system." Tr. at 8:16–17; see also id. at 30:16–18 (statement of plaintiff's counsel that "[a]t the same time [the Contracts were awarded] there was . . . a contract to develop the automated system known as DTS."). This appears to be confirmed by certain provisions of the Contracts themselves. For example, paragraph 3.25 provides notice that the DTS CUI

> is being deployed worldwide for all DoD travelers and may be deployed during the performance period of this contract. The award of [this contract] . . . and the CUI deployment are independent efforts and will most likely not

---

[5]In CW Government Travel, Inc. v. United States, 61 Fed. Cl. 559 (2004), the court evaluated a number of post-award modifications made by the parties to the 1998 DTS CUI contract. Id. at 569–70. The court determined that a modification adding traditional travel service requirements effectuated a cardinal change to the original contract, and concluded that the agency's failure to issue a competitive solicitation for these newly-added traditional travel services violated the "free and open competition" requirement in the Competition in Contracting Act (CICA), 41 U.S.C. § 253(a)(1)(A) (2000). 61 Fed. Cl. at 574. Accordingly, the court granted plaintiff's request for a permanent injunction enjoining performance of traditional travel services and ordered the agency to recompete the work. Id. at 576. However, the court also determined that plaintiff was not entitled to injunctive relief on its claim that contracting agency violated CICA by failing to issue a new solicitation when it changed the contract from firm fixed-price to cost reimbursement because the harm to the government and to the public interest resulting from further delays to the deployment of the DTS CUI would outweigh any injury to the plaintiff. Id. at 578–79.

> occur on the same timeline. Because the CUI may be deployed to locations included in this contract, the Government reserves the right to negotiate, under this contract, CTO connectivity to the [DTS] common CUI.

Contract at 32, ¶ 3.25. The development of the DTS CUI also appears to be contemplated by the Contracts' options clause, which specifically discusses the impact of the DTS CUI deployment on Carlson's traditional travel services Contracts:

> 1.1.1.2. The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract resulting from this solicitation.

Id. at 22, ¶ 1.1.1.2.

The parties agree that the term, "DTS" in paragraph 1.1.1.2 refers to the DTS CUI. See Tr. at 8:16–20 (statement of defendant's counsel that "it would have been impossible for the government to enter into a contract without informing a contractor that [the DTS] was out there. So this was very specific language saying that the government may exercise options, but please be advised that there's something else out there."); id. at 64:15–17 (statement of plaintiff's counsel that "[t]he reference to DTS [in paragraph 1.1.1.2] . . . only meant the automated system"). Although the parties disagree about the extent to which the DTS CUI must be implemented to permit defendant not to exercise an option, both parties acknowledge that defendant's non-exercise of an option was contemplated only in conjunction with some level of deployment of the DTS CUI. Compare Pl.'s Opp. at 8 ("At the time Carlson's four contracts were awarded, all parties understood and agreed that the phrase 'DoD implements the Defense Travel System (DTS)' meant the implementation of a fully functional, end-to-end travel management system to perform all of DoD's travel services electronically."), with Def.'s Reply at 3 ("[T]he clause is clear upon its face that the Army 'may' exercise options and may choose not to exercise some options so that it could transfer some requirements in the event DTS was operational.").

Section 1.6 of the Contracts, titled "Transition Plan (Phase-in/Phase-[o]ut)," see generally Contract at 24–25, states that it is designed "to ensure there is no break in service during the transition between [Carlson] and any previous or successor Contractor during [the] phase in and phase out of travel operations" id. at 24, ¶ 1.6.1. In contrast to paragraphs 1.1.1.2, and 3.25, the provisions in section 1.6 do not specifically refer to the implementation of the "DTS." For example, paragraph 1.6.7 provides:

> 1.6.7. At a future date a DOD travel services contract(s) will be awarded replacing this contract and all other Service/Agency existing travel service contracts. Once the DOD travel services contract is awarded all DOD sites will transition in accordance with the implementation dates to the DOD travel services contract.

Contract at 25, ¶ 1.6.7. Although the provisions in section 1.6 do not refer explicitly to the DTS, defendant itself interprets them as provisions that could come into play during a transition to a DTS CUI travel services contract. Def.'s Mot. at 4–5 (referring to paragraphs 1.1.1, 1.1.1.2, 1.6.7, and 1.6.8 as "special clauses . . . [that] were included to facilitate a smooth transition of requirements between Army and . . . [DTS] requirements"); cf. Pl.'s Opp. at 36 n.20 (conceding that paragraph 1.6.7 is not "limited to the meaning of 'DTS' in Section 1.1.1.2," and "recogniz[ing] that . . . new, global DoD travel service contracts may necessarily have to be awarded well before the DTS is fully functional").

The only provision in section 1.6 that does not expressly or by implication refer to a transition of work to another contractor is paragraph 1.6.8, which provides:

> 1.6.8. At any time after the base period of this contract, with a 90-day notice from the Contracting Officer to the Contractor, the Government may identify any/or all workload in th[e] contract[s] to be deleted.

Id. at 25, ¶ 1.6.8.

3. The MEPS Travel Requirements

The four Contracts at issue contain clauses requiring Carlson to provide traditional travel services at "a total of 54 Military Entrance Processing [Stations]." Def.'s Facts at 1, ¶ 2; see also Compl. at 2. MEPS facilities process new recruits into the armed services, Pl.'s Opp. at 6, and Carlson's Contracts require it to maintain the capacity "to support over 3500 MEPS recruits per year." Contract at 29, ¶ 2.1.29. According to Carlson, the 54 MEPS sites comprise "[$]35 to $40 million a year in travel . . . [out of] close to over $400 million a year [gross] in the four contracts." Tr. at 31:2–3, 8–9.

Carlson argues that providing MEPS travel services is quite labor-intensive. "[U]nlike many DoD travelers, [MEPS recruits] show up . . . one . . . morning. If they pass their physical[s], they get on a plane that afternoon, in a large group, to go to a boot camp for one of the services." Tr. at 53:19, 23–25. The unique nature of MEPS travel appears to be acknowledged by Carlson's Contracts, which provide: "The Contractor must convey . . . [its] ability to deal with last minute changes, last minute recruits, last

minute passenger substitutions and [its] flexibility in dealing with fast moving changes." Contract at 29, ¶ 2.1.29.

"At least 95% of MEPS travel is group travel," Pl.'s Opp. at 7, which cannot be performed using an automated system like the DTS CUI. See Tr. at 53:21–22 (statement of plaintiff's counsel); cf. Airtrak Travel, 2003 WL 21499653, at *16 (discussing previous solicitation for MEPS travel services, in which DoD representatives "advised offerors that 95 percent of travel at the MEPS would constitute group travel"). Therefore, "[a]ll the MEPS travel services require extensive personal effort of [Carlson's] Travel Counselors." Compl. at 9, ¶ 47. See also id. ("In the case of MEPS, . . . the most time-consuming efforts are negotiating directly with air carriers to arrange for group travel of up to 50 or more recruits at special rates and restricted service. Such group travel cannot be booked via the [airlines'] automated Global Distribution System[] . . . used for individuals or small groups (nine or less)."). According to Carlson, "the Government has stated that the DTS will not be functional and capable of facilitating MEPS travel until Fiscal Year 2006 . . . at the earliest." Pl.'s Opp. at 8 (footnote omitted). This representation is consistent with testimony offered by DoD representatives in a GAO bid protest action concerning "a small business set-aside to acquire official travel management" services for MEPS facilities. AirTrak Travel, 2003 WL 21499653, at *3. In that proceeding,

> officials gave varying testimony on whether the DTS would accomplish MEPS travel, only definitively representing that the DTS will automate some aspects of the DoD travel process at the MEPS, such as reconciliation of accounts. While the agency expresses optimism that the DTS will eventually be fully utilized for the MEPS locations, it has set no dates for the deployment and admits that there are obstacles to achieving this goal.

Id. at *16. Discussing the gradual deployment of the DTS CUI, DoD officials testified that, "with regard to MEPS locations . . . deployment of the DTS may not occur at all." Id. at *15.

### B. The MEPS Travel Solicitation and Carlson's Correspondence with its Contracting Officer

In February 2003, the Department of the Army, Information Technology, E-Commerce and Commercial Contracting Center (ITEC4) issued a solicitation set-aside for small businesses to provide DTS CUI travel management services to eighty-nine military sites, AirTrak Travel, 2003 WL 21499653, at **1, 3 (footnote omitted), including "most of the MEPS locations in Carlson's . . . Contracts," Pl.'s Facts at 7, ¶ 8. The solicitation

was cancelled following a GAO bid protest decision,[6] see generally AirTrak Travel, 2003 WL 21499653; "[h]owever, the Defense Travel System Program Management Office ("DTS PMO"), which sponsored the procurement, and ITEC4 . . . issued public statements to the industry to the effect that they intended to promptly reissue the solicitation for the same MEPS travel management service requirements." Pl.'s Facts at 7, ¶ 8. This proved to be the case. On October 8, 2003, Carlson learned that the DTS PMO and ITEC4 had "publicly announce[d] their intention to reissue such a small business set-aside Solicitation that include[d] the travel requirements for [all of] the MEPS sites covered by [Carlson]'s DTR Contracts." Pl.'s Opp., App. Ex. 3 (letter from plaintiff to Contracting Officer, Jackie Robinson-Burnette (CO or Contracting Officer), of Oct. 8, 2003 (Pl.'s First Letter)), at 1.

1. Carlson's First Letter to the Contracting Officer

Immediately upon learning about the proposed MEPS set-aside procurement, Carlson wrote a letter to its Contracting Officer, see generally id., with the subject line, "Improper Removal of Work Associated with MEPS in [the Contracts]; Request for a Contracting Officer's Final Decision," id. at 1. Quoting the exclusivity clauses in its Contracts, id. at 1 (quoting Contract at 26, ¶¶ 1.7.1–.2), Carlson contended that the impending MEPS procurement interfered with its rights under those provisions:

---

[6]The solicitation at issue in Airtrak contemplated the award of a fixed-price contract for MEPS travel services and required offerors to utilize the nascent DTS CUI program to perform all non-traditional travel services under the resulting contract. 2003 WL 21399653, at *4. Prior to the closing date, several protestors balked at the fixed-price requirement and argued that this requirement shifted all risks concerning uncertainties with the DTS CUI to the contractor. Id. at *6. Some of these protestors chose to submit proposals; others did not. Id. Responding to the protestors' concerns, DoD issued an amendment to the solicitation authorizing the contractor to file an equitable adjustment claim if the DTS CUI did not perform as expected. Id. at *13. However, DoD did not re-open the competition after issuing this amendment. Id. at *6. As a result, non-offeror protestors alleged that they improperly were excluded from the competition because they would have submitted offers under the revised, less risky, solicitation. Id. at *14.

The GAO conceded that "a procurement requiring the use of developmental software poses risks for contractors," id. at *10, but determined that the initial solicitation in this case did not expose offerors to undue or unacceptable risks, id. at *11. However, the GAO determined that the amendment effectuated a "fundamental change[]" to the original solicitation because it "significantly alleviate[d] the risks associated with the DTS," and concluded that "the agency's failure to reopen the competition" after the amendment issued "prejudice[d] . . . the non-offeror protestors." Id. at *14. Concluding that the solicitation should have been reopened to ensure that the agency benefited from maximum competition and to alleviate the prejudice to non-offeror protestors, the GAO sustained the protest. Id. at **14, 17.

> It is CWGT's position that so long as the DTR Contracts are in effect, CWGT is the exclusive provider of travel services to the MEPS sites . . ., and any transfer of that travel service business to another contractor, small business or otherwise, would constitute a breach of CWGT's . . . Contracts.

Id. at 2.

Stating that "Section 1.1.1.2 . . . provides that if the [DoD] . . . implements the [DTS] . . . and is able to provide the Army/other DoD agencies with [end-to-end] travel services under the new system[,] . . . then some of the DTR Contract options may not be exercised," Carlson argued that "this does not give the Government the right to remove significant travel service requirements piecemeal" from the Contracts. Id. Carlson cited the "well known" fact that "travel services required by MEPS cannot be provided by DTS CUI," and argued that, as a result "the award of other travel service contracts by or on behalf of the DTS PMO cannot justify [the] removal [of] or transfer of the MEPS travel requirements" from the Contracts." Id.

Carlson asked the Contracting Officer to "confirm" its position

> that the [MEPS] travel requirements . . . will continue to be performed by [Carlson] throughout the total contract period[,] . . . including all options that are exercised by the Government. In other words, so long as a DTR Contract remains in effect, none of the [MEPS] travel requirements . . . may be transferred to any other contractor.

Id. The letter concluded with a request that the Contracting Officer "promptly issue a Final Decision pursuant to the Contract Disputes Act of 1978" (CDA) if she determined "that the travel requirements of the MEPS sites covered by the . . . Contracts may be transferred to another contractor, including pursuant to a small business set-aside." Id.

On October 9, 2003, one day after Carlson sent this letter, ITEC4 issued a draft solicitation for a small business set-aside containing "the travel requirements for 63 MEPS locations, including the 54 MEPS locations contained in Carlson's . . . Contracts." Pl.'s Facts at 17–18, ¶ 11.

2. The Contracting Officer's Response to Carlson's First Letter

The Contracting Officer responded to Carlson's letter on October 17, 2003. Pl.'s Opp., App. Ex. 4 (CO's First Resp.). Stating that there were "no plans to delete the

MEPS travel service requirements from [Carlson's] contracts," the Contracting Officer "[could] not promise that the MEPS requirements never [would] be removed." Id. The Contracting Officer stated that paragraph 1.6.7 "provide[s] for the transition of travel services in accordance with [the] implementation dates of future DOD travel services contracts," and noted that the Contracts contained both the "standard termination for convenience clause[]" and an option clause, which may not be exercised in the future. Id. The letter concluded:

> I also cannot provide a Final Decision on this matter pursuant to the [CDA]. I do not know whether these MEPS requirements ever will be deleted from these contracts or (if so) what the circumstances of such a removal of work may be. The [CDA] does not contemplate contracting officer decisions for hypothetical and speculative situations.

Id.

### 3. Carlson's Second Letter to the Contracting Officer

On November 3, 2003, Carlson responded to the Contracting Officer's letter. Pl.'s Opp., App. Ex. 5 (Pl.'s Second Letter), at 1. Noting that a draft MEPS solicitation had been issued, Carlson argued that its "request was not in regard to any hypothetical or speculative situations." Id. Carlson stated that it was not asking for a "guarantee" that the government would not exercise its right to terminate the contract for convenience, but claimed that "if such a partial termination for convenience was done . . . to transfer the [MEPS] requirements to another contractor, that would not be a good faith exercise of such a termination for convenience," and would either constitute a material breach of the contract, or entitle Carlson to a "very substantial" equitable adjustment. Id. Restating its understanding of the exclusivity clauses, Carlson asked for a "Final Decision" that "confirm[ed] this fundamental contractual right, particularly in light of contrary action by ITEC4 and the DTS PMO." Id. at 1–2. Carlson advised that it would consider a "response similar to [the Contracting Officer's] letter of October 17, 2003," to be "an adverse Final Decision and [would] proceed accordingly." Id. at 2.

### 4. Carlson's Third Letter to the Contracting Officer

The Contracting Officer did not immediately reply to Carlson's second letter. However, in letters dated November 17 and 18, 2003, she notified Carlson that the Army intended to modify the Contracts "to add a reporting requirement." Pl.'s Opp., App. Ex. 6, at 1; see also id. Ex. 7, at 1 (Workload Data Letters). Pursuant to this new requirement, the Contracting Officer requested on behalf of ITEC4, "in their effort to support the

Department of Defense (DOD) Defense Travel Service (DTS) Program," that Carlson "submit[] . . . [all] travel workload data" for its Contracts' MEPS locations during fiscal year 2003. Id. Ex. 6, at 1; id. Ex. 7, at 1. The letters, which did not request data for any other sites covered by Carlson's Contracts, stated that Carlson "shall provide the [MEPS] data . . . by completing a[] . . . questionnaire form at the Government's [DTS] web site." Id. Ex. 7, at 1–2.

On December 1, 2003, Carlson sent a third letter to its Contracting Officer. Pl.'s Opp., App. Ex. 8 (Pl.'s Third Letter). Referencing the Workload Data Letters, Carlson quoted a statement on the DTS web site that the data was being collected to provide "prospective offerors the most accurate and current workload data available. The workload data is being provided to prospective offerors for their preparation of proposals in regard[] to the Government's Small Business Final Request for Proposals for Travel Management Services." Id. at 1 (quotation omitted).

Carlson claimed that this statement contradicted the Contracting Officer's representation in her letter "that the Government has no plans to delete the MEPS requirements from CWGT's contracts and that [the Contracting Officer was] unaware of any intent . . . to procure other contractors to provide travel services to the MEPS currently under CWGT's contracts." Id. Stating that such a procurement violated its "exclusive contract rights," id., Carlson requested that the Contracting Officer respond to its outstanding request for a "final decision on this subject without further delay." Id. at 2. Carlson also noted that, although it would "promptly and fully respond" to the workload data request, it considered the request "to be an anticipatory breach" of its Contracts. Id.

5. The Contracting Officer's Response to Carlson's Second and Third Letters

The Contracting Officer responded to Carlson's second and third letters on December 29, 2003. Pl.'s Opp., App. Ex. 9 (CO's Second Resp.). Reiterating that "there is no current intention to delete the MEPS requirements from your travel services contracts," the Contracting Officer stated that she could not "assure . . . that at some future date these services [would] not be deleted and/or transferred to a [DoD] travel service contract," and noted that such a transfer would "depend[] primarily on the outcome of the proposed acquisition set-aside for small business[es] by the Defense Travel System (DTS) Program Management Office (PMO) for travel services at MEPS sites, including those currently within [Carlson's] Army contract." Id. at 1.

Acknowledging that the draft MEPS Solicitation had been issued, the Contracting Officer stated that if a DTS contract were awarded "during the performance of your contracts, DTS PMO [would] need to coordinate the transition of MEPS services with the Army. However, as of this date, DTS PM[O] has not asked me to delete any MEPS travel sites from your contract for [a] transition to a DTS contract." Id. The Contracting Officer stated that she could not "predict the date of such an award (if it ever occurs)," id., nor could she predict how the Government would effectuate a transfer of services. However, she posited that the MEPS travel requirements could be transferred "in conjunction with a non-exercise of options," and opined that a transfer via a partial termination for convenience "may be allowable under some circumstances." Id. at 1–2.

Claiming that it was "premature . . . to speculate as to how (if ever) MEPS travel services will be transferred" because such a transfer might never occur, and emphasizing that she could "not speak for DTS PMO or fully anticipate what it [might] request from the Army in the future," the Contracting Officer declined to "absolute[ly] confirm[] . . . [Carlson's] contract interpretation." Id. at 2. The Contracting Officer concluded:

> I do not consider th[e] inability to provide the absolute commitment that you have requested to be a Final Decision . . . . I simply lack the knowledge of future events that would enable that type of commitment. In my opinion, there is no current dispute over the contract terms that govern your ongoing performance under these travel services contracts.

Id.

6. Carlson's Fourth (and Final) Letter to the Contracting Officer

Carlson responded with a letter dated January 6, 2004, which began: "The issue in controversy is simple, straightforward and the Contractor is entitled to a non-evasive final decision regarding the interpretation of contract terms pursuant to the [CDA] . . . and the Disputes Clause . . . in the above contracts." Pl.'s Opp., App. Ex. 10 (Pl.'s Fourth Letter), at 1. Quoting the exclusivity provisions in its Contracts, Contract at 26, ¶¶ 1.7.1–.2, Carlson reiterated its position that, under these clauses,

> so long as the . . . Contracts are in effect, [Carlson] is the exclusive provider of travel services to all the sites listed in the contracts, including the MEPS sites, and any transfer of such travel service business to another contractor, small business or otherwise, would constitute a breach . . . . The removal of MEPS travel requirements from [the] contracts would have a significant adverse impact on CWGT's performance of those contracts.

Id. at 2. Carlson also claimed that "a partial termination for convenience that removes the MEPS requirements . . . for the purpose of transferring the business to contracts awarded on behalf of the DTS PMO would be a subterfuge for breaching the exclusivity provisions . . . and could not be considered an act in good faith." Id. at 2, n.1.

Carlson rejected the Contracting Officer's argument that she could not render a "final decision" because she did "not know what DTS PMO intends to do in regard to the MEPS sites." Id. at 2. Carlson pointed out that ITEC4's draft solicitation and workload data requests made Carlson's "concern regarding a breach of its contractual rights . . . not hypothetical." Id. at 2, n.2. Accordingly, Carlson stated that it was

> entitled, as a matter of right, to your independent determination in regard to all matters relating to these contracts, including an interpretation of contract terms. The interpretation of the terms . . . should not depend upon the intent of the DTS PMO, or other Government solicitations. It also is noted that these contracts . . . [as well as] your final determination in regard to the interpretation of contract terms . . . bind[] the entire U.S Government [including DTS PMO]. We understand and appreciate the fact that you cannot control the actions of the DTS PMO and ITEC4. However, you, not they, are responsible for the interpretation of the above contracts, and resolution of any disputes or controversy arising thereunder.

Id. at 2–3. Carlson concluded with a request that the Contracting Officer "confirm, without equivocation, that so long as the above cited contracts are in effect, and CWGT is satisfactorily performing, none of the MEPS travel requirements currently included in these contracts may be transferred to another contractor," id. at 3, and stated that, if the Contracting Officer would not "confirm the exclusivity terms of these contracts, then the failure to agree with CWGT's interpretation [would] be taken as an adverse final decision." Id.

7. The Response to Carlson's Final Letter

On February 13, 2004, before the Contracting Officer responded to Carlson's final letter, ITEC4 issued its solicitation seeking six small business subcontractors to provide travel management services to sixty-seven MEPS sites, including the fifty-four MEPS sites covered under Carlson's contracts. See Compl. at 14, ¶ 80; Def.'s Mot. at 7; see generally Pl.'s Opp., App. Ex. 2 (Solicitation W91QUZ-04-R-0007) (MEPS Solicitation). "Carlson is not a small business concern and is thus precluded from competing under this MEPS Solicitation." Compl. at 15, ¶ 83. The MEPS Solicitation "purported to seek proposals to provide both DTS CUI-facilitated travel services and traditional travel

services for MEPS locations," id. ¶ 84, and required each contractor to begin providing travel management services on April 1, 2005, Pl.'s Facts at 18, ¶ 12 (citing MEPS Solicitation § C.4.2.1 and § J, Attach. 9, Technical. Ex. A).

On March 1, 2004, after the MEPS Solicitation issued, the Contracting Officer answered Carlson's "request for [a] Contracting Officer's Decision regarding [the] potential transfer of MEPS services." Pl.'s Opp., App. Ex. 11 (CO's Final Resp.). She began the letter by noting that Carlson's most recent request "differed slightly" from its predecessors:

> In previous letters[,] . . . you requested that I "confirm that the official travel requirements for all MEPS sites included in the four DTR contracts . . . will continue to be performed by CWGT throughout the total contract period . . . including all options . . . ." As I explained in previous responses[,] . . . I am unable to provide the absolute commitment requested because I "lack the knowledge of future events that would enable that type of commitment."

Id. at 1. The Contracting Officer stated that Carlson's fourth letter was different because

> [it] request[ed] an interpretation of the exclusivity clauses of the subject contracts . . . . You also assert that "so long as the above DTR Contracts are in effect, CWGT is the exclusive provider of travel services to all the sites listed in the contracts, including the MEPS sites, and any transfer of such travel service[s] . . . would constitute a breach of CWGT's DTR Contracts." In other words, you are asking me to agree that the exclusivity clauses absolutely prohibit a transfer of travel service businesses (including . . . "MEPS" services) to another contractor.

Id. In response to this "different" request, the Contracting Officer opined:

> The exclusivity clauses clearly prohibit the Government from obtaining like services from another contractor while the services are part of your contract requirements. However, the exclusivity clauses do not absolutely prohibit a transfer of services. The subject contracts allow for the non-exercise of options and a termination of services for the convenience of the government.

Id.

Turning to Carlson's claim that a partial termination for convenience would be a termination in bad faith, the Contracting Officer stated that, while "the Government may not terminate for convenience the services in a requirements contract in bad faith in order to transfer such services to another contractor," she could not determine whether "any partial termination for convenience of MEPS services to transfer them to contracts awarded by . . . [DTS PMO] necessarily would not be in good faith." Id. at 2. "Therefore, it is not simply a matter of interpreting the exclusivity clauses. It is a matter of knowing whether a proposed transfer involves [an] act of bad faith by the Government. I cannot determine that [such] a transfer . . . inevitably would be in bad faith." Id. The letter concluded:

> Accordingly, I am unable to provide a contracting officer's final decision in response to the hypothetical you have posed. Nonetheless, I will consider your interpretation of contract requirements if DTS PMO requests such a transfer of MEPS requirements services in the future.
>
> Once again, I do not consider this inability to provide the commitment that you have requested as a Final Decision under the [CDA]. In my opinion, there is no dispute over the contract terms that affect your ongoing performance under these travel services contracts.

Id. (footnote omitted).

8. Amendment 4 to the MEPS Solicitation

"On April 16, 2004, ITEC4 released Amendment 4 to the MEPS Solicitation." Compl. at 15, ¶ 86. Whereas the original procurement sought contractors to perform both DTS CUI-based and traditional travel services, the Amendment altered the Solicitation to require "only traditional travel services." Id. ¶ 89. According to Carlson, the MEPS Solicitation, as amended, does not require offerors to propose "prices for performing DTS CUI facilitated travel services during any portion of the five-year contract." Id. ¶ 111. Rather, it "states that the Government intends to negotiate transaction fees for DTS CUI-facilitated travel services in the second year of performance," id. ¶ 112, and "estimates for evaluation and contract award purposes[,] that tickets will only be issued via traditional travel services through [fiscal year] 2009," id. ¶ 114.

"Offerors submitted proposals in response to the MEPS Solicitation on June 11, 2004." Pl.'s Facts at 18, ¶ 14. However, the award of the contract, originally scheduled for October 2004, see id. ¶ 17, has been "continually delayed," Tr. at 6:10 (statement of defendant's counsel). At oral argument, defendant represented that "[t]he last award was

scheduled for November 30[, 2004]. However, that has now slipped. An award may not be made until some time in December [2004]." Id. at 6:11–13; see also id. at 52:17–19 (statement of plaintiff's counsel that "[t]his procurement has been going on for some time and they're representing that they are going to make awards in December."). Notwithstanding these delays, defendant stated that performance on the MEPS small business contract "wouldn't begin . . . until April [1], 2005," the day after Carlson's current option expires. Id. at 6:18–20; see also id. at 59:14–15 (same).

Interpreting Amendment 4, in conjunction with the Contracting Officer's final letter, to be a "constructive [adverse] Final Decision" under the CDA, Compl. at 14–15, ¶ 82, Carlson filed its complaint in this court on April 26, 2004. Carlson seeks, inter alia, (1) a declaratory judgment that it is "the exclusive provider of travel services for all the MEPS sites" in its Contracts "so long as those Contracts are in effect;" or (2) a declaratory judgment that it is "the exclusive provider of travel services for all the MEPS sites" in its Contracts "unless and until the DTS CUI is operationally deployed and capable of providing the majority of travel requirements at each MEPS site;" and (3) preliminary and permanent injunctions ordering the Army not to transfer any of the MEPS travel requirements under the Contracts "so long as those Contracts are in effect, unless and until a DTS CUI is operationally deployed and able to provide the majority of required travel services" at each MEPS site. Compl. at 25–26.

## II. Discussion

In its motion, defendant asks the court to dismiss Carlson's complaint for lack of subject matter jurisdiction and/or for failure to state a claim upon which declaratory relief can be granted. Def.'s Mot. at 1 (citing Rules of the Court of Federal Claims (RCFC) 12(b)(1) and 12(b)(6). Alternatively, defendant suggests that summary judgment is an appropriate means for disposing of Carlson's complaint. Id. Because subject matter jurisdiction is a "threshold matter" that must be addressed before the court reaches the merits of Carlson's claim, the court considers defendant's motion under RCFC 12(b)(1) first. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998); see also Nippon Steel Corp. v. United States, 219 F.3d 1348, 1352 (Fed. Cir. 2000).

### A. Whether the Court has Jurisdiction Over Carlson's Complaint

#### 1. Standard of Review

RCFC 12(b)(1) governs dismissal of a claim for lack of subject matter jurisdiction. RCFC 12(b)(1). In ruling on a Rule 12(b)(1) motion to dismiss, the court is generally "obligated to assume all factual allegations to be true and to draw all reasonable

inferences in plaintiff's favor." Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing Scheuer v. Rhodes, 416 U.S. 232, 236–37 (1974)). However, plaintiff, as the non-moving party, bears the burden of establishing jurisdiction by a preponderance of the evidence. Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). "A well-pleaded allegation in the complaint is sufficient to overcome challenges to jurisdiction." Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997); cf. Fisher v. United States, 364 F.3d 1372, 1377–78 (Fed. Cir. 2004) (noting that the test for determining whether a claim falls within this court's subject matter jurisdiction is fairly "relaxed", and stating that "a non-frivolous allegation that a particular statute is reasonably amenable, with fair inferences drawn, to a reading that it mandates money damages [states] a basis for jurisdiction [under 28 U.S.C. § 1491(a)(1)].").

2. Jurisdiction of the Court of Federal Claims Over CDA Claims

The United States Court of Federal Claims is a court of "limited jurisdiction." United States v. King, 395 U.S. 1, 3 (1969). The Tucker Act, 28 U.S.C. § 1491 (2000), vests this court with jurisdiction over certain claims against the United States; however, the Tucker Act does not create a substantive right enforceable against the sovereign. United States v. Testan, 424 U.S. 392, 398 (1976); Khan v. United States, 201 F.3d 1375, 1377 (Fed. Cir. 2000). The Tucker Act sets out this court's jurisdiction over disputes arising under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–13 (2000):

> The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the [CDA], including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under [section 605 of the CDA].

28 U.S.C. § 1491(a)(2); Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1264 (Fed. Cir. 1999) (quoting same).

Section 605(a) of the CDA requires that "[a]ll claims by a contractor against the government relating to a contract . . . be in writing and . . . be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). This provision also requires "the contracting officer [to] issue his decisions in writing, and . . . [to] furnish a copy of the decision to the contractor." Id. The Federal Circuit has interpreted section 605(a) to impose two distinct prerequisites to this court's jurisdiction over disputes between contractors and the government: the contractor must have submitted a "claim" to a contracting officer, and

the contracting officer must have issued a "final decision" concerning the contractor's claim. See, e.g., England v. The Swanson Group, Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004); Alliant, 178 F.3d at 1264; Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1578 (Fed. Cir. 1994); Sharman Co. v. United States, 2 F.3d 1564, 1568–69 (Fed. Cir. 1993), overruled in part on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995).

The parties agree that Carlson must establish both jurisdictional prerequisites to proceed in this court. See Def.'s Mot. at 8; Pl.'s Opp. at 19. The parties also agree that Federal Circuit's decision in Alliant provides the relevant standard for determining "whether a request for an interpretation of a contract qualifies as a CDA 'claim'," Def.'s Mot. at 11, and whether a letter from a contracting officer that expressly "refus[es] to issue a final decision on [a] claim," can nonetheless constitute a "final decision" under the CDA, Pl.'s Opp. at 22–23. The court agrees that Alliant, in conjunction with the CDA and the Federal Acquisition Regulations (FAR), lays out the proper legal framework.

a. The Federal Circuit's Decision in Alliant

Alliant involved a contract with the Army, which "incorporated by reference the standard 'disputes clause,'" requiring the contractor to perform "'pending final resolution of any request for relief, claim, [or] appeal . . ., and [to] comply with any decision of the Contracting Officer.'" 178 F.3d at 1263–64 (quoting FAR § 52.233.1(i). The contract also contained an option clause that specified "the time period during which the option could be exercised." Id. at 1263. After that time period had lapsed, the Army's contracting officer notified Alliant that he planned to exercise the option, and "issued a unilateral modification of the contract purporting to exercise the option." Id. at 1264. Alliant sent a letter to the contracting officer, which "set out [its] position that the attempt to exercise the option was ineffective [under the option clause]," id. at 1265, and "advised the contracting officer that 'if you disagree . . . please consider this letter a claim and request for a final decision under the CDA,'" id. The contracting officer responded in a letter stating that it "disagreed with Alliant's interpretation" of the option clause. Id. at 1264. The letter also "made it clear that he did not intend for the letter to constitute a final decision." Id. at 1267.

"Alliant filed a complaint in the Court of Federal Claims seeking a declaration that it was not required to perform the option . . . [and] an injunction barring the government from enforcing the option clause . . . ." Id. at 1264. The court determined that it possessed jurisdiction to issue a declaratory judgment, but lacked jurisdiction to issue an injunction. Id. On appeal to the Federal Circuit, the government argued that the Court of Federal Claims lacked jurisdiction over the complaint "because [it] was not preceded by

either a qualifying claim . . . or a final decision by the contracting officer." Id. at 1264–65. As discussed below, the Federal Circuit rejected both arguments and held that the contractor's letter constituted a valid "claim" and the contracting officer's letter constituted a valid "final decision" under the CDA. Id. at 1268. Against this backdrop, the court discusses each "jurisdictional prerequisite" in turn.

b. Whether Carlson Submitted a Valid Claim to its Contracting Officer

Although the term, "claim," is not explained in the CDA, it is defined in the FAR: "Claim means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101 (2004). The court recognizes that, "[t]o state a [valid] non-monetary claim, there is no requirement that the contractor make a request for a sum certain." Clearwater Constructors, Inc. v. United States, 56 Fed. Cl. 303, 309 (2003); see also GPA-I, LP v. United States, 46 Fed. Cl. 762, 766 (Fed. Cl. 2000). Rather, "the phrase 'as a matter of right' in the regulatory definition of a 'claim' requires only that the contractor specifically assert entitlement to the [non-monetary] relief sought. That is, the claim must be a demand for something due or believed to be due . . . ." Alliant, 178 F.3d at 1265.

Defendant argues that none of Carlson's letters makes out a valid CDA claim. Noting that "the first three letters . . . do not clearly and unequivocally seek an interpretation of contract terms," defendant insists that these letters do not constitute valid claims. Def.'s Mot. at 9. According to defendant, these letters "asked that the contracting officer 'confirm that the travel requirements for all MEPS sites . . . will continue to be performed by [Carlson] throughout the total contract period, including all options exercised by the Government.'" Id. (quoting Pl.'s First Letter at 2). Defendant insists that, based upon the above-quoted language, "[t]hese letters clearly demanded an expression of the agency's intent rather than an interpretation of contract terms." Id.

Defendant concedes that, in its fourth letter, Carlson "plainly submitted a demand couched in terms of requesting an interpretation of contract terms." Id. However, defendant argues that, because this letter, like its predecessors, asked the Contracting Officer to "'confirm without equivocation, that . . . none of the MEPS travel requirements . . . may be transferred to another contractor,'" id. at 10 (quoting Pl.'s Fourth Letter at 3), Carlson "was not asking for an 'interpretation' of the contract terms, but rather, for a guarantee of how the Government would act if, in the future, the DTS PMO requested a transfer of MEPS sites to its proposed small business set-aside contracts," id.

Not surprisingly, Carlson argues that, through repeated requests for "a confirmation of the meaning of the Exclusivity Clauses and its contractual rights in the context of specific Governmental actions," Pl.'s Opp. at 18–19, it submitted four valid claims seeking an interpretation of contract terms. Accusing defendant of recasting its claims "as requests for information about a hypothetical future event," Carlson insists that each letter "request[ed] that the Contracting Officer provide her interpretation about whether the contracts ensure Carlson the exclusive right to provide travel services to the MEPS sites while the . . . contracts are in effect, notwithstanding the pending ITEC4 MEPS Solicitation." Id. at 20. Accordingly, Carlson argues that each letter "constitute[s] a valid claim for purposes of establishing jurisdiction under the Tucker Act [because] [e]ach letter contains Carlson's written demand seeking, as a matter of right, an interpretation of the contract terms." Id. at 19–20.

The court finds that Carlson did submit a valid written claim to its Contracting Officer seeking an interpretation of contract terms. Contrary to defendant's assertion, the fact that the plain language of Carlson's first three letters does not "clearly and unequivocally seek an interpretation of contract terms," Def.'s Mot. at 9, is not determinative. The CDA does not require "that a 'claim' . . . use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis . . . of the claim." Contract Cleaning Maint., Inc., v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). If a contractor's written request for an interpretation of contract terms "assert[s] specific contractual and legal grounds for [the contractor's] interpretation" of those terms, that contractor has submitted a valid claim under the CDA. Alliant, 178 F.3d at 1265.

Here, at least two of Carlson's letters plainly state the contractual and legal bases for its request that the Contracting Officer interpret the exclusivity clauses in its Contracts. See Pl.'s First Letter at 1–2 (quoting Contract ¶¶ 1.1.1.2, 1.7.1 and 1.7.2); Pl.'s Fourth Letter at 1 (quoting Contract ¶¶ 1.7.1 and 1.7.2). Like the contractor in Alliant, Carlson submitted to its Contracting Officer its interpretation of several contractual provisions and asked the Contracting Officer to "confirm" that interpretation. Both the first and final letters to its Contracting Officer articulate Carlson's interpretation that, under its exclusivity clauses, "so long as a DTR Contract remains in effect, none of the travel requirements of the MEPS sites . . . may be transferred to any other contractor." Pl.'s First Letter at 2; see also Pl.'s Fourth Letter at 3. Both letters also request that the Contracting Officer "promptly issue a Final Decision pursuant to the [CDA]" if she disagreed with Carlson's interpretation. Pl.'s First Letter at 2; see also Pl.'s Fourth Letter at 1 (repeating Carlson's "[r]equest for [a] Contracting Officer's [f]inal [d]ecision"); id. at 2–3 (requesting the Contracting Officer's "independent . . . final determination" and

stating that "failure to agree with [Carlson's] interpretation [would] be taken as an adverse decision under the Contract Disputes Act"). Further, like the contractor in Alliant, Carlson argued in each letter that the government took actions inconsistent with those cited provisions. See, e.g., Pl.'s First Letter at 1 (discussing the announcement that DTS PMO and ITEC4 planned to reissue the MEPS Solicitation); Pl.'s Second Letter at 1 (discussing the recently-issued draft Solicitation); Pl.'s Third Letter at 1 (discussing the workload data requests); Pl.'s Fourth Letter at 2, n.2 (discussing the recently-issued MEPS Solicitation).

As in Alliant, Carlson requested that the Contracting Officer agree or disagree with its interpretation of contractual provisions. As in Alliant, Carlson's request was prompted by actions taken by the government that potentially affected its contractual rights. By submitting its interpretation of the exclusivity provisions in light of the MEPS Solicitation, and by asking the Contracting Officer to "confirm" or refute its interpretation, Carlson sought a contracting officer's interpretation of contract terms, rather than a guarantee that the government would behave a certain way under the contract.

Contrary to defendant's assertion, the way Carlson phrased its request is not outcome-determinative. The Federal Circuit "has definitively stated that certain 'magic words' need not be used [to establish a claim under the CDA;] . . . [rather,] the intent of the 'claim' governs." Transamerica Ins. Corp. v. United States, 973 F.2d 1572, 1578 (Fed. Cir. 1992), overruled on other grounds by Reflectone, 60 F.3d 1572. Here, Carlson asked the Contracting Officer to "confirm" or reject Carlson's understanding of the exclusivity provisions. Although Carlson did not use the magic word, "interpretation," until its final letter, it is apparent that Carlson intended to request a contracting officer's interpretation of terms. Accordingly, Carlson submitted a valid "claim" under the CDA.

Further, the court agrees with Carlson that "it matters little whether . . . one or four letters . . . demand[ed]" that the Contracting Officer issue an interpretation of contract terms. Pl.'s Opp. at 19. One valid demand constitutes a "claim" for purposes of the CDA and, as discussed above, at least Carlson's first and fourth letters each fulfill the criteria for a "claim." The court also notes that "a series of letters can be read together to comprise a clear and unequivocal statement giving the contracting officer notice of the basis for the contractor's claim." Kalamazoo Contractors, Inc. v. United States, 37 Fed. Cl. 362, 368 (1997) (citation omitted), quoted in Clearwater Constructors, 56 Fed. Cl. at 309; see also Contract Cleaning Maint., 811 F.2d at 592 (finding that two letters, read together, constitute a claim, and noting that the CDA does not require "that a 'claim' . . . be submitted in any particular form."). Accordingly, even if none of Carlson's letters individually cleared the jurisdictional bar, the series of letters, which "specifically

assert[s] entitlement" to non-monetary relief by "assert[ing] specific contractual and legal grounds for [Carlson's] interpretation" of its exclusivity clauses, see Alliant, 178 F.3d at 1265, constitutes a valid claim under the CDA.

c. Whether the Contracting Officer Issued a Final Decision

Even where a contractor has submitted a valid "claim" to its contracting officer, this court lacks jurisdiction to review that claim until "a decision of the contracting officer has been issued under section 6 of [the CDA]." 28 U.S.C. § 1491(a)(2); see also Paragon Energy Corp. v. United States, 645 F.2d 966, 967 (Ct. Cl. 1981) ("[T]he linchpin for appealing claims under the Contract Disputes Act is the contracting officer's 'decision.' No appeal, whether . . . to the agency board of contract appeals or to this court . . . may be taken without such a 'decision.'"). To protect the contractor's "unique" right of appeal,[7] this jurisdictional requirement may be satisfied by either the contracting officer's action or her inaction. If a contracting officer issues a written statement detailing "the reasons for [her] decision . . . and . . . inform[ing] the contractor of his rights," that statement constitutes a "decision" under the CDA. 41 U.S.C. § 605(a). Alternatively, if a contracting officer fails to issue a written decision within sixty days after receiving a contractor's claim, that failure is "deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim." Id. § 605(c)(1), (5).

Here, the court finds that, at minimum, the Contracting Officer's March 1, 2004 letter constitutes a final decision under the CDA. As a threshold matter, the court notes defendant's statement that, in this letter,

---

[7]"The Senate Report on the Act makes clear that "one reason for giving contractors 'unique' appeal rights from adverse decisions by contracting officers is that contractors are obligated under the disputes clause to continue work without 'stopping to litigate.'" Alliant, 178 F.3d at 1266 (quoting S. Rep. No. 95-1118, at 32 (1978), reprinted in 1978 U.S.C.C.A.N. 5235, 5266). The Federal Circuit has been mindful of Congress' intent to "equalize the bargaining power of the parties when a dispute exists." S. Rep. No. 95-1118, at 1, quoted in Burnside-Ott Aviation Training Ctr. v. Dalton, 107 F.3d 854, 858 (Fed. Cir. 1997). See also Alliant, 178 F.3d at 1268 ("The government cannot, in response to a claim, demand that a contractor obey the contracting officer's directive . . . while characterizing that directive as nonfinal."); Applied Cos. v. United States, 144 F.3d 1470, 1478 (Fed. Cir. 1998) ("The Contract Disputes Act was intended primarily to create opportunities for informal dispute resolution at the contracting officer level and to provide contractors with clear notice as to the government's position regarding contract claims.").

> the contracting officer provided an interpretation of the exclusivity contract clauses referenced by the contractor in its [fourth letter]. While she noted that the exclusivity clauses prohibited the Government from obtaining travel services from another contractor while CW was providing the services, the clauses did not absolutely prohibit a transfer of those services.

Def.'s Mot. at 13. Notwithstanding this concession, defendant insists that the Contracting Officer did not render a "final decision" because she expressly refused to answer Carlson's "demand[] that [she] determine how those clauses would be applied if certain hypothetical events occurred." Id. Defendant argues that, "[a]ssuming, for the sake of argument, that this demand represents a valid claim, the contracting officer did not decide the matter adversely to the contractor. Instead, [she] refused to issue a decision unless and until facts arose which made such a determination possible." Id.

Given the circumstances presented here, defendant's argument lacks merit. A contracting officer's written refusal to render a "final decision" does not provide an end-run around this court's jurisdiction; the substance, rather than the form of the letter is determinative. "Whether a contracting officer's letter may be taken as a final expression of an agency's position on a claim . . . is ultimately to be judged by what the letter says and not by how it is labeled." Litton Sys., Inc. v. United States, 27 Fed. Cl. 306, 309 (1992). See also Alliant, 178 F.3d at 1267 ("A letter can be a final decision under the CDA even if it lacks the standard language announcing that it constitutes a final decision."); Made in the USA Found. v. United States, 51 Fed. Cl. 252, 256 (2001) ("A letter from an agency can constitute a final decision under the CDA even if it does not announce itself as such.").

Defendant correctly notes that each of the Contracting Officer's letters refuses to provide a final decision because the Contracting Officer could not predict the government's future treatment of the MEPS requirements in Carlson's contracts. Cf. CO's Final Resp. at 2 (refusing to engage in speculation concerning a transfer of MEPS requirements via partial termination for convenience because the Contracting Officer could not determine in advance "whether a proposed transfer [would] involve[] [an] act of bad faith by the Government."). However, defendant's argument ignores the critical fact that, in addition to declaring her unwillingness to speculate about the government's future behavior, the Contracting Officer's final letter also advances her interpretation of the exclusivity clauses in Carlson's Contract—an interpretation directly adverse to Carlson's interpretation of the same provisions. In its letters, Carlson interpreted the exclusivity clauses as providing that,

> so long as the DTR Contracts are in effect, [Carlson] is the exclusive provider of travel services to all sites listed in the contracts, including the MEPS sites, and any transfer of such travel service business to another contractor, small business or otherwise, would constitute a breach of CWGT's DTR Contracts.

Pl.'s Fourth Letter at 2 (footnote omitted); see also Pl.'s First Letter at 2 (same). Carlson also

> requested that [the Contracting Officer] confirm, without equivocation, that so long as the above-cited contracts are in effect, and CWGT is satisfactorily performing, none of the MEPS travel requirements currently included in these contracts may be transferred to another contractor. The exclusivity provisions are quite clear and unambiguous.

Pl.'s Fourth Letter at 3; see also Pl.'s First Letter at 2 (same); Pl.'s Second Letter at 2 (same); cf. Pl.'s Third Letter at 1 ("As you are aware, CWGT believes that its contracts . . . unequivocally provide that [it] will be the exclusive provider of official travel services to all sites covered by the Army contracts, including the MEPS. We have twice requested a Contracting Officer's final decision under the Disputes Clause in regard to CWGT's exclusive rights to provide travel services to MEPS sites.").

In her final response, the Contracting Officer offered the following interpretation of the same exclusivity provisions:

> The exclusivity clauses clearly prohibit the Government from obtaining like services from another contractor while the services are part of your contract requirements. However, the exclusivity clauses do not absolutely prohibit a transfer of services.

CO's Final Resp. at 1. Even if defendant is correct that the Contracting Officer properly refused to answer Carlson's alleged "demand[] that . . . [she] determine how th[e] [exclusivity] clauses would be applied if certain hypothetical events occurred," Def.'s Mot. at 13, an issue that the court does not decide, defendant cannot ignore that the Contracting Officer also refused to confirm Carlson's interpretation of the exclusivity provisions and instead offered a contrary interpretation of those same terms. See CO's Final Resp. at 1; Def.'s Reply at 6 ("In her letter dated March 1, 2004, the contracting officer provided an interpretation of the exclusivity contract clauses referenced by the contractor in its letter of January 6, 2004."). To the extent that the Contracting Officer provided a written interpretation of contract terms, her response constitutes a "final

decision" under the CDA, which is subject to this court's review. Cf. Alliant, 178 F.3d at 1267 (noting that, notwithstanding any written assertion to the contrary, "[t]he contracting officer's decision . . . [which] stated in the letter that Alliant's contract interpretation was incorrect" constituted a final decision under the CDA).

Further, the court notes that, even if the Contracting Officer's final letter did not constitute a "decision" under the CDA, her failure to render a final decision on Carlson's claim within sixty days of receiving that claim automatically would be deemed a "decision . . . denying that claim" for purposes of invoking this court's jurisdiction. 41 U.S.C. § 605(c)(1), (5). Here, Carlson submitted its final letter requesting the Contracting Officer's interpretation of the exclusivity provisions on January 6, 2004. Pl.'s Fourth Letter at 1. Even if the Contracting Officer had not issued a final decision interpreting the exclusivity provisions, her failure to do so would have been deemed a decision denying Carlson's claim on or about March 8, 2004. Carlson filed its complaint on April 26, 2004—111 days after submitting its final claim and 49 days after the statutory deadline for a contracting officer's final decision had passed. Accordingly, Carlson's complaint lies within this court's jurisdiction and defendant's motion to dismiss is DENIED.

B. Whether Carlson States a Valid Claim for Declaratory Relief

Defendant also moves that Carlson's complaint be dismissed for failure to state a claim upon which relief can be granted. See Def.'s Mot. at 1 (citing RCFC 12(b)(6)). Conceding that "the Tucker Act and the CDA provide[] this [c]ourt with the jurisdiction to entertain non-monetary disputes," id. at 15 (citing Alliant, 178 F.3d at 1268), defendant argues that it would be inappropriate for the court to award declaratory relief in this case. Id. ("[T]he [c]ourt has exercised [its authority to grant declaratory] relief only in very limited circumstances—none of which exist here.").

1. Standard of Review

When considering a motion under RCFC 12(b)(6), the court must accept as true the facts alleged in the complaint, Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 633 (1999), and must construe all reasonable inferences in favor of the non-movant, Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001). "Dismissal for failure to state a claim under Rule 12(b)(6) is proper only when a plaintiff 'can prove no set of facts in support of his claim which would entitle him to relief.'" Leider v. United States, 301 F.3d 1290, 1295 (Fed. Cir. 2002) (quoting Conley v. Gibson, 355 U.S. 41, 45–46 (1957)), cert. denied, 538 U.S. 978 (2003); see also Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000) (noting that court must grant a Rule 12(b)(6) motion

"when the facts asserted by the plaintiff do not entitle him to a legal remedy."). Granting a RCFC 12(b)(6) motion "summarily terminates the case on its merits." Ponder v. United States, 117 F.3d 549, 552–53 (Fed. Cir. 1997).

Where, as here, the parties have presented "matters outside the pleading" to the court, and the court has not excluded those materials, RCFC 12(b)(6) specifically instructs that the "motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56." RCFC 12(b); see also Rotec Indus., Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1250 (Fed. Cir. 2000). Rule 56 provides that summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact that might affect the outcome of the litigation is material. Anderson, 477 U.S. at 248. Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. Id.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party makes such a showing, the burden then shifts to the non-moving party to show that a genuine issue exists. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562–63 (Fed. Cir. 1987). The movant is also entitled to summary judgment if the non-movant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. Celotex, 477 U.S. at 322–23; Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994). The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, Litton Indus. Prods., Inc. v. Solid State Sys. Corp., 755 F.2d 158, 163 (Fed. Cir. 1985), to whom the benefits of all favorable inferences and presumptions run. H.F. Allen Orchards v. United States, 749 F.2d 1571, 1574 (Fed. Cir. 1984), cert. denied, 474 U.S. 818 (1985).

### 2. Standard for Granting Declaratory Relief

As discussed above, see Part II.A.2, supra, this court's jurisdiction extends to "nonmonetary disputes on which a decision of the contracting officer has been issued" pursuant to the CDA, 28 U.S.C. § 1491(a)(2), including certain requests for declaratory relief. See Alliant, 178 F.3d at 1270 ("We have held . . . that the Tucker Act grants the Court of Federal Claims jurisdiction to grant nonmonetary relief in connection with contractor claims, including claims requesting an interpretation of contract terms."); Garrett v. Gen. Elec. Co., 987 F.2d 747, 750–51 (Fed. Cir. 1993) (concluding that a contractor's claim seeking "nonmonetary substitute[s] for monetary relief" falls within

this court's jurisdiction). However, declaratory relief is neither necessary nor appropriate to resolve every case. For example, the Federal Circuit has observed that this court

> is [not] required to issue a declaration of rights whenever a government contractor raises a question of contract interpretation during the course of contract performance. In responding to such a request, the court . . . is free to consider the appropriateness of declaratory relief, including whether the claim involve[d] a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests.

Alliant, 178 F.3d at 1271. The Federal Circuit described a request for declaratory relief that would fail this nonexhaustive factors test:

> While a contractor may want to know ahead of time how a contract issue will be resolved—such as whether the contractor will be entitled to additional compensation under the changes clause for a particular item of work directed by the contracting officer—such cases do not ordinarily put into question whether the contractor is obligated to perform at all. . . . It would normally be appropriate in such cases for the court . . . to decline to issue a declaratory judgment and to await a later equitable adjustment claim by the contractor. In refusing a request for declaratory relief in the absence of a need for an early declaration of the parties' rights, the court . . . would be applying a principle analogous to the traditional rule that courts will not grant equitable relief when money damages are adequate.

Id. However, the Federal Circuit also emphasized that declaratory "intervention during contract performance" is appropriate to resolve claims "involving a fundamental question of contract interpretation or a special need for early resolution of a legal issue." Id. Such was the case in Alliant, where the contractor had argued that "once it had performed the main contract, it had no contractual obligations to the government under either the option clause or the disputes clause . . . [and] [t]hus, it objected to the requirement that it perform at all." Id. The Federal Circuit found that "these arguments were nonfrivolous and that there was a special need to resolve th[is] issue in a timely manner, since requiring Alliant to perform under the option clause without a ruling on its claim that it had no obligations under that clause would have denied Alliant any meaningful relief."

Id.

3. Whether Carlson's Request for Declaratory Relief is Properly Before This Court

Both parties focus on the first factor in Alliant, specifically whether a live dispute exists between the parties, to support their arguments concerning the appropriateness of declaratory relief in this case. Defendant argues that no "live dispute" exists between the parties because "[t]here is no current or imminent decision by the Army to delete MEPS locations" from Carlson's Contracts." Def.'s Mot. at 16–17. Claiming that, "[a]t most, [Carlson] alleges that the Government contemplates the future deletion of requirements at a time when [Carlson's] contracts might not even be in effect," Def.'s Reply at 8, defendant emphasizes that "it is unclear whether the Government will reach a point where deletion of travel services requirements at MEPS sites is considered during the term of the [Contracts]." Def.'s Mot. at 17.

Quoting Alliant, defendant suggests that Carlson "want[s] to know ahead of time how a contract issue will be resolved," rather than "whether [it] is obligated to perform at all." Def.'s Reply at 7 (quoting Alliant, 178 F.3d at 1271). Defendant argues that, in contrast to the contractor in Alliant, Carlson "has not been ordered to perform any action in contravention [of] its contract requirement," and reasserts that there is no "imminent decision to delete the MEPS locations from [Carlson's] contracts." Id. at 8; cf. Def.'s Mot. at 17 ("No deletions of work have occurred, the contracts are still in full force and effect, and [Carlson] has not been informed of any changes to its contract . . . ."). According to defendant, "the fact that the Government has solicited bids for future MEPS work does not affect [Carlson's] current contract." Def.'s Reply at 8. Therefore, defendant argues, the MEPS Solicitation does not impact Carlson's Contracts in a way that justifies declaratory relief because there is no "current dispute over contract terms that affects [Carlson's ongoing] contract performance." Def.'s Mot. at 17. Defendant insists that Carlson's complaint "seeks a declaration . . . that is akin to an advisory opinion. It wants the [c]ourt to declare how it would rule upon a possible future event." Def.'s Mot. at 18.[8]

[8]Addressing the second prong of Alliant, whether a declaration will resolve the dispute, defendant concedes that a declaration from this court "[a]rguably . . . would resolve the dispute because it would mandate that [Carlson] remains as the sole provider of travel services for all MEPS sites." Def.'s Mot. at 18. However, defendant claims that such a declaration "goes beyond [Carlson's] own strained contract interpretation (which at least would allow the transfer of requirements upon deployment of a DTS CUI)," and emphasizes that Carlson's alternate request for a declaration that it is "the exclusive provider of travel services for MEPS sites unless and until the DTS CUI is operationally deployed to and capable of performing the majority of travel requirements at each MEPS site," id. at 18–19 (quotation omitted), "likely would lead to

Carlson argues that its "request for a declaratory judgment interpreting its contracts with the Army is analogous to the request made by the contractor in Alliant [because] both requests involve a specific, ongoing dispute that can only be adequately settled by early declaratory relief." Pl.'s Opp. at 27. Rejecting defendant's argument that "there is no current or imminent decision . . . to delete MEPS locations" from the Contracts, id. (quotation omitted), Carlson insists that, through its actions, defendant has made clear its intention simultaneously "to award all the contracts for these 54 MEPS sites to other contractors to commence work on 1 April 2005," and "to exercise Carlson's" next option "to provide the work for all its regions from 1 April to 30 September." Tr. at 50:4–8. Accordingly, Carlson argues that this case is "suitable for declaratory relief" because it presents a live controversy for breach of contract that turns on the interpretation of contract terms and ultimately could "remov[e] [Carlson's] obligation to perform the [MEPS] requirements." Pl.'s Opp. at 31.[9]

The parties' arguments concerning the "live dispute" prong of Alliant present a very close issue. Although Alliant is instructive, neither Alliant nor any case applying Alliant speaks to the precise situation before the court.[10] Alliant involved a situation in

---

further controversy . . . as to whether the DTS CUI is operationally deployed to and capable of performing these travel requirements," id. at 19 (quotation omitted).

Regarding the third prong of Alliant, whether available legal remedies are inadequate, defendant argues that it is unnecessary for the court to grant Carlson's request for declaratory and injunctive relief because "the law provides for a full recovery of any costs or damages [Carlson might] sustain in the future due to a possible deletion of work from [its] contracts." Id. According to defendant, if the MEPS requirements were deleted, "ensuing litigation would not necessarily be complex or involve multiple parties. It likely would involve only a breach claim by [Carlson], based upon contract interpretation." Def.'s Reply at 10.

[9]Addressing the second prong of Alliant, Carlson insists that a declaration from this court interpreting the exclusivity provisions would necessarily resolve the dispute, Pl.'s Opp. at 29, presumably because the MEPS work would not be transferred from Carlson to another contractor. Carlson also argues that, under the third prong of Alliant, money damages would be inadequate to remedy the "irreparable injury," caused by "disrupting the ongoing operations servicing multiple Government travel offices[,] . . . [requiring] operational restructuring . . . to move or eliminate personnel . . . [and] [eliminating] anticipated profit[s]," which could not be recovered if the MEPS requirements were deleted. Id. at 30.

[10]Defendant insists that the court "has denied similar requests for declaratory judgment." Def.'s Mot. at 16. The court disagrees. None of the three decisions cited by defendant resembles this case. See id. For example, as defendant notes, the court in Hamilton Security Advisory Services, Inc. v. United States, 60 Fed. Cl. 144 (2004), declined to issue a declaratory judgment

which a contractor was ordered to perform pursuant to a contract that the contractor believed had expired. Under those circumstances, the Federal Circuit found that there existed a "live dispute" concerning whether the contracting officer had validly exercised an option and whether the contractor was required to perform. Alliant, 178 F.3d at 1271. This case presents a quite different situation. Although Carlson's present obligations under its Contracts have not been altered or abridged, Carlson argues that defendant has taken actions to facilitate a transfer of future work requirements from Carlson to another contractor, and that this transfer will occur simultaneously with the commencement of Carlson's next option.

Alliant presented a "live dispute" concerning the contractor's then-current obligation to perform. The only possible "live dispute" in this case concerns Carlson's future obligation to perform. In contrast to Alliant, the appropriateness of declaratory relief appears to turn on whether Carlson has alleged a "live controversy" concerning the government's anticipatory breach of the Contracts. As the Federal Circuit has explained:

> At common law, anticipatory repudiation of a contract required an unambiguous and unequivocal statement that the obligor would not or could not perform the contract. See Dingley v. Oler, 117 U.S. 490, 503, 6 S.Ct. 850, 29 L. Ed. 984 (1886); Cascade Pac. Int'l v. United States, 773 F.2d 287, 293 (Fed. Cir. 1985). As the Restatement of Contracts has recognized, however, modern decisions do not limit anticipatory repudiation to cases of express and unequivocal repudiation of a contract. Instead, anticipatory repudiation includes cases in which reasonable grounds support the obligee's belief that the obligor will breach the contract. In that setting, the obligee "may demand adequate assurance of due performance" and if the

---

that the government owed a contractor millions of dollars in damages. However, the circumstances underlying that ruling are not present here. In Hamilton, the court noted that performance of the contract had been completed and that a trial on liability and damages had already been scheduled; the court concluded that, under those circumstances, there was no need for an early declaration resolving the case. Id. at 156. Defendant also cites Sweet v. United States, 53 Fed. Cl. 208 (2002), as an analogous decision; however, Sweet is not a contract case. The Sweet court's holding that it only can grant declaratory relief incidental to a monetary claim arising under a statute, id. at 228, is inapposite. Nor does Made in the USA Foundation v. United States, 51 Fed. Cl. 252 (2001), assist defendant's case. In that decision, the court declined to reach the issue of declaratory relief after finding that it lacked jurisdiction because the contractor had not submitted a valid CDA claim and the contracting officer had not issued a "final decision" pursuant to the CDA. Id. at 255, 257.

None of the cases cited by defendant speaks to the circumstances presented here.

> obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract. Restatement (Second) of Contracts § 251 (1981).

Danzig v. AEC Corp., 224 F.3d 1333, 1337–38 (Fed. Cir. 2000); cf. Cross Petroleum, Inc. v. United States, 54 Fed. Cl. 317, 326 (2002) (declining to apply the Restatement's "lower standard" for anticipatory breach where the alleged breach was permissible under a "specific [and more stringent] rule set out by the mutually agreed-upon contract").

The applicability of the Danzig anticipatory breach standard to Carlson's claim appears to be consistent with the CDA itself, which recognizes that contractors do not have to wait to file a claim until an actual violation has occurred. As the Federal Circuit has noted, the standard disputes clause

> does not impose [an] . . . obligation on the contractor to wait until performance is complete[] before filing a claim for relief from the contracting officer's decision. . . . To hold that the disputes clause bars any pre-performance claim seeking an interpretation of contract terms would render largely meaningless those portions of the definition of claim that refer to requests for nonmonetary relief.

Alliant, 178 F.3d at 1266–67.

The parties have introduced numerous facts that bear on the question of whether there exists a "live dispute" involving an anticipatory breach of Carlson's Contracts. Many of these facts do not appear to be disputed, including, for example, (1) defendant's release of the draft MEPS Solicitation, see Part I.B.1, supra; (2) defendant's workload data requests, see Part I.B.4, supra; (3) defendant's issuance of the official MEPS Solicitation, see Part I.B.6, supra; (4) defendant's issuance of Amendment 4 to the Solicitation, see Part I.B.8, supra; (5) defendant's acceptance of proposals pursuant to the Solicitation, see id.; (6) defendant's representation to the court that the contract resulting from the MEPS Solicitation will begin April 1, 2005, see id.; and (7) defendant's March 1 deadline for exercising Carlson's next option, which, if exercised, will commence April 1, 2005, see Part I.A, supra; and (8) defendant's probable exercise of Carlson's next option extending the Contracts from April 1 through September 30, 2005, see id. Although the parties appear to agree on most—if not all—of these facts, neither has analyzed whether these facts give rise to an anticipatory breach of Carlson's Contracts that warrants declaratory intervention by the court.

The court finds that the facts before the court sufficiently evidence a "live dispute" involving an anticipatory breach of contract to defeat defendant's motion to dismiss Carlson's claim for declaratory relief. Because defendant has not established that it is entitled to judgment as a matter of law that Carlson's request for declaratory relief is not properly before the court, its motion to dismiss Carlson's complaint for failure to state a claim is DENIED. See RCFC 12(b), 56(c); Anderson, 477 U.S. at 250.

C. Whether the Terms of the Contract Entitle Defendant to Summary Judgment

In its motion, defendant argues that, even if "a declaratory judgment is an appropriate form of relief in this case, the [C]ontracts themselves establish that [Carlson] is not entitled to" a declaration "that the Army may transfer requirements . . . only upon implementation of a fully functional DTS CUI to electronically perform all official travel management services." Def.'s Mot. at 21 (quotation omitted). According to defendant, Carlson's argument that its Contracts permit such declaratory relief from the court, "misconstrues and/or ignores several provisions of the [C]ontracts" themselves. Def.'s Reply at 12. However, Carlson insists that "the language of the contract does not support the Government's interpretation, and, to the extent that there is any doubt in meaning, discovery from the . . . Contracting Officer and [about] the course of conduct under similar existing DoD travel service contracts would almost assuredly confirm Carlson's interpretation." Pl.'s Opp. at 31–32.

Interpretation of the clear and unambiguous language of a contract is a question of law that may be resolved by summary judgment. See Beta Sys., Inc. v. United States, 838 F.2d 1179, 1183 (Fed. Cir. 1988). When interpreting contractual language, the court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. Fortec Constructors v. United States, 760 F.2d 1288, 1292 (Fed. Cir. 1985). Generally, the plain language of a contract controls; however, language that is reasonably susceptible to more than one interpretation, where "each [interpretation] . . . is found to be consistent with the contract language," may be considered ambiguous. Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993). Although parties' differing interpretations of contract terms do not necessarily create an ambiguity, id., a contract will be considered ambiguous if "it sustains the interpretations advanced by both parties to a suit." Pacificorp Capital, Inc. v. United States, 25 Cl. Ct. 707, 716 (1992). "To the extent that the contract terms are ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution." Beta Sys., 838 F.2d at 1183 (citation omitted). However, if the ambiguity is "patent," consisting of "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap," Fort Myer Constr. Corp. v. United States, 42 Fed. Cl. 720, 729 (1999) (internal quotation and citation omitted), a summary judgment in favor of the government would be proper.

Both parties point to paragraphs 1.1.1.2, 1.6.7, and 1.6.8, and the exclusivity clauses (paragraphs 1.7.1 and 1.7.2) as the critical provisions governing this dispute. However, the parties' interpretations of those provisions differ widely. The court finds that both parties' interpretations of several provisions can be supported in the language of the Contracts and concludes that ambiguities in the Contracts preclude summary judgment at this time. Accordingly, defendant's motion is DENIED.

1. Whether the Options Clause is Ambiguous

As noted above, see Part I.A.2, supra, the parties differ concerning the degree to which the DTS CUI must be implemented to permit defendant not to exercise Carlson's next option under the Contracts. The options clause provides:

> 1.1.1.2. The Army/other DoD agencies may exercise options included within the contract. However, if during the life of the contract, the DoD implements the Defense Travel System (DTS) and is able to provide the Army/other DoD agencies with travel services under the new system, some or all options may not be exercised under the contract resulting from this solicitation.

Contract at 22, ¶ 1.1.1.2. Carlson insists that this provision "limits the government's ability to just not exercise the option."[11] Tr. at 33:19–20. According to Carlson, "[a]t the time Carlson's four contracts were awarded, all parties understood and agreed that the phrase[,] 'DoD implements the Defense Travel System (DTS)' meant [that] the implementation of a fully functional, end-to-end travel management system to perform all of DoD's travel services electronically" was the sole prerequisite justifying the non-exercise of an option. Pl.'s Opp. at 8. To support this interpretation, Carlson points to language in the current MEPS Solicitation, "where DTS is used throughout as a reference to the automated system." Id. at 35–36. Carlson also insists that a review of the GAO's

---

[11]According to Carlson,

> [T]hese six-month options were put in because now the government had to pay for the travel services and it created budgetary problems. So by having six-month options, the government only had to obligate six months [of funds] at a time. It was really a funding issue that caused them to break it to six months, but they were trying to assure people that we are going to exercise these options, unless very specific events occurred.

Tr. at 33:21–34:4.

Airtrak decision "and [the] testimony of Government officials during that GAO protest," which involved a predecessor to the MEPS Solicitation, "would confirm Carlson's interpretation of the term 'DTS,' as used in [¶] 1.1.1.2 of the DTR Contracts." Id. at 36; see also id., Tr. at 40:9–14 (suggestion by counsel that limited discovery and testimony from officials involved in both MEPS solicitations would clarify this provision).

Defendant argues that "the [C]ontracts do not contain any language supporting [Carlson's] interpretation [of paragraph 1.1.1.2]." Def.'s Mot. at 23. Defendant further contends that, even if Carlson's interpretation of paragraph 1.1.1.2 were correct,

> the clause itself does not restrict the Government's right to exercise options. On its face, the clause simply recognizes that the Army may choose not to exercise options in order to transition services. It then alerts [Carlson] to the possibility that some options will not be executed to allow a transfer of requirements. It does not only limit the right of the Army to exercise options where a DTS, with an operational CUI, has been implemented.

Id.

The court determines that neither party's interpretation of paragraph 1.1.1.2 is fully consistent with the language of that provision. Contrary to Carlson's contention, paragraph 1.1.1.2 does not state that the DTS CUI must be one-hundred percent operational to permit the government not to exercise an option. Further, Carlson's representation that MEPS travel services might never be achievable via the DTS CUI, see, e.g., Pl.'s Opp. at 8 & n.5, undercuts its argument that the non-exercise of an option could occur only following the implementation of a "fully functional, end-to-end travel management system to perform all of DoD's travel services electronically." Pl.'s Opp. at 8. If MEPS travel services cannot be provided via the DTS CUI, then Carlson's expansive interpretation of the phrase "implements the . . . DTS" in paragraph 1.1.1.2 renders the entire clause largely meaningless because there would exist no circumstances permitting defendant not to exercise an option.

Defendant's interpretation of paragraph 1.1.1.2 is no more persuasive than Carlson's. Defendant appears to ignore the clause's reference to the implementation of the DTS as a reason for not exercising an option. See Def.'s Mot. at 23 (stating that "the [C]ontracts do not contain any language" that supports Carlson's interpretation of paragraph 1.1.1.2). Contrary to defendant's view, the language of paragraph 1.1.1.2 does appear to limit to some degree the circumstances under which the government may decline to exercise an option. Defendant itself appears to concede that the Contracts do not contemplate the non-exercise of an option under circumstances unrelated to the DTS.

See Def.'s Reply at 3 (arguing that paragraph 1.1.1.2 "is clear upon its face that the Army 'may' exercise options and may choose not to exercise some options so that it could transfer some requirements in the event DTS was operational."). As the court noted at oral argument, see Tr. at 40:8–14, external evidence might very well be necessary to ascertain the meaning of this unclear provision. Because paragraph 1.1.1.2 is ambiguous, defendant's motion for summary judgment must be DENIED.

2. Whether the Transition of Work Provisions are Ambiguous

Even if paragraph 1.1.1.2 were clear on its face, the court would still be compelled to deny defendant's motion for summary judgment because paragraphs 1.6.7 and 1.6.8, the clauses addressing the circumstances permitting the deletion or transfer of work from Carlson's Contracts, are ambiguous. Paragraphs 1.6.7 and 1.6.8 provide:

> 1.6.7. At a future date, a DoD travel services contract(s) will be awarded replacing this contract and all other Service/Agency existing travel service contracts. Once the DoD travel services contract is awarded all DoD sites will transition in accordance with the implementation dates to the DoD travel services contract.
>
> 1.6.8. At any time after the base period of this contract, with a 90-day notice from the Contracting Officer to the Contractor, the Government may identify any/or all workload included in th[e] contract[s] to be deleted.

Contract at 24, ¶¶ 1.6.7–.8.

Defendant claims that each clause provides an independent basis for it to transfer MEPS travel services to another contractor at any time after the base period of Carlson's Contracts has expired. Quoting paragraph 1.6.7, defendant insists that "[t]he clause does not restrict the Army's right to delete or transfer travel service requirements. On the contrary, the clause declares the intention of the Government to transfer requirements when DoD travel services are awarded." Def.'s Mot. at 24. Notwithstanding the specific language in paragraph 1.6.7, which appears to contemplate that a new (presumably, the DTS CUI) contract would replace all DoD travel contracts simultaneously, see Tr. at 13:23–24 (similar observation by the court), defendant claims that a transition of work sites to another contractor can be triggered not only by a DoD-wide travel services contract, but also by the small-business set-aside for MEPS travel services at issue here. At oral argument, defendant explained its interpretation by noting that, at the time the contract was drafted,

> the government planned to do an open competition for all of the [travel services] work. It then realized that it needed to concern itself with small business . . . set[-] asides. So that part of the work, the small business [set-]aside, has already been the subject of a solicitation. The remainder of the work that Carlson is doing now, the non-MEPS sites, would be the subject of another competition.

Tr. at 17:11–18. Defendant does not show how this argument is supported by the text of the Contracts.

Disputing defendant's interpretation of paragraph 1.6.7, Carlson insists that the plain language of this provision requires "travel services contracts . . . replacing this contract and all other service agency existing travel contracts" to be implemented before any work sites may be deleted from the Contracts and transferred to another contractor. See Tr. at 41:16–21. Carlson explained at oral argument that the draft of a "worldwide DoD travel contract[]" presently is being contemplated. Id. at 42:24. This contract "would provide new travel managers for all of DoD and . . . [would] divide[] [DoD worldwide] into some unknown number of regions . . . [w]ith a single point at the top." Id. at 42:24–43:5. Carlson explains that "[paragraph] 1.6.7 is referring to . . . this blanket overall solicitation," rather than to the MEPS Solicitation, which impacts a small piece of overall DoD travel. Id. at 43:8–9; see also id. at 67:10–16 ("[Paragraph] 1.6.7 cannot be interpreted as applying to this MEPS case. 1.6.7 clearly is worldwide, all DoD travel services contract[s], not ten percent of Carlson's Contracts and in fact, the very fact that they have now issued a draft of such a worldwide contract also clearly establishes that 1.6.7 does not apply to the MEPS.").

Defendant further contends that, regardless of any lack of clarity in paragraph 1.6.7, paragraph 1.6.8

> is not limited in any way. Th[e] clause plainly allows the Army to transition travel service requirements to DTS PMO. It expressly says the Army may delete such requirements "at any time after the base period of this contract." . . . Accordingly, [paragraph] 1.6.8 explicitly allows the Government to delete any requirements from the CW travel contracts (including MEPS locations) without recourse to any other contractual provisions.

Def.'s Reply at 14. Defendant insists that paragraph 1.6.8, by itself, provides sufficient grounds justifying any future deletion of MEPS work from Carlson's Contracts. See Tr. at 59:17–60:10 (statement of defendant's counsel that, if Carlson's next option was

exercised, paragraph 1.6.8 would permit defendant to delete MEPS services from the Contracts and transfer those services to another contractor).

Carlson disputes defendant's argument that paragraph 1.6.8 permits the deletion and transfer of MEPS requirements at any time after the base period of the Contracts has expired. Noting that paragraph 1.6.8 immediately follows paragraph 1.6.7 in the Contracts, Carlson insists that the two clauses must be read together:

> 1.6.8 implements Section 1.6.7, which provides that, at some future time, new DoD travel services contracts will be issued "replacing this contract and all other Service/Agency existing travel contracts." . . . Sections 1.6.7 and 1.6.8 merely provide that, if all existing DoD travel service contracts, such as Carlson's DTR Contracts, are replaced by a global DoD travel service contract(s), the current contractors will be given 90 days notice before the workload is actually deleted. Section 1.6.8 does not independently authorize the deletion of the MEPS sites from the Carlson DTR Contracts in order to transfer the work to contracts awarded under [the MEPS Solicitation].

Pl.'s Opp. at 34–35. Cf. id. at 35 n.18 ("Section 1.6.7 is consistent with the Exclusivity Provisions in that it identifies the only situation that permits portions of Carlson's DTR Contracts to be deleted and transferred to other contractors.").

Carlson insists that paragraph 1.6.8 never has been interpreted as providing an independent basis for deleting work requirements from the Contracts:

> We sent four letters requesting our contracting officer's final decision . . . and our contracting officer, who is very familiar with these contracts, never advanced the theory that 1.6.8 was a stand alone provision, because if that was a stand alone provision, that would be the answer. They could just say, we can give you 90-day's notice under 1.6.8 and go away, but no one, other than government counsel in this case, has advanced that theory that 1.6.8 was a stand alone provision that should not be read in conjunction with 1.6.7.

Tr. at 38:16–39:1. Carlson claims that "no one else in the government who is very familiar with this and has focused extensively on these contracts [in prior GAO and judicial proceedings] has advanced the theory that 1.6.8 was a stand alone clause," id. at 39:13–18, and suggests that parol evidence and other documentation would confirm its interpretation, id. at 40:9–14. But see id. at 63:21–64:2 (statement of defendant's counsel

that "I don't think that [the interpretation of 1.6.8] has come up before [in a prior proceeding] . . . . I don't think anyone has ever had an interpretation of this clause . . . or maybe even discussed the clause.").

The court finds each party's interpretation of these provisions to be problematic as a possible basis for a decision on summary judgment. First, each party looks beyond the four corners of the Contract and relies on extrinsic evidence to support its interpretation. Compare Tr. at 17:11–18 (statement of counsel to defendant relying on extrinsic information to explain the scope of paragraph 1.6.7) with id. at 39:13–40:14 (statement of counsel to Carlson relying on extrinsic information to explain the scope of paragraph 1.6.8). Second, each party's interpretation "render[s] portions of the contract meaningless," contrary to the standard rule of contract interpretation. Fortec, 760 F.2d at 1292. As defendant noted, Carlson's interpretation that paragraph 1.6.7 permits a transition of work requirements only upon implementation of a DoD-wide travel services contract "can prevail only if [paragraph] 1.6.8 is entirely disregarded." Def.'s Reply at 14. The court also notes that Carlson's argument that paragraph 1.6.8 implements paragraph 1.6.7 would be more persuasive if paragraph 1.6.8 appeared as a subsidiary provision to paragraph 1.6.7 (i.e., 1.6.7.1 or 1.6.7a) rather than as a distinct provision. See Tr. at 44:14–15 (statement of the court). However, as Carlson noted, defendant's interpretation that paragraph 1.6.8 permits the government to delete and transfer work requirements at any time after the base period of the Contract expires renders the Contracts' exclusivity provisions meaningless. See Pl.'s Opp. at 34 ("The Government . . . asserts '[the exclusivity] clauses do not prevent the Army from deleting these requirements, and transferring them to another contractor.' Such an interpretation would totally negate the Exclusivity Clause of the contracts, if the Government, at any time, can simply remove requirements from Carlson's contracts for the purpose of transferring them to another contractor, there is no exclusivity whatsoever.").

As the court noted at oral argument, it is difficult to harmonize paragraphs 1.6.7 and 1.6.8 with one another and with the rest of the provisions of the Contracts, particularly with paragraph 1.1.1.2 and the exclusivity clauses. See Tr. at 37:17–20 (statement of the court that "I can read [1.6.7 and 1.6.8] together, but it sounds like one side wins if 1.6.7 is right and one side wins if 1.6.8 is right. Why isn't that an ambiguity?"); id. at 32:13–34:11 (statement of the court asking counsel to Carlson about "what might be regarded as a patent ambiguity between 1.7.2 and 1.6.8" and discussing the possibility that paragraphs 1.7.2 and 1.1.1.2 limit the government's right to delete work only in conjunction with the non-exercise of an option). Further, the court notes that, by relying on conflicting extrinsic evidence concerning the meaning of these provisions, "[t]he parties thus raised a question of material fact underlying the issue of contract interpretation. To the extent that the contract terms are ambiguous, requiring

weighing of external evidence, the matter is not amenable to summary resolution." Beta Sys., 838 F.2d at 1183 (citation omitted).

Because there appear to be ambiguities in the Contracts, the court concludes that further proceedings are necessary to clarify the meaning of the provisions discussed above, and perhaps other provisions. Accordingly, summary judgment is not appropriate at this juncture and defendant's motion must be DENIED as a matter of law.

## III. Conclusion

For the foregoing reasons, defendant's motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6), and its motion in the alternative for summary judgment, see RCFC 56, are DENIED. Defendant shall file its answer to the complaint on or before January 20, 2005, and the parties shall, on or before January 27, 2005, file a Joint Preliminary Status Report in accordance with RCFC Appendix A, ¶ 4.

IT IS SO ORDERED.

s/Emily C. Hewitt
EMILY C. HEWITT
Judge